# EXHIBIT B

EXECUTION COPY

LICENSE AGREEMENT

BETWEEN

PHILLIPS-VAN HEUSEN CORPORATION

AND

INTERNATIONAL HOME TEXTILES, INC.

IZOD

SHEETS, PILLOW CASES AND TOWELS (INCLUDING, WITHOUT LIMITATION, WASH CLOTHS, HAND TOWELS, BATH TOWELS, BATH SHEETS , BATH MATS AND BEACH TOWELS BUT EXCLUDING DISH TOWELS)

UNITED STATES OF AMERICA ITS TERRITORIES AND POSSESSIONS

JANUARY 1, 2006

# TABLE OF CONTENTS

Page

ARTICLE I. GRANT..........................................................................................................1
    1.1    License.............................................................................................................1
          1.1.1    Exclusion of E-Commerce Sales. ...............................................1
          1.1.2    Manufacturing; Right to Manufacture Outside of Territory; No
    Exporting. .......................................................................................................1
    1.2    Reservation .....................................................................................................2
          1.2.1    Retail Sales....................................................................................2
          1.2.2    License Strictly Limited ................................................................2
    1.3    Definitional Disputes ......................................................................................2
    1.4    Exploitation of the License ..............................................................................2
          1.4.1    Commercially Reasonable Efforts .................................................3
          1.4.2    Additional Licenses Prohibited. ....................................................3
          1.4.3    Limitation on Licensed Products. ..................................................3
          1.4.4    Merchandising Calendar. ...............................................................3
          1.4.5    Distribution Channels ....................................................................3
          1.4.6    Designer. ........................................................................................3
    1.5    Showrooms; Trade Shows ................................................................................3
          1.5.1    Showrooms ....................................................................................3
          1.5.2    In-Store Shops................................................................................4
          1.5.3    Tradeshows ....................................................................................4
ARTICLE II. LICENSE PERIOD .....................................................................................4
    2.1    Initial License Period ......................................................................................4
    2.2    Renewal License Period...................................................................................4
ARTICLE III. SALES .......................................................................................................5
    3.1    Sales/Marketing and Production Plans ............................................................5
    3.2    Minimum Sales Levels ....................................................................................5
ARTICLE IV. LICENSE FEES ..........................................................................................5
    4.1    Requirement of Royalties ................................................................................5
          4.1.1    Percentage Royalties......................................................................5
          4.1.2    Gross and Net Sales .......................................................................5
          4.1.3    Guaranteed Minimum Royalties.....................................................6
    4.2    Royalty Statements .........................................................................................6
    4.3    Books and Records .........................................................................................7
    4.4    Underpayments ...............................................................................................7
    4.5    Manner of Payment.........................................................................................7
    4.6    Interest on Late Payment ................................................................................7
    4.7    No Set-Off.......................................................................................................8
    4.8    Taxes ..............................................................................................................8
    4.9    Financial Statements .......................................................................................8
ARTICLE V. ADVERTISING ..........................................................................................8
    5.1    Advertising Obligation....................................................................................8
          5.1.1    Marketing Obligation.....................................................................8
    5.2    Advertising Support. .......................................................................................9

i

5.3    Use of Advertising and Promotional Materials. ........................................... 9
ARTICLE VI. QUALITY AND STANDARDS ................................................................. 9
6.1    Distinctiveness and Quality of the Trademark.......................................... 9
       6.1.1    Distinctiveness and Quality. ................................................... 9
       6.1.2    Form of Trademark. ............................................................. 10
6.1.3  Pricing. ................................................................................. 10
       6.2      Product Approval; Quality Control................................. 10
6.3    Manufacture of Licensed Products by Third Parties........................... 10
6.4    Non-Conforming Products ...................................................................... 11
6.5    Approvals ............................................................................................... 11
6.6    Marking, Labeling and Packaging ......................................................... 11
6.7    Inspection of Facilities .......................................................................... 12
6.8    Samples and Artwork.............................................................................. 12
6.9    PVH Designs. .......................................................................................... 12
6.10   Know-how. .............................................................................................. 13
6.11   Market Weeks ......................................................................................... 13
6.12   Meetings.................................................................................................. 13
6.13   Design Rights.......................................................................................... 13
6.14   Approved Accounts ................................................................................ 13
6.15   Disposal of Seconds and Close-Outs .................................................... 14
       6.15.1   Seconds ................................................................................ 14
       6.15.2   Close-Outs ........................................................................... 15
6.16   Non-Approved Sales............................................................................... 15
6.17   Standards of Conduct. ............................................................................ 15
       6.17.1   Standards. ............................................................................. 15
       6.17.2   Audit Requirement................................................................ 15
       6.17.3   Approval ............................................................................... 16
       6.17.4   Use of Facility...................................................................... 16
ARTICLE VII. THE TRADEMARK ............................................................................. 16
7.1    Rights to the Trademark.......................................................................... 16
       7.1.1    Ownership of Trademark ...................................................... 16
       7.1.2    No Adverse Actions .............................................................. 16
       7.1.3    Additional Registrations ...................................................... 17
       7.1.4    Survival ................................................................................. 17
7.2    Protecting the Trademark........................................................................ 17
7.3    Use of the Trademark.............................................................................. 17
       7.3.1    Compliance with Legal Requirements. ................................ 17
       7.3.2    Use with Other Name............................................................ 17
       7.3.3    Execution of Documents....................................................... 18
7.4    Ownership of Copyright .......................................................................... 18
7.5    Infringements, Counterfeits and Parallel Imports. ............................... 18
       7.5.1    Infringements........................................................................ 18
       7.5.2    Counterfeits and Parallel Imports. ...................................... 19
                7.5.2.1   PVH and Licensee to Cooperate ........................ 19
                7.5.2.2   Diversion ............................................................. 19
       7.5.3    Legal Proceedings. ............................................................... 19

ii

| | | |
|---|---|---|
| 7.6 | Trademark Security | 20 |
| | 7.6.1 Counterfeit Protection | 20 |
| | 7.6.2 Trademark Security Plan | 20 |
| 7.7 | Use of Trademark on Invoices, etc | 20 |
| 7.8 | Monitoring | 20 |
| ARTICLE VIII. | TERM AND TERMINATION | 20 |
| 8.1 | Expiration | 20 |
| 8.2 | Other Rights Unaffected | 20 |
| 8.3 | Immediate Right of Termination of the License | 21 |
| 8.4 | Termination With Notice and Right to Cure | 22 |
| 8.5 | Effect of Termination | 22 |
| | 8.5.1 Expiration or Full Termination | 22 |
| | 8.5.2 Partial Termination | 22 |
| 8.6 | Inventory Upon Termination | 23 |
| 8.7 | Freedom to License | 23 |
| 8.8 | Rights Personal | 24 |
| 8.9 | Trustee in Bankruptcy | 24 |
| 8.10 | Compensation | 24 |
| ARTICLE IX. | INDEMNIFICATION AND INSURANCE | 25 |
| 9.1 | Indemnification by Licensee | 25 |
| 9.2 | Notice of Suit or Claim | 26 |
| 9.3 | Indemnification by PVH | 26 |
| 9.4 | Insurance | 26 |
| | 9.4.1 Requirement | 26 |
| | 9.4.2 Theft and Destruction Coverage | 27 |
| | 9.4.3 General Provision | 27 |
| | 9.4.4 Approved Carrier/Policy Changes | 27 |
| | 9.4.5 Evidence of Coverage | 27 |
| | 9.4.6 Territory | 27 |
| ARTICLE X. | COMPLIANCE WITH LAWS | 27 |
| 10.1 | Compliance with Laws | 27 |
| 10.2 | Equitable Relief | 28 |
| ARTICLE XI. | MISCELLANEOUS | 28 |
| 11.1 | Warranties and Representations of the Parties | 28 |
| 11.2 | Definitions | 29 |
| 11.3 | Notices | 29 |
| 11.4 | No Assignment Without Consent | 30 |
| 11.5 | No Sublicense or Distribution Agreement Without Consent | 30 |
| 11.6 | Assignment by PVH | 30 |
| 11.7 | No Agency | 30 |
| 11.8 | Suspension of Obligations | 30 |
| 11.9 | Benefit | 30 |
| 11.10 | Entire Agreement; Amendment | 30 |
| 11.11 | Non-Waiver | 31 |
| 11.12 | Severability | 31 |
| 11.13 | Headings | 31 |

11.14  Counterparts ......................................................................................................... 31
11.15  Governing Law ..................................................................................................... 31
11.16  Jurisdiction ............................................................................................................ 31
11.17  Non-Solicitation .................................................................................................... 32
11.18  Confidentiality. ..................................................................................................... 32
11.19  Guaranties.. ........................................................................................................... 33
11.20  Construction .......................................................................................................... 33

## SCHEDULES

6.14    APPROVED ACCOUNTS
6.15    APPROVED SECONDS AND CLOSE-OUT ACCOUNTS

## EXHIBITS

EXHIBIT A    ROYALTY STATEMENT
EXHIBIT B    ADVERTISING EXPENDITURE FORM
EXHIBIT C    SAMPLE SUBMISSION FORM
EXHIBIT D    THIRD-PARTY MANUFACTURING AGREEMENT
EXHIBIT E    "A SHARED COMMITMENT –REQUIREMENTS FOR SUPPLIERS,
             CONTRACTORS, BUSINESS PARTNERS" and "STATEMENT OF
             CORPORATE RESPONSIBILITY"
EXHIBIT F    PRODUCTION FACILITY EVALUATION FORM

<u>LICENSE AGREEMENT</u>

LICENSE AGREEMENT, dated as of January 1, 2006, between PHILLIPS-VAN HEUSEN CORPORATION ("<u>PVH</u>"), a Delaware corporation, and INTERNATIONAL HOME TEXTILES, INC. (the "<u>Licensee</u>"), a Florida corporation, with offices located at 19401 West Dixie Highway, Miami, Florida 33180.

WITNESSETH:

WHEREAS, PVH is the owner in the United States of America, its possessions and territories (the "<u>Territory</u>") of the IZOD trademark and Licensee desires to obtain from PVH, and PVH is willing to grant to Licensee, a license to use the Trademark (as defined herein) in connection with the manufacture, sale, distribution and promotion of sheets, pillow cases and towels, including, without limitation, wash cloths, hand towels, bath towels, bath sheets, bath mats and beach towels but excluding dish towels (collectively, the "<u>Products</u>") in the Territory, subject to the terms contained in this Agreement. Products bearing the Trademark are hereinafter referred to as "<u>Licensed Products</u>." Capitalized terms referred to in Section 11.2 are defined in the Sections set forth therein.

NOW, THEREFORE, the parties hereto agree as follows:

## ARTICLE I. GRANT

1.1 <u>License</u>. PVH hereby grants to Licensee an exclusive license (the "<u>License</u>") during the License Period, without the right to sublicense or assign, and subject to and in accordance with all of the terms contained in this Agreement, to use the Trademark, solely in the forms approved by PVH, in connection with the sale, distribution and promotion of the Licensed Products, solely on a wholesale basis, to approved customers in the Territory. Licensee may authorize its Affiliates to distribute Licensed Products on a wholesale basis to approved customers in the Territory, subject to and accordance with the terms contained herein, provided Licensee shall remain responsible to PVH for the performance of all obligations hereunder, and, provided further that Licensee pay to PVH Percentage Royalties on such sales of Licensed Products in accordance with the terms of Section 4.1.1 hereof.

1.1.1 <u>Exclusion of E-Commerce Sales</u>. The License excludes the sale, distribution and promotion of Licensed Products via commerce conducted on, made available through or facilitated by interactive or electronic media, whether now known or hereafter developed, including, without limitation, the Internet and on-line service providers, regardless of the means through which it is conducted ("<u>E-Commerce</u>"), other than on a wholesale basis to approved customers in the Territory.

1.1.2 <u>Manufacturing; Right to Manufacture Outside of Territory; No Exporting</u>. Licensee shall have the non-exclusive right to manufacture Licensed Products in or outside of the Territory and the right to import into the Territory Licensed Products manufactured outside the Territory; provided, however, that the right to manufacture Licensed Products outside of the Territory and import such goods into the Territory is conditioned upon Licensee taking all reasonable precautions to prevent any and all labels, tags, packaging material,

business supplies and advertising and promotional materials and any and all other forms of identification bearing the Trademark (collectively, the "Labels") from being used otherwise than in connection with the distribution and sale of Licensed Products within the Territory. Licensee shall neither export Licensed Products from the Territory nor sell Licensed Products to any entity which it knows or has any reason to believe intends to export Licensed Products from the Territory.

      1.2    Reservation. PVH reserves all rights in and to the Trademark except as specifically granted herein including, without limitation, those rights set forth in this Section. PVH may exercise any of its rights, or authorize others to exercise such rights at any time.

      1.2.1   Retail Sales. PVH reserves the exclusive right to use the Trademark upon and/or in connection with the retail sale, distribution and promotion of Licensed Products, including, without limitation, in PVH's company-controlled retail stores and via E-Commerce in and outside of the Territory. PVH reserves the right in connection with such sale, distribution and promotion to manufacture or purchase Licensed Products from any supplier PVH chooses, including Licensee; provided, however that PVH shall purchase Licensed Products from the Licensee for such stores to the extent that PVH reasonably determines that the Licensee is competitive in cost, quality, service and availability with other suppliers. Licensee acknowledges and agrees that sales to PVH's company-controlled stores are subject to a corporate discount from the agreed upon wholesale price. Such discount is established by PVH from time to time and is currently 3% off of the invoice price. Nothing herein shall prohibit approved customers from selling Licensed Products purchased from Licensee in the customers' approved locations, subject to the terms hereof.

      1.2.2   License Strictly Limited. Nothing contained in this Agreement shall be construed as an assignment or grant to Licensee of any right, title or interest in or to the Trademark, it being understood and acknowledged by Licensee that all rights relating thereto are reserved by PVH except for the rights specifically granted to Licensee in this Agreement. Licensee understands and agrees that PVH, and its other licensees and sublicensees, may manufacture or authorize third parties to manufacture Licensed Products in the Territory for sale outside of the Territory, or to manufacture and sell or authorize third parties to manufacture and sell products of any and all types and descriptions other than the Products under the Trademark in or outside the Territory. In addition, no license is granted hereunder for the manufacture, sale or distribution of the Licensed Products to be used for publicity purposes (other than publicity of the Licensed Products), in combination sales or as premiums or giveaways, or to be disposed of under or in connection with similar methods of merchandising, such rights being specifically reserved for PVH.

      1.3    Definitional Disputes. Licensee acknowledges that due to the nature of the marketplace, the definition of Products may change or may not be amenable to precise delineation. Licensee agrees that if there is a dispute over the definition of Licensed Products, PVH shall render a reasonable written determination which shall be conclusive and binding on Licensee without legal recourse.

      1.4    Exploitation of the License.

1.4.1    <u>Commercially Reasonable Efforts</u>.  At all times during the License Period, Licensee shall use commercially reasonable efforts to exploit the License throughout the Territory, including, but not limited to, selling a sufficiently representative quantity of all styles, fabrications, colors and sizes of the Licensed Products; offering for sale the Licensed Products so that they may be sold to consumers on a timely basis; maintaining a sales force sufficient to provide effective distribution throughout all areas of the Territory; and cooperating with marketing, merchandising, sales and anti-counterfeiting programs of PVH and any of its licensees.

1.4.2    <u>Additional Licenses Prohibited</u>.  Licensee shall not enter into or obtain from any third party any license that would directly or indirectly compete with the Licensed Products without the prior written consent of PVH; <u>provided</u>, <u>however</u>, this provision shall not apply to any existing licenses owned by Licensee on or prior to the date hereof, or any renewals thereof, or any license hereafter entered into with Martha Stewart, Pillowtex, Cannon or Fieldcrest for any of their respective brands.

1.4.3    <u>Limitation on Licensed Products</u>.  To the extent that Licensee, in PVH's reasonable opinion, is unable to sell a commercially reasonable quantity of a category of Products (e.g. sheets, beach towels, etc.), PVH shall give Licensee written notice thereof. Licensee shall submit to PVH a marketing plan with respect to such category of Licensed Products setting forth in reasonable detail steps to be taken by Licensee to increase the sales thereof within 30 days of its receipt of such notice.  In the event that Licensee's sales of such category of Products continue to be commercially unreasonable in PVH's reasonable opinion for the 12-month period following the receipt of PVH's initial written notice, PVH shall have the right, upon 30 days' written notice to Licensee, to terminate the License with respect to such category of Product.  Thereupon, the provisions of Section 8.5.2 shall control the disposition of Inventory of such category of Product.

1.4.4    <u>Merchandising Calendar</u>.  Licensee shall, as promptly as shall be practicable, provide PVH with a merchandising calendar for each product category and, after consultation with PVH, a detailed timeline for each product category launch.

1.4.5    <u>Distribution Channels</u>.  Licensee agrees that its sales of Licensed Products will be appropriately distributed among the various channels of distribution.

1.4.6    <u>Designer</u>.  Licensee shall appoint and maintain at all times during the License Period, a designer as a full-time employee of Licensee dedicated exclusively to the design of the Licensed Products.  At all times, Licensee must maintain sufficient staffing to support the business properly and to endeavor to maximize sales of Licensed Products.

1.5    <u>Showrooms; Trade Shows</u>.

1.5.1    <u>Showrooms</u>.  Licensee shall display the Licensed Products for sale in a separate showroom at its Miami headquarters and such other showrooms as PVH shall from time to time approve.  All such showrooms shall be designed in conformity with the prestige associated with PVH and the Trademark, and the plans therefore shall be subject to the prior written approval of PVH, which approval shall not be unreasonably withheld or delayed.  The

3

maintenance and renovation of such showrooms shall be subject to the ongoing direction and approval of PVH, which approval shall not be unreasonably withheld or delayed. Subject to prior written approval by PVH, Licensee may display the Trademark on showroom doors and office directories. Immediately upon execution of this Agreement, Licensee shall send photographs of its current IZOD showroom to PVH for PVH's approval.

       1.5.2   <u>In-Store Shops</u>.   Licensee will, at PVH's request, participate in any in-store shop or main floor fixturing programs with any Approved Accounts. All such programs shall be designed in conformity with the prestige associated with PVH and the Trademark, and the plans therefor shall be subject to the prior written approval of PVH. To the extent that the same is not paid for by Licensee's customers, Licensee shall pay for the necessary fixturing for the display of the Licensed Products.

       1.5.3   <u>Tradeshows</u>.   Licensee shall display the Licensed Products all tradeshows attended by Licensee at which Products are promoted for sale in the Territory, at Licensee's sole cost and expense. PVH may require Licensee to participate in PVH's booth at the MAGIC Convention at a cost to Licensee equal to a pro rata portion of the total costs of PVH's participation at the MAGIC Convention, allocated equally among all of PVH's other licensees participating in PVH's booth for the Trademark.

## ARTICLE II.  LICENSE PERIOD

       2.1   <u>Initial License Period</u>.   The initial license period shall commence on January 1, 2006 and shall end on December 31, 2008 (the "<u>Initial License Period</u>"), unless sooner terminated as herein provided.

       2.2   <u>Renewal License Period</u>.   Licensee shall have the right, provided that Licensee is not then in default of any of the provisions of this Agreement, including, without limitation, the provisions of Section 3.2, to request an extension of the License for an additional license period (the "Renewal License Period"; the Initial License Period and any Renewal License Period together are referred to as the "<u>License Period</u>"). Said right to request an extension shall be exercised by written notice by Licensee to PVH, received by PVH not more than nine months nor less than six months prior to the expiration of the Initial License Period. Any extension of this License shall be for a duration and on terms (including appropriate revisions of Sections 3.2 and 4.1.3) mutually acceptable to PVH and Licensee, in their sole and absolute discretion. Licensee acknowledges that the six to nine-month period is necessary in order to maintain the continuity of PVH's licensing and marketing programs and to protect the goodwill associated with the Trademark. Licensee agrees that "time is of the essence" and that Licensee's failure to exercise timely its option to request an extension of the License or to reach agreement with PVH on terms, shall be construed as a decision by Licensee that it has elected not to extend the License and shall permit PVH immediately to replace Licensee by executing a new license agreement with a third party, to commence after the Initial License Period has ended, without any liability to Licensee.

4

## ARTICLE III. SALES

3.1     Sales/Marketing and Production Plans. Not later than the execution hereof with respect to the 2006 calendar year and not later than 60 days prior to the beginning of each subsequent calendar year during the License Period, Licensee shall submit to PVH a written marketing plan, forecast and pro forma business plan (a "Licensing Forecast"), which shall contain a reasonable, good faith estimate of Net Sales for such Annual Period. The term "Annual Period" refers to each calendar year during the License Period.

3.2     Minimum Sales Levels. During each Annual Period, Licensee shall be required to meet the following minimum Net Sales levels, not including sales to PVH or sales in breach of any provision hereof, including, but not limited to, sales of Non-Conforming Products, Close-Outs or Seconds in excess of the amounts permissible under this Agreement (the "Minimum Sales"):

| Annual Period | Minimum Sales |
|---|---|
| 01/01/06-12/31/06 | $8,000,000 |
| 01/01/07-12/31/07 | $11,000,000 |
| 01/01/08-12/31/08 | $13,000,000 |

## ARTICLE IV. LICENSE FEES

4.1     Requirement of Royalties. All Licensed Products sold by Licensee or its Affiliates require the payment of royalties by Licensee to PVH as set forth in this Article IV. "Affiliates" of any party means all persons and business entities, whether corporations, partnerships, joint ventures or otherwise, which now or hereafter control, or are owned or controlled, directly or indirectly, by such party, or are under common control with such party.

4.1.1     Percentage Royalties. In respect of each Annual Period or portion thereof during the License Period, Licensee shall pay PVH percentage royalties (the "Percentage Royalties") in the amount of 5.0% of all Net Sales other than (i) sales to PVH which shall be in the amount of 3.0% of Net Sales and (ii) as set forth in Section 6.16 herein. Percentage Royalties shall be payable in quarterly installments not later than April 30, July 31, October 31 and January 31 during the License Period commencing April 30, 2006; provided that the last payment of Percentage Royalties during the Initial License Period shall be payable on January 31, 2009. All royalties shall accrue upon the sale of the Licensed Products regardless of the time of collection of the proceeds from such sale by Licensee or the failure to collect such proceeds. For purposes of this Agreement, a Licensed Product shall be considered "sold" upon the date of billing, invoicing, shipping or payment, whichever occurs first.

4.1.2     Gross and Net Sales. "Gross Sales" means the invoiced amount of Licensed Products, including, but not limited to, Seconds and Close-Outs, sold by Licensee, or on a wholesale basis by Licensee's Affiliates, before any deductions for returns, allowances, discounts, insurance or freight. "Net Sales" means the Gross Sales of Licensed Products less returns actually allowed and actually received by Licensee, price allowances and customary and usual trade discounts granted. The combined deductions from the Gross Sales for returns,

5

allowances and trade discounts shall not exceed 8% of the Gross Sales of the Licensed Products in any Annual Period. No other deductions shall be taken. It is the intention of the parties that Percentage Royalties will be based on the bona fide wholesale prices at which Licensee sells Licensed Products to independent retailers in arms' length transactions. In the event Licensee shall sell Licensed Products to its Affiliates for retail sales direct to consumers, Gross Sales, Net Sales and Percentage Royalties shall be calculated on the basis of such a bona fide wholesale price irrespective of Licensee's internal accounting treatment of such sales.

     4.1.3   <u>Guaranteed Minimum Royalties</u>. In respect of each Annual Period or portion thereof during the License Period, Licensee shall pay to PVH the minimum royalties listed below, excluding (i) royalties paid on sales to PVH; (ii) royalties paid on sales in breach of any provision hereof, including, without limitation, royalties paid pursuant to Section 6.16 hereof; and (iii) royalties paid on sales of Non-Conforming Products, Seconds and Close-Outs (the "<u>Guaranteed Minimum Royalties</u>"), in four equal installments no later than April 30, July 31 and October 31, and January 31 for the immediately preceding calendar quarter commencing April 30, 2006 and ending on January 31, 2009; <u>provided</u>, <u>however</u>, that (x) the installment of the Guaranteed Minimum Royalties for any calendar quarter shall be payable only to the extent of the <u>excess</u>, if any, <u>of</u> such installment <u>over</u> the Percentage Royalties under Section 4.1.1 for such calendar quarter and (y) if the actual payments under Section 4.1.1 and this Section 4.1.3 for all prior calendar quarters in respect of such Annual Period, exceed the Guaranteed Minimum Royalties payable for such Annual Period, no further Guaranteed Minimum Royalties shall be payable in respect of such Annual Period.

| Annual Period | Guaranteed Minimum Royalties |
|---|---|
| 01/01/06-12/31/06 | $400,000 |
| 01/01/07-12/31/07 | $550,000 |
| 01/01/08-12/31/08 | $650,000 |

     4.2   <u>Royalty Statements</u>. At the time each payment of Guaranteed Minimum Royalties and Percentage Royalties is due, Licensee shall deliver to PVH a royalty statement, substantially in the form of <u>Exhibit A</u>, signed by the chief financial officer of Licensee and certified by such officer as complete and accurate, setting forth for each month during the immediately preceding calendar quarter, and for such calendar quarter in the aggregate, and, in the case of the statement for each calendar quarter ending December 31, for each Annual Period in the aggregate, all of the following information: (i) Gross Sales by product category; (ii) the amount of returns, allowance and discounts from Gross Sales which properly may be deducted therefrom in calculating Net Sales; (iii) Net Sales by product category; (iv) a computation of the amount of Percentage Royalties by the number of units in each product category by size of the Licensed Products; (v) Net Sales by account, including separately Net Sales to PVH, Net Sales of Seconds, total units of Seconds sold, Net Sales of Close-Outs and total units of Close-Outs sold; and (vi) all of Licensee's inventory of Licensed Products and of related work in process (collectively, the "<u>Inventory</u>"). Licensee shall identify separately in such statements all sales to Affiliates. Within 90 days after the end of each Annual Period, Licensee will also deliver to PVH a certification from its independent auditors that the royalty statement for the calendar quarter ending December 31 is in accordance with the requirements of this Section 4.2. Receipt or acceptance by PVH of any statement furnished, or of any sums paid by Licensee, shall not

preclude PVH from questioning their correctness at any time; provided, however, that reports submitted by Licensee shall be binding and conclusive on Licensee.

4.3    Books and Records.  Licensee shall, at its sole cost and expense, maintain complete and accurate books and records (specifically including, without limitation, the originals or copies of documents supporting entries in the books of account) covering all transactions arising out of or relating to this Agreement.  Such books and records shall be maintained in accordance with generally accepted accounting principles.  PVH and its duly authorized representatives shall have the right once with respect to each Annual Period, during normal business hours, during the License Period and for three years thereafter, to examine and copy said books and records and all other documents and materials in the possession of or under the control of Licensee with respect to all transactions arising out of or relating to this Agreement. The exercise by PVH of any right to audit at any time or times or the acceptance by PVH of any statement or payment shall be without prejudice to any of PVH's rights or remedies and shall not bar PVH from thereafter disputing the accuracy of any payment or statement, and Licensee shall remain fully liable for any balance due under this Agreement. The Licensed Products shall be assigned style numbers unique from any other Products Licensee may manufacture or sell. The style number assigned to each Licensed Product shall be identical to the style number utilized to identify that Licensed Product in all Licensee's books and records. All documents evidencing the sale of Licensed Products shall state the style number of each of such Products. The Licensee shall not use terms such as "assorted" or "irregular" without a style specification with respect to the Licensed Products.

4.4    Underpayments.  If, upon any examination of Licensee's books and records pursuant to Section 4.3, PVH shall discover any royalty underpayment by Licensee, Licensee will make all payments required to be made to correct and eliminate such underpayment within 10 days of PVH's demand.  In addition, if said examination reveals a royalty underpayment of 3% or more for any royalty period, Licensee will reimburse PVH for the cost of said examination within 10 days of PVH's demand.

4.5    Manner of Payment.  All payments required by Licensee hereunder shall be made to PVH in U.S. Dollars at the following address:

> Phillips-Van Heusen Corporation
> 1001 Frontier Road
> Bridgewater, New Jersey 08807
> Attention: Finance Department
> Telephone: (908) 698-6640
> Facsimile: (908) 704-3412

All references in this Agreement to dollars shall mean U.S. Dollars.  In the event that Licensee is required to withhold certain amounts for payment to the appropriate governmental authorities, Licensee will supply to PVH the official receipts evidencing payment therefor.

4.6    Interest on Late Payment.  In addition to any other remedy available to PVH, if any payment due under this Agreement is delayed for any reason, including, without limitation, as a result of any royalty underpayment, interest shall accrue and be payable, to the

7

extent legally enforceable, on such unpaid principal amounts from and after the date on which the same became due at the lower of 1½% per month and the highest rate permitted by law in New York.

4.7    No Set-Off.  The obligation of Licensee to pay royalties hereunder shall be absolute, notwithstanding any claim which Licensee may assert against PVH.  Licensee shall not have the right to set-off, compensate or make any deduction from such royalty payments for any reason whatsoever.

4.8    Taxes.  Licensee will bear all taxes, duties and other governmental charges in the Territory relating to or arising under this Agreement, including, without limitation, any state or federal income taxes (except taxes on PVH's income), any stamp or documentary taxes or duties, turnover, sales or use taxes, value added taxes, excise taxes, customs or exchange control duties or any other charges relating to or on any royalty payable by Licensee to PVH. Licensee shall obtain, at its own cost and expense, all licenses, Federal Reserve Bank, commercial bank or other bank approvals, and any other documentation necessary for the importation of materials and Products and the transmission of royalties and all other payments relevant to Licensee's performance under this Agreement.  If any tax or withholding is imposed on royalties, Licensee shall obtain certified proof of the tax payment or withholding and immediately transmit it to PVH.

4.9    Financial Statements.  Once during each Annual Period, upon at least 60 days' written notice to Licensee, Licensee shall deliver to PVH an interim financial statement certified to by Licensee's chief financial officer.  Within 120 days after the end of each fiscal year of Licensee, Licensee shall deliver to PVH an annual financial statement certified to by Licensee's independent, certified public accountant.

## ARTICLE V.  ADVERTISING

5.1    ~~Advertising Obligation.  In each Annual Period, Licensee shall pay to~~ PVH an amount equal to the greater or (i) 2.0% of Net Sales for the immediately prior Annual Period and (ii) 2.0% of the Minimum Sales for the immediately prior Annual Period as specified in Section 3.2 hereof (the "Advertising Obligation") in four equal payments to be made at the time each payment of Guaranteed Minimum Royalties and Percentage Royalties is due; provided, however, that the Advertising Obligation for the first Annual Period shall be equal to 2.0% of Net Sales for the calendar year immediately preceding the first Annual Period, which sales were made pursuant to the prior license agreement between the parties.  The Advertising Obligation shall be used by PVH, in its sole and absolute discretion, for advertising and promoting the Trademark.  PVH, in its sole and absolute discretion, shall determine how to advertise and promote the Trademark, including, without limitation, the amount, type, media and method of such advertising and promotion.

5.1.1    Marketing Obligation.  In each Annual Period, Licensee shall spend an amount equal to at least the greater of (i) 3.0% of Net Sales for the immediately prior Annual Period and (ii) 3.0% of the Minimum Sales for the immediately prior Annual Period as specified in Section 3.2 hereof (the "Marketing Obligation") for trade shows, cooperative

advertising, materials, catalogues, point of sale promotions, in-store fixturing, visual marketing programs, special events and signage; provided, however, that the Marketing Obligation for the first Annual Period shall be equal to 3.0% of Net Sales for the calendar year immediately preceding the first Annual Period which sales were made pursuant to the prior license agreement between the parties. If in any Annual Period the Marketing Obligation has not been satisfied, then the Licensee shall spend such amount for the designated expenses within the first 90 days of the subsequent Annual Period. If the Marketing Obligation has not been satisfied by the end of such 90-day period, then the amount which should have been expended and which was not expended shall be paid over to PVH to be used by PVH for advertising the Trademark; provided, however, that if the Marketing Obligation has not been fulfilled within 90 days after the termination of the License Period, the unexpended Marketing Obligation shall be paid over to PVH absolutely. Proof of expenditure shall be submitted each quarter using the Marketing Expenditure Form, attached hereto as Exhibit B.

      5.2    Advertising Support. If Licensee requests advertising support including, without limitation, the acquisition of rights to use images of models in jurisdictions within the Territory where rights have not been obtained or for uses for which authorization has not been granted, the Licensee shall pay over to PVH the incremental costs associated with such advertising support. At PVH's request, Licensee shall provide Licensed Products at Licensee's sole expense for use in PVH's photo shoots related to advertising for the Trademark.

      5.3    Use of Advertising and Promotional Materials. Licensee shall only use graphics and images supplied by or approved by PVH. It is understood and agreed that all costs involved with using the images in the Territory, including production costs, for advertising and marketing materials supplied by PVH to Licensee shall be the responsibility of Licensee. The use and release of any and all promotional material (printed or otherwise) relating to the Licensed Products or Licensee's activities pursuant to this Agreement in the nature of press releases, interviews or other similar public relations events, and any other corporate release, data or information which will or is likely to become public will be prepared or conducted in consultation with, and subject to the prior approval of, PVH's public relations and legal departments, it being acknowledged and agreed by Licensee that any such public event or release could affect the image and prestige of PVH and the Trademark. After any such approval, Licensee will not modify the approved material or activity in any respect unless such modification is specifically approved by PVH's public relations and legal departments.

## ARTICLE VI.  QUALITY AND STANDARDS

      6.1    Distinctiveness and Quality of the Trademark.

      6.1.1    Distinctiveness and Quality. Licensee shall maintain the distinctiveness of the Trademark and the image and high quality of the goods and merchandise bearing the Trademark presently manufactured and sold by PVH and its other licensees, and the prestigious marketing of same as presently maintained by PVH and its other licensees. Licensee agrees that all Licensed Products manufactured or sold by it will be of high quality as to workmanship, fit, design and materials, and shall be at least equal in quality, workmanship, fit, design and material to the samples of Licensed Products submitted by Licensee and approved by

PVH pursuant to Section 6.2. All manufacturing and production shall be of a quality in keeping with the prestige of PVH and the Trademark.

      6.1.2   <u>Form of Trademark</u>.  Licensee agrees that it will only use the Trademark in the form thereof then approved by PVH, and that all Licensed Products shall bear the Trademark in such approved form.  PVH shall give Licensee reasonable prior notice of any change in the form of the Trademark and shall permit Licensee to use a superseded form of the Trademark for up to six months in order to enable Licensee to sell inventory, complete and sell work-in-process, and to deplete inventories of labels, tags, packaging, and other materials bearing the Trademark.  In the event PVH elects to change the form of the Trademark, Licensee's obligations in respect to the image and high quality of the goods and merchandise bearing the Trademark, and the prestigious marketing of same as required by this Section 6.1, shall be consistent with the actions of PVH and its other licensees in respect to Licensed Products bearing such new form of the Trademark.

      6.1.3   <u>Pricing</u>.  Licensee acknowledges that in order to preserve the goodwill attached to the Trademark, the Licensed Products should be sold at prices and terms reflecting the prestigious nature of the Trademark, and the reputation of the Trademark as appearing on goods of high quality and reasonable price, it being understood, however, that PVH is not empowered to fix or regulate the prices for which the Licensed Products are to be sold, either at the wholesale or retail level.

      6.2   <u>Product Approval; Quality Control</u>.    Before producing, selling or distributing any Licensed Product, Licensee shall submit for PVH's review, revision and approval samples of each of the Licensed Products.  Any such request for approval shall be submitted to PVH on the form annexed hereto as <u>Exhibit C</u>.  Such samples shall be submitted sufficiently far in advance to permit Licensee time to make such changes as PVH deems necessary.  Any approval given hereunder shall be limited to the time period during the Annual Period set forth in such request, or as otherwise modified in PVH's discretion.  Once samples have been approved, Licensee will manufacture only in accordance with such approved samples and will not make any changes without PVH's prior written approval.  Upon PVH's request, Licensee shall submit to PVH additional samples of Licensed Products.  No Licensed Products (including samples) shall be distributed and/or sold by Licensee unless such Licensed Products are in substantial conformity with, and at least equal in quality to, the samples previously approved by PVH in accordance with this Section 6.2.  Upon request by PVH, Licensee shall supply PVH with a reasonable quantity of production samples in order for PVH to assess the conformity of production with the approval samples.  All samples of Licensed Products submitted to PVH pursuant to this Section 6.2 shall be provided at Licensee's sole cost and expense.

      6.3   <u>Manufacture of Licensed Products by Third Parties</u>.  All contractors wherever located which Licensee desires to use in connection with the manufacture of Licensed Products are subject to the prior written approval of PVH.  In order to maintain PVH's high standard of quality control and to insure that appropriate measures are taken against counterfeiting, Licensee shall provide PVH with the following information: (i) name and address of each proposed manufacturer; (ii) type of Licensed Products to be manufactured; (iii)

quantity of Licensed Products to be manufactured; and (iv) any other relevant information. Licensee shall obtain the signature of an authorized representative from each approved third-party manufacturer used by Licensee on an agreement (a "Third-Party Manufacturing Agreement"), substantially in the form of Exhibit D. Licensee shall not knowingly enter into a Third-Party Manufacturing Agreement with any third party that has breached a similar agreement with PVH or its Affiliates or any licensee of PVH or its Affiliates. Licensee acknowledges that it shall remain primarily liable and completely obligated under all of the provisions of this Agreement in respect of such contracting or assembly arrangements.

      6.4   <u>Non-Conforming Products</u>. In the event that any Licensed Products are, in the judgment of PVH, not being manufactured, distributed or sold with first quality workmanship or in strict adherence to all details and characteristics furnished by PVH, PVH shall notify Licensee thereof in writing, and Licensee shall promptly change such Licensed Product to conform thereto. If Licensed Products as changed do not strictly conform after PVH's request and such strict conformity cannot be obtained after one resubmission, such Licensed Products (the "<u>Non-Conforming Products</u>") shall be disposed of in a way which shall not reduce the value of the Trademark or detract from its reputation. Licensee shall obtain the express prior written consent of PVH with respect to the terms, conditions and method of their disposal, which may include, without limitation, the destruction of the Non-Conforming Products, the donation of such Non-Conforming Products to eleemosynary institutions, the sale of such Non-Conforming Products in a private sale, with proceed to be given to charity, or the removal of Labels and other identification prior to sale. PVH may require Licensee to recall any Licensed Products that not consistent with approved quality standards or may purchase at Licensee's expense any such Licensed Products found in the marketplace. Licensee must pay royalties on sales of Non-Conforming Products.

      6.5   <u>Approvals</u>. All approvals by PVH required under this Agreement must be obtained in advance of use of the item subject to approval, which approval must be in writing from PVH to Licensee. Except as otherwise expressly provided hereunder, a submission for approval shall be deemed approved unless PVH delivers a notice of disapproval within 30 days after receipt of a written request for approval. All matters requiring approval of PVH shall be granted or withheld in the sole and absolute discretion of PVH and may be based solely on PVH's subjective aesthetic standards. PVH shall provide an explanation for disapprovals, unless such disapproval reflects an issue of taste or subjective judgment. PVH has no obligation to approve, review or consider any item which does not strictly comply with the required submission procedures. Approval by PVH shall not be construed as a determination that the approved matter complies with all applicable regulations and laws. No disapproved item shall be manufactured, sold, used, distributed or advertised by Licensee under the Trademark. Licensee may revise any disapproved item and resubmit it. Licensee must strictly comply with all of PVH's decisions. PVH may amend the approval forms as appropriate. In the event that it is reasonably necessary for PVH to do on-site approvals, Licensee will pay any and all expenses and airfare incurred by PVH with respect to such on-site approvals.

      6.6   <u>Marking, Labeling and Packaging</u>. All Labels must be approved by PVH. The use of any Label that has not been approved is expressly prohibited. PVH reserves the right to require Licensee to purchase Labels to be used on the Licensed Products only from sources designated by PVH, provided that such sources provide the Labels to Licensee in a reasonably

competitive manner as to price and delivery schedules. All Licensed Products manufactured, distributed or sold by, or on behalf of, Licensee shall be marked, labeled, packaged, advertised, distributed and sold in accordance with this Agreement, in accordance with all applicable laws, rules and regulations in the Territory, and in such a manner as will not tend to mislead or deceive the public. At the request of PVH, Licensee shall cause to be placed on all Licensed Products an appropriate notice designating PVH as the owner of the Trademark. The manner of presentation of such notice shall be determined by PVH.

6.7     Inspection of Facilities.  PVH and its duly authorized representatives shall have the right, during normal business hours and upon reasonable notice, to inspect all facilities utilized by Licensee (and its contractors and suppliers to the extent Licensee may do so) in connection with the manufacture, sale, storage or distribution of Licensed Products, and to examine the Licensed Products in the process of manufacture and when offered for sale within Licensee's and its contractors' operation.

6.8     Samples and Artwork.  PVH shall make available to Licensee certain samples, sketches, designs, colors, fabric samples, tags, labels, packaging, catalogues and artwork available to PVH, and, except as provided in Section 5.3 hereof, the cost of providing such materials shall be borne by Licensee at PVH's cost, for the development of Products and Labels.  All right, title and interest, including any copyrights or other intellectual property rights, in and to samples, sketches, designs, and other materials furnished to Licensee by PVH or submitted by Licensee to PVH in connection with the Licensed Products, including any modifications or improvements thereof which may be created by PVH, but excluding Excluded Designs (collectively the "Artwork Designs"), shall remain the sole property of PVH as between Licensee and PVH, and are licensed hereunder solely and exclusively for use in connection with the manufacture, sale, distribution and promotion of Licensed Products in the Territory in accordance with the terms of this Agreement. "Excluded Design" means a design (i) submitted by Licensee and not approved by PVH; (ii) not distinguishable from similar generic products generally available in the marketplace; or (iii) not distinguishable from a product which has previously appeared in Licensee's product line and Licensee advised PVH of such condition at the time of submission. In the event of clause (i) or (iii) above, Licensee shall retain title to such designs but shall permit PVH to use such designs in perpetuity.  PVH may use and permit others to use said designs and other materials in any manner it desires, provided that such use does not conflict with any rights granted Licensee hereunder.  Licensee specifically acknowledges that such designs and other materials may be used by PVH and other licensees on Licensed Products in jurisdictions outside the Territory, on products other than Licensed Products anywhere in the world, and on all products including Licensed Products anywhere in the world after the expiration or termination of this Agreement.

6.9     PVH Designs.  PVH may provide Licensee with creative concepts and fashion direction as to each seasonal collection of Licensed Products, including recommendations as to color, material, design and styling of such Products and such additional design assistance as PVH determines in its sole discretion.  For each such collection , Licensee shall utilize substantially all of the designs, fabrics, trim submitted or approved by PVH and shall produce on a timely basis pre-production prototypes for PVH's review and approval.

12

6.10    Know-how.  Licensee shall have the right to cause its personnel to visit PVH's offices, factories, showrooms and other places of business, and also to attend PVH's sales meetings, in order to obtain additional know-how and assistance, all as PVH deems appropriate. The scheduling of such visits shall be at times mutually convenient to the parties hereto.  In connection with such visits, Licensee shall bear all expenses of Licensee's representatives.

6.11    Market Weeks.  In the event PVH desires to market the Licensed Products in conjunction with its goods or the merchandise of other licensees bearing the Trademark, Licensee shall, upon receipt of reasonable notice from PVH, have sales personnel present at PVH's showroom in New York during each major market week during the License Period, and Licensee shall be permitted to utilize such showrooms to market and sell the Licensed Products during such market week.

6.12    Meetings.  PVH may from time to time hold meetings of PVH's licensees during the License Period.  Licensee shall, upon receipt of reasonable notice, attend such meetings at its own expense but shall not be required to attend more than two such meetings per year.

6.13    Design Rights.  Al designs created hereunder by or on behalf of Licensee shall be original works.  Licensee acknowledges and agrees that PVH owns or shall own all rights in and to the Artwork Designs regardless of whether such designs are created by PVH or by or on behalf of Licensee, except Excluded Designs.  Licensee agrees to make, procure and execute all assignments necessary to vest ownership of such rights in PVH.  Licensee shall place appropriate notices, reflecting ownership of such rights by PVH, on all Licensed Products, Labels and other promotional materials.  Licensee shall not do or allow to be done anything which may adversely affect any of PVH's rights in the Artwork Designs.  All designs used by Licensee for the Licensed Products shall be used exclusively for the Licensed Products and may not be used under any other mark, whether during the License Period or any time thereafter, without the prior written consent of PVH.  Licensee shall disclose and freely make available to PVH any and all developments or improvements it may make relating to the Licensed Products and to their manufacture, promotion and sales, including, without limitation, developments and improvements in any machine, process or product design, that may be disclosed or suggested by PVH or regarding any patent or trademark which Licensee is entitled to utilize.

6.14    Approved Accounts.  Subject to Section 6.15, the Licensed Products sold by Licensee may be sold only to those specialty shops, department store and retail outlets (i) which carry high quality and prestige merchandise; (ii) whose location, merchandising and overall operations are consistent with PVH's reputation and sales policies and with the prestige of PVH and the Trademark;  and (iii) which have been expressly approved by PVH, including, without limitation, the customers listed on Schedule 6.14.  No warehouse club, mass merchandiser, value retailer or account or store of comparable characterization is or will be an Approved Account.  Whenever Licensee shall wish to sell Licensed Products to customers not previously approved by PVH, Licensee shall submit to PVH for its approval, a written list of proposed customers, together with such other information as PVH may reasonably request, such as photographs, address and information regarding the Products and other merchandise sold by such proposed customer.  The proposed customers approved by PVH, together with the customers listed on Schedule 6.14, are referred to as the "Approved Accounts."

13

Notwithstanding PVH's approval of any customer, including customers listed on Schedule 6.14, PVH may at any time subject such sales to such customer to any conditions or limitations PVH considers appropriate; provided, however, that in order to be effective, any such conditions or limitations must be set forth in a writing provided to Licensee.  Without limiting the generality of the foregoing, the Licensee acknowledges and agrees that no more than 33% of its sales (both by units and Net Sales) may be to J.C. Penney Company, Inc.  Nothing herein shall be deemed to prohibit PVH from withdrawing its approval of any Approved Account, including, without limitation, any customer on Schedule 6.14, upon written notice to Licensee (at which time, such customer shall cease to be an Approved Account for purposes of this Agreement); provided, however, that Licensee may fulfill any firm orders entered into prior to Licensee's receipt of PVH's withdrawal of approval.  Licensee shall not (i) market or promote or seek customers for the Licensed Products outside of the Territory; (ii) maintain any Inventory outside of the Territory, except in connection with the manufacture of Licensed Products outside of the Territory in accordance with the terms hereof pending shipment to Licensee or its approved customers; (iii) sell or distribute any Licensed Products to wholesalers, jobbers, diverters, or any other entity which does not operate retail stores exclusively; (iv) sell the Licensed Products directly to the public in retail stores, via E-Commerce, or otherwise; (v) use the Licensed Products as giveaways, prizes or premiums, except for promotional programs which have received the prior written approval of PVH; (vi) sell the Licensed Products to any third party or Affiliate of Licensee or any of its directors, officers, employees or any person having an equity participation in or any other affiliation to Licensee, without the prior written approval of PVH, except for incidental sales for personal use only; or (vii) sell Licensed Products to any third party that intends to resell the Licensed Products (a) outside of the Territory or (b) via E-Commerce.

      6.15    Disposal of Seconds and Close-Outs.  Seconds and Close-Outs sold by Licensee may be sold only to those customers set forth on the Approved Accounts and Approved Seconds and Close-Outs Accounts.  Whenever Licensee shall wish to sell Seconds and Close-Outs to customers not previously approved by PVH, Licensee shall submit a written list of the proposed customers for Seconds and Close-Outs for PVH's prior written approval.  The proposed customers approved from such list, together with the customers listed on Schedule 6.15, are referred to as the "Approved Seconds and Close-Outs Accounts."  Notwithstanding PVH's approval of any customer including, without limitation, any customer listed on Schedule 6.15, PVH may at any time subject sales to any such customer to any conditions or limitations PVH considers appropriate; provided, however, that in order to be effective, any such conditions or limitations must be set forth in a writing provided to Licensee.  Nothing herein shall be deemed to prohibit PVH from withdrawing its approval of any Approved Seconds and Close-Outs Account, including, without limitation, any customer listed on Schedule 6.15, upon written notice to Licensee (at which time, such customer shall cease to be an Approved Seconds and Close-Outs Account for purposes of this Agreement); provided, however, that Licensee may fulfill any firm orders entered into prior to Licensee's receipt of PVH's withdrawal of approval.

      6.15.1  Seconds.  Licensee shall only sell Licensed Products which are damaged, imperfect, non-first quality or defective goods ("Seconds") in a way which shall not reduce the value of the Trademark or detract from its reputation and shall obtain the express prior written consent of PVH with respect to the terms and method of their disposal.  All Seconds approved for sale by PVH shall be clearly marked "Seconds" or "Irregular."  The percentage of Seconds of any of the Licensed Products which may be disposed of pursuant to this Section

6.15.1 shall not, in any event, exceed 10% of the total number of units of Licensed Products distributed or sold by Licensee.

6.15.2 <u>Close-Outs</u>. All first quality Licensed Products which cannot reasonably be sold to regular customers and are sold at a price which is at lest 30% off of full line price ("<u>Close-Outs</u>") may be sold only upon the prior approval and upon such terms and conditions as PVH, in its reasonable discretion, approves and shall not be sold to any person which Licensee knows, or has reason to know, will export such Close-Outs from the Territory. Sales of Close-Outs of any of the Licensed Products which may be disposed of pursuant to this Section 6.15.2 in any Annual Period shall not, in any event exceed 15% of the total number of units of Licensed Products distributed or sold by Licensee during such Annual Period. Licensee acknowledges and agrees that "make-ups" and "cut-ups" are not included in the definition of Close-Outs and that Licensee has no right to produce "make-ups," "cut-up" or other special productions of Licensed Products without PVH's consent.

6.16    <u>Non-Approved Sales</u>.  Notwithstanding any other remedies PVH may have under law or pursuant to this Agreement with respect thereto, including, but not limited to the right to terminate the License granted hereunder, Licensee shall pay to PVH Percentage Royalties on (i) any and all sales to customers other than Approved Accounts or Approved Seconds and Close-Out Accounts, as the case may be, in the amount of 15% of Net Sales; and (ii) sales of Close-Outs, Seconds or to specific Approved Accounts or Approved Seconds and Close-Out Accounts in excess of the amounts permissible under this Agreement, in the amount of 10% of Net Sales.

6.17    <u>Standards of Conduct</u>.

6.17.1 <u>Standards</u>.  Licensee acknowledges that it has received copies of, read and understands PVH's publications "A Shared Commitment - Requirements for Suppliers, Contractors, Business Partners" and "Statement of Corporate Responsibility" attached hereto as <u>Exhibit E</u>.  Licensee shall conduct its business in compliance with the moral, ethical and legal standards set forth in such publications, as the same may from time to time be revised by PVH upon reasonable notice to the Licensee (the "<u>Standards</u>") and shall cause all manufacturers, contractors and suppliers which manufacture Licensed Products or from whom Licensee obtains Licensed Products or materials for the manufacture of Licensed Products to abide by the Standards.

6.17.2 <u>Audit Requirement</u>. Prior to producing Licensed Products in a facility (whether directly produced or produced by or through a contractor, subcontractor or supplier) Licensee will arrange to have the facility audited for compliance with the Standards unless PVH notifies Licensee in writing that it already has a current audit with respect to such facility that evidences compliance with the Standards. Audits on each facility used must thereafter be conducted no less often than annually. Each audit shall be conducted by a suitable independent third party auditor designated by Licensee and approved by PVH and shall be conducted using the evaluation form attached hereto as <u>Exhibit F</u> or a substantively similar form approved by PVH. Licensee shall identify to PVH in writing each facility in which it is proposed that any Licensed Product (or part thereof) be produced or which is to be re-audited and PVH shall notify Licensee within 30 days of PVH's receipt of the notice if PVH has currently

approved the facility for production and when re-audit is required. If a facility is currently approved for production, Licensee shall have no obligation to arrange for a current audit of the facility. All audits shall be conducted at Licensee's sole expense.

6.17.3 <u>Approval</u>. A comprehensive audit report prepared by the approved independent third party auditor shall be provided to PVH, attention the Director of PVH's Human Rights Programs Department, promptly upon its completion. PVH shall have 30 days from its receipt of an audit report to notify Licensee of its disapproval of the facility that is the subject thereof. If PVH does not give notice to Licensee within such 30-day period, the facility shall be deemed approved by PVH. PVH shall set forth in its notice of disapproval its reason(s) for disapproval in reasonable detail.

6.17.4 <u>Use of Facility</u>. Unless and until Licensee delivers to PVH an audit report for a facility that evidences compliance with the Standards and PVH approves such facility, the facility shall not be used for the production of Licensed Products. If Licensee uses a facility that has not been approved in accordance herewith or fails timely to cause an approved auditor to submit to PVH an audit report evidencing continued compliance with the Standards when a re-audit of a facility is required in accordance with the terms hereof or if Licensee or any of its manufacturers, contractors or suppliers with respect to Licensed Products shall, in PVH's sole determination, fail to abide by the Standards, PVH's sole remedy with respect to such breach of this Section 6.17, to the extent that PVH is not otherwise damaged as a result of such breach, shall be to terminate the License and all of the other rights granted to Licensee under this Agreement. Nothing in this Section 6.17 shall be deemed to confer third-party beneficiary rights upon any person, corporation, partnership or other entity.

## ARTICLE VII. THE TRADEMARK

7.1     <u>Rights to the Trademark</u>.

7.1.1 <u>Ownership of Trademark.</u> The Licensee acknowledges that (i) PVH is the sole and exclusive owner of the trademark IZOD, all combinations, forms, variants, modifications, embodiments and derivatives thereof (the "<u>Trademark</u>") in the Territory and all goodwill related to such marks, (ii) Licensee's rights to use the Trademark shall be governed exclusively by this Agreement and (iii) all use of the Trademark by Licensee shall inure solely to the benefit of PVH.

7.1.2 <u>No Adverse Actions</u>. Licensee shall not, at any time, do, or otherwise suffer to be done, any act or thing which may at any time, in any way, adversely affect any rights of PVH in and to the Trademark or any registrations thereof or which, directly or indirectly, may reduce the value of the Trademark or detract from its reputation. Licensee shall not file or prosecute a trademark or service mark application or applications to register the Trademark or any trademark, name or other mark confusingly similar thereto in respect of the Products or any other goods or services in the Territory or elsewhere. Licensee shall not, during the term of the License Period or thereafter, (i) attack PVH's title or right in and to the Trademark in any jurisdiction or attack the validity of the License or the Trademark or (ii) contest the fact that Licensee's rights under this Agreement (a) are solely those of a

16

manufacturer and distributor and (h) subject to the provisions of Section 8.5, cease upon termination or expiration of the License Period.

   7.1.3 <u>Additional Registrations</u>. Licensee acknowledges and agrees that PVH, as the sole and exclusive owner of the Trademark, has the exclusive right to apply for registrations and to extend existing registrations of the Trademark for all categories of goods, including, without limitation, the Products. Licensee agrees that it shall promptly notify PVH of Licensee's first use of the Trademark on Products in the Territory. The Licensee agrees to cooperate with PVH in the preparation, filing and prosecution of applications for registration, or extensions of existing registrations, or other documentation relative to the Trademark. During the License Period, Licensee may also request (but not require) that PVH apply to register the Trademark for Products in the Territory or extend existing registrations. All costs and fees (including attorneys' fees) incurred in connection with any such registration or extension shall be paid as PVH and the Licensee shall agree at that time.

   7.1.4 <u>Survival</u>. The provisions of this Section 7.1 shall survive the expiration or termination of the License.

   7.2 <u>Protecting the Trademark</u>. Licensee shall cooperate fully and in good faith with PVH for the purpose of securing, preserving and protecting PVH's rights in and to the Trademark and any secondary trademark that Licensee may develop and use with the approval of PVH. Any such secondary mark shall also be owned by PVH. At the request of PVH, Licensee shall execute and deliver to PVH any and all documents and do all other acts and things which PVH deems necessary or appropriate to make fully effective or to implement the provisions of this Agreement relating to the ownership or registration of the Trademark and any secondary trademark.

   7.3 <u>Use of the Trademark</u>.

   7.3.1 <u>Compliance with Legal Requirements</u>. Licensee will use the ~~Trademark in the Territory strictly in compliance with the legal requirements therein. Licensee~~ shall duly display all other notices with respect to the Trademark, on the Licensed Products and otherwise, as are or may be required by the trademark laws and regulations applicable within the Territory and by PVH. Upon expiration or termination of the License for any reason whatsoever, Licensee will execute and deliver to PVH any and all documents required by PVH terminating any and all trademark registrations and other documents regarding the Trademark.

   7.3.2 <u>Use with Other Name</u>. Licensee shall not (a) co-join any name or names with the Trademark, (b) use the Trademark or any portion or derivative thereof in its corporate name, or (c) use any other name, or names in connection with the Trademark, in any advertising, promotion, publicity, labeling, packaging or other printed matter of any kind in connection with the distribution or sale of Licensed Products except as may be approved in writing by PVH. Any use of Licensee's corporate name or that of its Affiliates in connection with the Trademark will be subject to the approval of PVH. If PVH approves any use of the Trademark in connection with the Licensee's corporate name, the Licensee will clearly indicate that Licensee is using the Trademark pursuant to a license from PVH as may be required by PVH.

7.3.3    <u>Execution of Documents</u>.  At PVH's request and expense, Licensee will execute any and all documents (including registered user agreements) and take any actions required by PVH to confirm PVH's ownership of the marks referred to in 7.1.1 and the respective rights of PVH and Licensee pursuant to this Agreement.

7.3.4    <u>Registration</u>.  Notwithstanding anything herein to the contrary, Licensee acknowledges that PVH may not have, and does not represent it will have throughout the License Period, active registrations of the Trademark in the Territory for each of the Products.  The Licensee may request (but not require) that PVH file applications on behalf of PVH to register the Trademark for Products in the Territory or extend existing registrations.  All costs and fees (including attorneys' fees) incurred in connection with any such registration or extension shall be paid by PVH; <u>provided</u>, <u>however</u>, that if the Licensee requests that an application or extension be filed and PVH determines that such application or extension is not necessary, Licensee shall pay all such costs and fees.  PVH shall use all commercially reasonable efforts to obtain such registrations and extensions as it agrees to seek, but makes no representations regarding the same and retains the right to withdraw or abandon any such application, in its reasonable discretion.  If the Trademark cannot be registered, or a registration extended, in any jurisdiction in the Territory for a Product for whatever reason, PVH shall give notice thereof to the Licensee.  Except as otherwise expressly provided herein, PVH shall have no liability to the Licensee for Licensee's use or inability to use the Trademark in the Territory on all Products.  The inability of the Licensee to use the Trademark in the Territory on all Products shall not otherwise affect the Licensee's rights, obligations or liabilities hereunder.

7.4    <u>Ownership of Copyright</u>.  Any copyright which may be created in any Artwork Design, Label or the like designed or approved or used with the Trademark by Licensee will be the property of PVH.  Licensee will not, at any time, do, or otherwise suffer to be done, any act or thing which may adversely affect any rights of PVH in such Artwork Design, Labels and the like and will, at PVH's request, do all things reasonably required by PVH to preserve and protect said rights.

7.5    <u>Infringements, Counterfeits and Parallel Imports</u>.

7.5.1    <u>Infringements</u>.  In the event that Licensee learns of any infringement or imitation of the Trademark with respect to Products which it believes could be considered a counterfeit of the Licensed Products, or of any use by any person of a trademark or trade name similar to the Trademark which it believes could be considered a deliberate use of something substantially similar to the Trademark, it will promptly notify PVH thereof.  PVH will thereupon take such action as it deems advisable for the protection of the Trademark and its rights therein, and Licensee shall assist PVH in the prosecution of any such suit, as PVH may reasonably request, at PVH's expense.  In no event, however, will PVH be required to take any action if it deems it inadvisable to do so, and Licensee will have not right to take any action with respect to the Trademark, including, without limitation, settling any action, appealing any adverse decision or discontinuing any action taken by it, except to the extent the same is approved in advance by PVH.  In the event a third party infringes the use of the Trademark in the Territory on items similar to the Products, PVH shall take all advisable and necessary measures to protect the Trademark; <u>provided</u>, <u>however</u>, that if such action was taken solely at Licensee's request and PVH did not reasonably believe such measures were necessary, Licensee agrees that,

18

at PVH's request, Licensee will pay the costs incurred therefor, including judicial expenses and legal fees. In no event will any infringement by a third party justify the withholding of any payment of monies due hereunder by Licensee.

### 7.5.2 Counterfeits and Parallel Imports.

7.5.2.1 PVH and Licensee To Cooperate. PVH and Licensee shall work together to minimize and deter (i) the diversion into and sale within and from the Territory of products (including those which would correspond to Licensed Products) authorized for sale by its Affiliates and other licensees, which may include, without limitation, unauthorized distribution of such products by the manufacturers and subcontractors thereof ("Parallel Imports") and (ii) the importation into, or sale or manufacture within as well as from, the Territory of counterfeit Licensed Products or infringing Products. Unless or until PVH otherwise determines and so advises Licensee in PVH's reasonable discretion, Licensee will cooperate in such efforts as reasonably requested by PVH, Licensee will timely remit and/or, as applicable, promptly reimburse out-of-pocket expenses reasonably incurred by PVH in actions or proceedings involving Parallel Imports of Licensed Products, counterfeit Licensed Products and/or infringing Products that are reasonably allocated to Licensee by PVH based Licensee's responsibility, directly or indirectly, for the problematic products, or such other reasonable basis as may exist due to the facts and circumstances of the situation. Upon Licensee's request, PVH will meet with Licensee to discuss PVH's enforcement activities and the costs associated therewith. Licensee shall cooperate with PVH in all actions taken by PVH pursuant to this Section 7.5, whether on its own or at Licensee's request, and in all criminal proceedings, as may be required or reasonably requested.

7.5.2.2 Diversion. Licensee shall use all commercially reasonable efforts to minimize and deter the diversion of Licensed Products for sale outside of the Territory, including, without limitation, the unauthorized distribution of Licensed Products by the Licensee's manufacturers and subcontractors ("Diversion"). Such efforts shall include, without limitation, the utilization of such processes, controls, identification methods and reporting and auditing procedures as PVH may from time to time reasonably request. Licensee shall cooperate with PVH in PVH's efforts to minimize and deter Diversion. Without limiting the foregoing the Licensee shall promptly provide such information as PVH may from time to time reasonably request concerning its manufacturing, subcontracting and distribution locations, activities and shipments, product and label identification systems and data and sales to and by its customers.

### 7.5.3 Legal Proceedings. PVH may, but need not elect to, initiate criminal or civil actions against persons or entities outside the Territory seeking to manufacture counterfeit Licensed Products or sell or ship counterfeit Licensed Products into the Territory (excluding, for this purpose, manufacturers or subcontractors described in the definitions of Diversion or Parallel Imports). The cost related to any such actions shall be borne entirely by PVH, provided, however, that if such action was taken solely at Licensee's request and PVH did not reasonably believe such action was necessary, Licensee agrees that, at PVH's request, Licensee will pay the costs incurred therefore, including judicial expenses and legal fees. Any damages recovered or sums obtained in settlement in or with respect to any action shall (i) first be applied proportionately to reimburse PVH and Licensee for the respective expenses incurred and actually paid by them and (ii) the balance, if any, shall belong and shall be paid over to PVH

19

exclusively; provided, however, that if Licensee's sales of Licensed Products was directly and negatively impacted by the sales of such counterfeit Licensed Products, then PVH shall reasonably allocate no more than 50% of the balance to Licensee based on the affect such activity had on Licensee's sales of Licensed Products.

  7.6  Trademark Security.

    7.6.1 Counterfeit Protection. Licensee shall use its best efforts to prevent counterfeiting. All Licensed Products shall bear and use any reasonable counterfeit preventive system, devices or labels designated by PVH.

    7.6.2 Trademark Security Plan. Licensee shall prepare and implement a Trademark security plan (a "Trademark Security Plan") if requested by PVH at any time during the License Period. The implementation of any such plan shall be subject to the prior written approval thereof by PVH. Not later than 90 days after PVH makes such request and, thereafter, at the same time Licensee submits the Licensing Forecast to PVH, Licensee shall submit a Trademark Security Plan to PVH. Each Trademark Security Plan (if any) shall describe the methods of controlling the purchase, storage, requisition from storage, use and shipment of Labels to safeguard against the escape or unauthorized use of the Trademark or Licensed Products. Each Trademark Security Plan (if any) shall include, but not be limited to, (i) maintaining necessary records to account for and reconcile all flows of Labels and (ii) providing for an annual audit by Licensee of such flows and use, for each manufacturing facility in which Labels are affixed to Licensed Products. Within 30 days after completion of such audit, Licensee shall provide PVH with a detailed copy of the audit report. In the event that a manufacturing facility cannot regularly account for and reconcile substantially all of the Labels or Licensed Products, Licensee shall discontinue placing orders with such facility.

  7.7  Use of Trademark on Invoices, etc. The use of the Trademark by Licensee on invoices, order forms, stationery and related materials in advertising in telephone or other directory listings is permitted only upon PVH's prior written approval of the format in which the Trademark is to be so used, the juxtaposition of the Trademark with other words and phrases, and the content of the copy.

  7.8  Monitoring. Licensee shall use reasonable efforts to monitor the use of the Trademark by Licensee's customers and to require its customers to advertise, display and promote the Trademark in a manner consistent with the terms and conditions of this Agreement.

## ARTICLE VIII. TERM AND TERMINATION

  8.1  Expiration. The License and, subject to Section 8.5, the other rights granted to Licensee hereunder shall terminate at the end of the License Period.

  8.2  Other Rights Unaffected. It is understood and agreed that termination of the License or other rights granted to Licensee hereunder by PVH on any ground shall be without prejudice to any other rights or remedies which PVH may have.

8.3    <u>Immediate Right of Termination of the License</u>. If any of the following grounds for termination shall occur, PVH may elect, by written notice to Licensee, to terminate immediately the License and other rights granted to Licensee hereunder:

(a)    Failure by Licensee to attain the Minimum Sales for any Annual Period, as set forth in Section 3.2;

(b)    Failure by Licensee to perform or observe any term or covenant or agreement contained in Sections 5.3 (other than an immaterial breach thereof), 6.1 (other than an immaterial breach thereof), 6.2 (other than an immaterial breach thereof), 11.4 or 11.18;

(c)    Licensee shall (i) use a contractor, subcontractor or supplier, or (ii) sell or distribute Licensed Products to retailers, not approved by PVH in accordance with Sections 6.12, 6.13 or 6.14 (as applicable);

(d)    Underpayment of royalties of 5% or more by Licensee with respect to any calendar quarter or Annual Period as determined pursuant to Section 4.3;

(e)    Licensee institutes for its protection, or is made a defendant, in any proceeding under bankruptcy, insolvency, reorganization or receivership law, or Licensee is placed in receivership or makes an assignment for benefit of creditors or is, or states that it is, unable to meet its debts in the regular course of business;

(f)    Licensee shall use the Trademark in an unauthorized or improper manner;

(g)    Cessation by Licensee of, or the taking of steps by Licensee to cease, its business;

(h)    Licensee shall sell, transfer, lease, pledge, encumber, sublease or assign, by operation of law or otherwise (collectively, a "<u>Transfer</u>"), (i) all or substantially all the assets of Licensee or (ii) 50% or more, in the aggregate, of the ownership interests in Licensee directly or indirectly to a direct competitor of PVH;

(i)    Any change, effect or circumstance that is materially adverse to the business, condition, operations, performance, properties or prospects of Licensee or its ability timely to perform its obligations under this Agreement shall occur;

(j)    Entry of a final judgment against Licensee, or the occurrence of any other event, which individually or in the aggregate, would have a materially adverse effect on the business condition (financial or otherwise), operations, performance, properties or prospects of Licensee or its ability to perform its obligations under this Agreement;

(k)    The guaranties referred to in Section 11.19 shall for any reason be revoked, rescinded or determined to be unenforceable; or

21

(1)    Salo Grosfeld shall at any time for any reason cease to be active in the management of Licensee.

8.4    <u>Termination With Notice and Right to Cure</u>.  In the event of the failure by Licensee to perform or observe any term or covenant or agreement contained in this Agreement, other than those specified in Section 8.3, PVH may terminate the License and the other rights granted to Licensee under this Agreement by giving notice of termination to Licensee (a "<u>Notice of Termination</u>"), which termination shall become effective automatically unless Licensee completely cures the breach within 15 days of the giving of the Notice of Termination.  If the Notice of Termination relates to royalties or to product quality, pending cure, Licensee shall ship no Licensed Products; if Licensee does ship, it shall automatically forfeit its right to cure and the License shall be terminated.  Upon the giving of a Notice of Termination for the second time, for any reason, Licensee shall no longer have the right to cure any violation, and termination shall be effective upon the giving of the Notice.

8.5    <u>Effect of Termination</u>.

8.5.1    <u>Expiration or Full Termination</u>.  On the expiration or termination of the License and the License Period for any reason whatsoever, all of the rights of Licensee under this Agreement shall forthwith terminate and immediately revert to PVH; all royalties on sales theretofore made shall become immediately due and payable; Licensee shall forthwith discontinue all use of the Trademark, except that Licensee may during the period (i) commencing on the date of the expiration of the License Period pursuant to Section 2.1 or 2.2 or termination of the License because of the breach of Section 3.2 and ending six-months thereafter or (ii) commencing on the date of the termination of the License pursuant to clause (b), (d) or (e) of Section 8.3 and ending 90 days thereafter (each, the "<u>Disposal Period</u>"), consummate all sales of Licensed Products which were firm on the date of such expiration or termination and sell the balance of the Inventory not purchased by PVH as provided in Section 8.6; <u>provided</u>, <u>however</u>, that any advertising used during the Disposal Period shall be subject to PVH's prior written approval and such disposition of the Licensed Products shall continue to be subject to Licensee's obligations hereunder, including, but not limited to, payments to be made to PVH, and royalties with respect thereto shall be due on the last day of the Disposal Period.  Subsequent to the Disposal Period, or if none, subsequent to such termination, Licensee shall no longer use the Trademark, any variation, imitation or simulation thereof, or any trademark similar thereto; Licensee will promptly transfer to PVH, free of charge, all registrations, filings and rights with regard to the Trademark which it may have possessed at any time; and Licensee shall thereupon deliver to PVH, free of charge, all sketches, designs, colors and the like in its possession or control, designed or approved by PVH, and all Labels supplied by PVH in Licensee's possession or control.  PVH shall have the option, exercisable upon notice to Licensee within 30 days of such expiration or termination, to negotiate the purchase of Labels which have not been supplied by PVH.  If such negotiations do not result in the purchase of such Labels, Licensee shall destroy the unused Labels at the end of the Disposal Period, or if none, upon such termination, under the supervision of PVH, and Licensee shall supply to PVH a certificate of destruction thereof signed by a duly authorized officer of Licensee.

8.5.2    <u>Partial Termination</u>.  Upon the termination of the License with respect to a specific category of Product pursuant to Section 1.4.3 all of the rights of Licensee

22

under this Agreement with respect to the category of Product affected by such termination shall forthwith terminate and immediately revert to PVH; all royalties on sales of the affected category of Licensed Product theretofore made shall become immediately due and payable, it being acknowledged that such partial termination of the License shall not affect any obligation of License to make payments hereunder accruing prior to such termination; Licensee shall forthwith discontinue all use of the Trademark on the affected Product, except that Licensee may during the Disposal Period commencing as of the date of such termination and ending six-months thereafter consummate all sales of the affected Licensed Products which were firm on the date of such termination; provided, however, that any advertising used during the Disposal Period shall be subject to PVH's prior written approval and such disposition of the Licensed Products shall continue to be subject to Licensee's obligations hereunder, including, but not limited to, payments to be made to PVH, and royalties with respect thereto shall be due on the last day of the Disposal Period. Without limiting the generality of the foregoing, Licensee acknowledges that sales during the Disposal Period are on a non-exclusive basis. Subsequent to the Disposal Period, Licensee shall no longer use the Trademark, any variation, imitation or simulation thereof, or any trademark similar thereto on the terminated Products; and Licensee will promptly transfer to PVH, free of charge, all registrations, filings and rights with regard to the Trademark which it may have possessed at any time with respect to the terminated Products.

      8.6    <u>Inventory Upon Termination</u>. Upon the expiration or termination of the License and the License Period in their entirety for any reason whatsoever, Licensee shall immediately deliver to PVH a complete and accurate schedule of Inventory of Licensed Products as of the close of business on the date of such expiration or termination (the "<u>Inventory Schedule</u>"). PVH thereupon shall have the option, exercisable by written notice to Licensee within 15 days after its receipt of the Inventory Schedule, to purchase any or all of the Inventory (other than Inventory required to consummate sales of Licensed Products which were firm on the date of such expiration or termination) for an amount equal to the wholesale price of the Inventory less 40%. Percentage Royalties shall not be payable with respect to the purchase of the Inventory by PVH. In the event such notice is sent by PVH, PVH may collect the Inventory referred to therein within 90 days after PVH's notice. PVH will pay for the Inventory upon collection. In the event such notice is not sent, Licensee may dispose of the Licensed Products during any Disposal Period pursuant to Section 8.5; provided, however, that such disposition shall continue to be subject to Licensee's obligations hereunder, including, without limitation, with respect to the payment of royalties and the approval of customers and advertising. At the end of the Disposal Period, or if none, upon such termination, any Licensed Products remaining in Licensee's possession or control, including, without limitation, in any stores of Licensee, shall, at the request of PVH, be destroyed. PVH shall have the right at any time to conduct a physical inventory of the Licensed Products then in Licensee's possession or control.

      8.7    <u>Freedom to License</u>. Starting 12 months prior to the scheduled expiration of this Agreement, or in the event of (i) default by Licensee; (ii) termination of the License in its entirety or with respect to a specific category of Product; or (iii) the receipt by PVH of a notice from Licensee requesting the termination of the License in its entirety or with respect to a specific category of Product, PVH shall be free to license others to use the Trademark in connection with the manufacture, sale, distribution and promotion of all Licensed Products in the Territory or the relevant category of Product in the Territory, as the case may be. PVH shall be

free to negotiate such licenses, and make sales on its own or allow sales under any new license, prior to the termination or expiration of this License in part or in its entirety, provided only that no sales to consumers of Licensed Products produced by or on behalf of PVH or pursuant to any such new license will be permitted prior to the termination or expiration of the License with respect to the applicable Products.

      8.8    <u>Rights Personal</u>.  The License and rights granted hereunder are personal to Licensee.  No assignee for the benefit of creditors, receiver, trustee in bankruptcy, sheriff or any other officer or court charged with taking over custody of Licensee's assets or business, shall have any right to continue performance of this Agreement or to exploit or in any way use the Trademark if this Agreement is terminated pursuant to Sections 8.3, 8.4 or 11.8, except as may be required by law.

      8.9    <u>Trustee in Bankruptcy</u>.  Notwithstanding the provisions of Section 8.8, in the event that, pursuant to the applicable bankruptcy law (the "<u>Code</u>"), a trustee in bankruptcy, receiver or other comparable person, of Licensee, or Licensee, as debtor, is permitted to assume this Agreement and does so and, thereafter, desires to assign this Agreement to a third party, which assignment satisfies the requirements of the Code, the trustee or Licensee, as the case may be, shall notify PVH of same in writing.  Said notice shall set forth the name and address of the proposed assignee, the proposed consideration for the assignment and all other relevant details thereof.  The giving of such notice shall be deemed to constitute an offer to PVH to have this Agreement assigned to it or its designee for such consideration, or its equivalent in money, and upon such terms as are specified in the notice.  The aforesaid offer may be accepted by PVH only by written notice given to the trustee or Licensee, as the case may be, within 15 days after PVH's receipt of the notice to such party.  If PVH fails to deliver such notice within said 15 days, such party may complete the assignment referred to in its notice, but only if such assignment is to the entity named in said notice and for the consideration and upon the terms specified therein.  Nothing contained herein shall be deemed to preclude or impair any rights which PVH may have as a creditor in any bankruptcy proceeding.

      8.10    <u>Compensation</u>.  (a) If PVH terminates this Agreement pursuant to Section 8.3 (b), (c), (d), (e), (f), (g), (h), (i), (j) or (k), PVH shall have the right to receive, and Licensee shall immediately pay to PVH, as liquidated damages, solely with respect to Licensee's royalty obligations hereunder and not as a penalty, a sum equal to the total of the Percentage Royalties that would have been payable by Licensee to PVH for the remainder of the License Period based on the Net Sales for the Annual Period immediately preceding the year of termination or, if this Agreement is terminated during the first Annual Period, a sum equal to the total of the Percentage Royalties that would have become payable if the Licensing Forecast for the first Annual Period had been achieved.

      (b) If PVH terminates this Agreement pursuant to Section 8.3(a) or Section 8.4, PVH shall have the right to receive, and Licensee shall immediately pay to PVH, as liquidated damages, solely with respect to Licensee's royalty obligations hereunder and not as a penalty, a sum equal to the total of the Percentage Royalties that would have been payable by Licensee to PVH for the twelve months following such termination based on the Net Sales for the Annual Period immediately preceding the year of termination or, if this Agreement is terminated during

the first Annual Period, a sum equal to the total of the Percentage Royalties that would have become payable if the Licensing Forecast for the first Annual Period had been achieved.

## ARTICLE IX. INDEMNIFICATION AND INSURANCE

9.1      <u>Indemnification by Licensee</u>.  Licensee does hereby indemnify and hold harmless PVH, its Affiliates, including, without limitation its and their current and former respective directors, officers, employees, agents, trustees, and representatives (each, an "<u>Indemnified Party</u>") from and against any and all losses, liabilities, damages and expenses (including reasonable attorneys' fees and expenses (including allocable costs of in-house counsel)), whether incurred in any action or proceeding between the parties hereto, or otherwise, which an Indemnified Party may incur or be obligated to pay in any action, claim or proceeding, for or by reason of any acts, whether of omission or commission, that may be committed by Licensee (which for purposes of this Section 9.1, includes its Affiliates) or any of their servants, agents or employees in connection with Licensee's performance of this Agreement, including but not limited to:

(a)      any alleged defect in any Licensed Product, regardless of whether the action is based upon negligence or strict liability, and regardless of whether the alleged negligence is characterized as "passive" or "active";

(b)      the manufacture, labeling, sale, distribution or advertisement of any Licensed Product by Licensee;

(c)      any violation of any warranty, representation or agreement made by Licensee pertaining to a Licensed Product; or

(d)      the claim of any broker, finder or agent in connection with the making of this Agreement or any transactions contemplated by this Agreement.

PVH shall give Licensee prompt written notice of any such claim or action and thereupon Licensee shall undertake and conduct the defense of any suit so brought; <u>provided</u>, <u>however</u>, that the failure to notify Licensee promptly shall not relieve Licensee of its obligation hereunder, except to the extent (if any) that Licensee is actually prejudiced thereby.  In the event an appropriate action is not taken by Licensee within 30 days of its receipt of notice from PVH, PVH shall have the right to defend such claim or action in its own name, but no settlement or compromise of any such claim or action may be made without the prior written consent of Licensee, such consent not to be unreasonably withheld or delayed.  In either case, PVH and Licensee shall keep each other fully advised of all developments and shall cooperate fully with each other and in all respects in connection with any such defense.  Such indemnification shall be deemed to apply solely to the amount of the judgment, if any, against PVH and reasonable sums paid by PVH in connection with its defense, and shall not apply to any consequential damages suffered by PVH which are not included in the aforementioned judgment.  The provisions of this Section and Licensee's obligations hereunder shall survive any termination of the License or recision of this Agreement.

25

9.2    <u>Notice of Suit or Claim</u>.  Licensee shall promptly inform PVH by written notice of any suit or claim against Licensee relating to Licensee's performance under this Agreement, whether such suit or claim is for personal injury, involves alleged defects in the Licensed Products manufactured, sold or distributed hereunder, or otherwise.

9.3    <u>Indemnification by PVH</u>.  PVH does hereby indemnify and hold harmless Licensee and its Affiliates, and their respective directors, shareholders, employees and agents from and against any and all losses, liabilities, damages and expenses (including reasonable attorneys' fees, costs and expenses) which any of them may incur or for which it may become liable or compelled to pay in any action or claim alleging: (i) PVH's breach of any representation or warranty in Section 11.1; (ii) that Licensee's use of the Trademark in accordance with the terms of this Agreement violates the bona fide trademark ownership rights of a third party; (iii) that use in Licensed Products of a special design or special fabric submitted by PVH and required by PVH to be used by Licensee without any change thereto and used in accordance with the provisions hereof, violates the third-party ownership or other patent or other copyright of a third party; or (iv)  that any advertising or advertising materials created by PVH and used in accordance with the provisions hereof and within any limitation to usage applicable thereto, violates the copyright of a third party, or limitation or usage rights as to any model depicted therein.  Licensee will promptly notify PVH of any action or claim brought to its attention; <u>provided</u>, <u>however</u>, that the failure to promptly notify PVH shall not relieve PVH of its obligation hereunder, except to the extent (if any) that PVH actually is prejudiced thereby.  If, however, there is a dispute between PVH and Licensee as to whether the suit was brought as a result of Licensee's failure to use the Trademark in accordance with the terms of this Agreement, Licensee may be required to conduct such defense unless and until it is determined that no such misuse of the Trademark occurred.  Subject to the preceding sentence, in the event an appropriate action is not taken by PVH within 30 days of its receipt of notice from Licensee, Licensee shall have the right to defend such claim or action in its own name, but no settlement or compromise of any such claim or action may be made without the prior written approval of PVH.  In either case, PVH and Licensee shall keep each other fully advised of all developments and shall cooperate fully with each other and in all respects in connection with any such defense.  Such indemnification shall be deemed to apply solely to the amount of the judgment, if any, against Licensee, and sums paid by Licensee in connection with its defense, and shall not apply to any consequential damages suffered by Licensee which are not included in the aforementioned judgment.  Such indemnification shall not apply to any damages sustained by Licensee by reason of such claimed infringement other than those specified above.  The provisions of this Section 9.3 and the obligations of PVH set forth herein shall survive the expiration or other termination of this Agreement.

9.4    <u>Insurance</u>.

9.4.1    <u>Requirement</u>.  Without limiting Licensee's liability pursuant to the indemnity provisions of this Agreement, Licensee shall maintain commercial general liability insurance in the amount of at least $5,000,000 (combined single limit per occurrence) with a broad form property damage liability endorsement.  This insurance shall include broad form blanket contractual liability, personal injury liability, advertising liability, products and completed operations liability.  Each coverage shall be written on an "occurrence" form.

9.4.2   <u>Theft and Destruction Coverage</u>.  The Licensee shall purchase insurance against theft and destruction of the Licensed Products which shall (i) be written on an "all risk" basis, including, without limitation, crime/employee dishonesty, flood and earthquake coverage; (ii) provide that Licensee shall be reimbursed for loss in an amount equal to the manufacturer's selling price for the Products (either by a selling price endorsement or business interruption insurance); (iii) provide that PVH is added as a loss payee to the extent of any royalties and other fees due to PVH hereunder with respect to any loss to Licensed Products; (iv) be in effect while goods are on premises owned, rented or controlled by Licensee and while in transit or storage; and (v) include a brand and label clause stating that the insurer will pay the cost of removing PVH's name from damaged merchandise and relabeling goods.  PVH shall be the sole judge as to whether any Licensed Products or Labels are damaged such as to require the removal of any Labels or the re-Labeling of any Licensed Products, in its reasonable discretion.

9.4.3   <u>General Provision</u>.  The insurance described in Section 9.4.1 shall include: (i) a cross-liability endorsement; (ii) an endorsement stating that PVH shall receive at least 30 days' written notice prior to cancellation or non-renewal of coverage; (iii) an endorsement naming PVH and its Affiliates as additional insureds; (iv) an endorsement stating that the insurance required by this Agreement is primary and that any insurance purchased by PVH shall only apply in excess of the insurance purchased by Licensee; (v) a waiver of subrogation in favor of PVH; and (vi) an endorsement stating that PVH may recover for any loss caused PVH, its agents or employees, whether caused by the negligence (including active, passive and gross negligence) of Licensee, or otherwise.

9.4.4   <u>Approved Carrier/Policy Changes</u>.  All insurance shall be obtained from an insurance company approved by PVH.  The Licensee shall give at least 30 days' prior written notice to PVH of the cancellation or any modification of such insurance policy that would affect PVH's status or benefits thereunder.  This insurance may be obtained for PVH by Licensee in conjunction with a policy which covers products other than the Licensed Products.

9.4.5   <u>Evidence of Coverage</u>.  Not later than 20 days from the date hereof, Licensee shall furnish to PVH evidence, in form and substance satisfactory to PVH, of the required insurance, and Licensee shall upon PVH's request therefore, furnish to PVH proof of the maintenance and renewal of the required insurance, including, but not limited to, copies of policies with applicable riders and endorsements, an d certificates of insurance.

9.4.6   <u>Territory</u>.  The insurance set forth in this Section must cover the entire Territory.

## ARTICLE X.  COMPLIANCE WITH LAWS

10.1   <u>Compliance with Laws</u>.  The Licensee shall comply with all laws, rules, regulations and requirements of any governmental body which may be applicable to the operations of Licensee contemplated hereby, including, without limitation, as they relate to the manufacture, distribution, sale or promotion of Licensed Products, notwithstanding the fact that PVH may have approved such item or conduct.

27

10.2   <u>Equitable Relief</u>.  PVH shall be entitled to equitable relief by way of temporary and permanent injunction and such other and further relief as any court with jurisdiction may deem just and proper.

## ARTICLE XI.  MISCELLANEOUS

11.1   <u>Warranties and Representations of the Parties</u>.  Each of the parties hereby represents and warrants to the other party that:  it is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation; it has the full right, power and authority to enter into, and perform its obligations under, this Agreement; and all necessary corporate acts have been effected by it to render this Agreement valid and binding upon it.

11.2    Definitions.  Each of the following terms has the meaning ascribed thereto in the Section indicated below next to such term:

| Defined Term | Section Defined In | Defined Term | Section Defined In |
|---|---|---|---|
| Advertising Obligation | 5.1 | Licensed Products | Recital |
| Affiliates | 4.1 | Licensee | Preamble |
| Annual Period | 3.1 | Licensing Forecast | 3.1 |
| Approved Accounts | 6.14 | Marketing Obligation | 5.1.1 |
| Approved Seconds and Close-Outs | | Minimum Sales | 3.2 |
| Accounts | 6.15 | Net Sales | 4.1.2 |
| Artwork Designs | 6.8 | Non-Conforming Products | 6.4 |
| Close-Outs | 6.15.2 | Notice of Termination | 8.4 |
| Code | 8.9 | Parallel Imports | 7.5.2.1 |
| Disclosing Party | 11.18 | Percentage Royalties | 4.1.1 |
| Disposal Period | 8.5.1 | Products | Recital |
| Diversion | 7.5.2.2 | PVH | Preamble |
| E-Commerce | 1.1.1 | Renewal License Period | 2.2 |
| Excluded Design | 6.8 | Seconds | 6.15.1 |
| Gross Sales | 4.1.2 | Standards | 6.17.1 |
| Guaranteed Minimum Royalties | 4.1.3 | Territory | Recital |
| Indemnified Party | 9.1 | Third-Party Manufacturing Agreement | 6.3 |
| Initial License Period | 2.1 | Trademark | 7.1.1 |
| Inventory | 4.2 | Trademark Security Plan | 7.6.2 |
| Inventory Schedule | 8.6 | Transfer | 8.3(h) |
| Labels | 1.1.2 | | |
| License | 1.1 | | |
| License Period | 2.2 | | |

11.3    Notices.  All reports, approvals and notices required or permitted to be given under this Agreement shall be in writing and shall, unless specifically provided otherwise in this Agreement, be deemed to have been given if personally delivered or if mailed (by certified or registered mail, return receipt requested and prepaid) or faxed as follows:

If to PVH, to:          Phillips-Van Heusen Corporation
                        200 Madison Avenue
                        New York, New York  10016
                        Attention:  President – Licensing
                        Telephone:  (212) 381-3628
                        Facsimile:  (212) 381-3959

                        Phillips-Van Heusen Corporation
                        200 Madison Avenue
                        New York, New York  10016
                        Attention:  Vice President and General Counsel
                        Telephone:  (212) 381-3509
                        Facsimile:  (212) 381-3970

29

If to Licensee, to:        International Home Textiles
19401 West Dixie Highway
Miami, Florida 33180
Attention: Salo Grosfeld
Telephone:  (305) 933-7100
Facsimile:  (305) 932-4232

A party may change its address for receipt of notices at any time upon notice to the other party.

     11.4   <u>No Assignment Without Consent</u>.  The License and all rights granted to Licensee hereunder are personal in nature, and Licensee shall not Transfer the License, this Agreement or its rights and interest hereunder, or any part hereof, without the prior written consent of PVH, which consent may be withheld by PVH in its sole and absolute discretion.

     11.5   <u>No Sublicense or Distribution Agreement Without Consent</u>.  Licensee is prohibited from granting any sublicenses under this Agreement, or from entering into any distribution agreements with respect to Licensed Products under this Agreement, without the prior written consent of PVH, which consent may be withheld by PVH in its sole and absolute discretion.

     11.6   <u>Assignment by PVH</u>.  PVH shall have a complete and unrestricted right to Transfer its rights and interests in this Agreement to any domestic or foreign corporation or other business entity, providing that such transferee agrees to be bound by all of the terms hereof and is the holder of the Trademark in the Territory.  PVH shall given written notice to Licensee within 30 days of any such Transfer; <u>provided</u>, <u>however</u>, that the failure to give such notice shall not be deemed to be a breach of this Agreement.

     11.7   <u>No Agency</u>.  Licensee shall not represent itself as the agent or legal representative of PVH or its Affiliates for any purpose whatsoever and shall have no right to create or assume any obligation of any kind, express or implied, for or on behalf of them in any way whatsoever.  PVH shall similarly not represent itself as the agent or legal representative of Licensee or its Affiliates.

     11.8   <u>Suspension of Obligations</u>.  If Licensee shall be prevented from performing any of its obligations because of governmental regulation or order, or by strike or war, declared or undeclared, or other calamities such as fire, earthquake, or similar acts of God, or because of other similar or dissimilar cause beyond the control of Licensee, Licensee's obligations shall be suspended during the period of such conditions.  If such condition continues for a period of more than 60 days, PVH shall have the right to terminate this Agreement.

     11.9   <u>Benefit</u>.  This Agreement shall inure to the benefit of and be binding upon the parties hereto, and, subject to Sections 11.4 and 11.6, their successors and assigns.

     11.10   <u>Entire Agreement; Amendment</u>.  This Agreement, including the exhibits and schedules hereto, constitutes the entire agreement of the parties hereto with respect to the subject matter hereof, and supersedes all prior agreements, contracts, promises, representations and statements between them, if any, whether written or oral, with respect thereto including, without limitation, the License Agreement between PVH and Licensee dated December 2001, as

30

the same may have been heretofore amended. This Agreement may not be amended or modified, except in a writing signed by both parties hereto.

11.11   Non-Waiver. The failure of either party to enforce at any time any term, provision or condition of this Agreement, or to exercise any right or option herein, shall in no way operate as a waiver thereof, nor shall any single or partial exercise preclude any other right or option herein; and no waiver whatsoever shall be valid unless in writing, signed by the waiving party, and only to the extent herein set forth. No waiver by either party of any breach hereof or default hereunder will constitute a continuing waiver of such provision or of any other provision of this Agreement. Acceptance of payment by PVH will not be deemed a waiver by PVH of any violation of or default under any of the provisions of this Agreement by Licensee or an election of remedies as to which any and all rights (and all remedies) are expressly reserved and retained.

11.12   Severability. In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect in any jurisdiction, the validity, legality and enforceability of such provisions shall not be affected or impaired in any other jurisdiction, nor shall the remaining provisions contained herein in any way be affected or impaired thereby, unless PVH determines such provision was material, in which case PVH may terminate this Agreement.

11.13   Headings. The headings of the Articles and Sections of this Agreement are for convenience only and in no way limit or affect the terms or conditions of this Agreement.

11.14   Counterparts. This Agreement may be executed in two counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument.

11.15   Governing Law. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE.

11.16   Jurisdiction. Any legal action or proceeding with respect to this Agreement shall be brought in the courts of the State of New York or of the United States of America located in the City of New York, and, by execution and delivery of this Agreement, each party hereby accepts for itself and in respect to its property, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts. The Licensee hereby irrevocably and unconditionally waives any claim for special, consequential or punitive damages and any objection, including, without limitation, any objection to the laying of venue or based on the grounds of *forum non conveniens*, which it may now or hereafter have to the bringing or maintaining of any such action or proceeding in such respective jurisdictions. Each party irrevocably and unconditionally consents to the service of process of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the other party at its address for notices provided in Section 11.3, such service to become effective 30 days after such mailing.

31

11.17  Non-Solicitation.  Licensee agrees that during the License Period and for a period of two years following the termination or expiration thereof for any reason, Licensee shall not hire or solicit to hire, whether on its own behalf or on behalf of any other person (other than PVH), any employee of PVH or any of its Affiliates or any person who had left the employ of PVH or any of its Affiliates within 12 months of the termination or expiration of the License Period.  In addition, during the License Period and such two-year period thereafter, Licensee shall not, directly or indirectly, encourage or induce any employee of PVH or any of its Affiliates to leave PVH's or such Affiliate's employ.

11.18  Confidentiality.  Each of the parties hereto acknowledges that it may receive from the other (the "Disclosing Party"): prints, designs, ideas, sketches, and other materials or information, including, without limitation, (a) financial or business information; (b) a formula, pattern, compilation, program, device, method, technique, or process; or (c) other information that in each case derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use which the Disclosing Party intends to use on or in connection with lines of merchandise other than the Licensed Products and which have not as yet found their way into the channels of distribution. The parties recognize that these materials are valuable property of the Disclosing Party.  Each of the parties hereto acknowledges the need to preserve the confidentiality and secrecy of these materials and agrees to take all necessary steps to ensure that use by it, or by its contractors, will in all respects preserve such confidentiality and secrecy. Licensee shall take all reasonable precautions to protect the secrecy of the materials, samples, and designs described in Article VI prior to their commercial distribution or the showing of samples for sale, and shall not sell any merchandise employing or adapted from any of said designs except under the Trademark.  None of the parties shall, at any time during the License Period or any time thereafter, disclose or use for any purpose, other than as contemplated by this Agreement, any confidential information and data relating to the business of the other.  Nothing herein shall be deemed to limit PVH's rights under Sections 6.8 and 6.13.  The provisions of this Section 11.18 shall not apply to information that (i) is now or hereafter becomes generally available to the public, other than as a result of a breach hereof, or (ii) is obtained from a third party that, to the knowledge of the party receiving the information, is not under any obligation to keep such information confidential. Notwithstanding anything in this Section 11.18 to the contrary, if any party becomes legally compelled (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) to disclose any of the confidential information, such party shall provide the others with prompt written notice of such requirement so that the party whose information it is may seek a protective order or other appropriate remedy.  If such protective order or other remedy is not obtained, the party under compulsion to disclose the information agrees to disclose only that portion of the confidential information which it is advised by opinion of counsel is legally required to be disclosed, and it agrees to take all reasonable steps to preserve the confidentiality of the confidential information (including by obtaining, at the cost of the owner of the information, an appropriate protective order or other reliable assurance that confidential treatment will be accorded the confidential information).  In addition, the party under compulsion to disclose the information shall not oppose any effort (and shall, if and to the extent requested by the owner of the information, cooperate with, assist and join with the owner of the information, at the expense of the owner of the information) in any action by the owner of the information to obtain a protective order or other reliable assurance that confidential treatment will be accorded the confidential information.

32

11.19  <u>Guaranties</u>.  The obligations of Licensee hereunder, including, without limitation, the obligation to pay Percentage Royalties and Guaranteed Minimum Royalties shall be guaranteed jointly and severally by the shareholders of Licensee pursuant to a personal guaranty in form and substance acceptable to PVH.

11.20  <u>Construction</u>.  This Agreement shall be construed without regard to any presumption or other rule requiring construction against the drafting party.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

PHILLIPS-VAN HEUSEN CORPORATION

By: _____
Name: Mark Fischer
Title: Vice President, General Counsel
Date: February 3, 2006

INTERNATIONAL HOME TEXTILES, INC.

By: _____
Name: Saul Grosfeld
Title: President
Date: 2/2/06

33

**SCHEDULE 6.14**

## APPROVED ACCOUNTS - IZOD

### BED, BATH & BEYOND

### BELK

### DILLARDS

### FEDERATED
The Bon Marche
Burdine's
Macy's East
Macy's West
Rich's/Lazarus

### INDEPENDENTS
Bealls
Bon Ton
Boscovs
Gottschalks
Marshall Fields
Stage Stores

### JCPENNEY*

### LINENS & THINGS

### MAY CORPORATION
Famous Barr
Filenes
Foleys
Hechts
Lord & Taylor
Robinsons/May

### SAKS, INC.
Carsons/Herberger's
Parisian
Proffitt's/McRae's

\*   The Licensee shall be permitted to sell Licensed Products to JC Penney, subject to the limitation that no more than 33% of its sales (both by units and Net Sales) may be to JC Penney. Nothing herein shall be deemed to restrict PVH's right to withdraw its approval of JC Penney as a customer of the Licensee or the right of PVH to amend, modify, expand or otherwise change the foregoing limitation on the Licensee's sales of Licensed Products to JC Penney.

**SCHEDULE 6.15**

**APPROVED SECONDS AND CLOSE-OUTS ACCOUNTS**

**TJX CORP.**
Marshall's
TJMaxx

**ROSS STORES**

## ROYALTY STATEMENT

FORM MUST BE SUBMITTED COMPLETED

# PHILLIPS-VAN HEUSEN CORPORATION

Page ____ of _____

Date _____

NAME OF LICENSEE:    INTERNATIONAL HOME TEXTILES, INC.

LICENSEE'S ADDRESS:    19401 WEST DIXIE HIGHWAY
MIAMI, FLORIDA 33180

LICENSED PRODUCT:    SHEETS, PILLOW CASES AND TOWELS, INCLUDING, WITHOUT LIMITATION, WASH CLOTHS, HAND TOWELS, BATH TOWELS, BATH SHEETS, BATH MATS AND BEACH TOWELS, BUT EXCLUDING DISH TOWELS

(i)    For each month during the period of _____ to _____ (the "Period").

For the month of _____:

| Category | Style No. | Units | Net Sales | Percentage Royalties |
|----------|-----------|-------|-----------|----------------------|
|          |           |       |           |                      |

For the month of _____:

| Category | Style No. | Units | Net Sales | Percentage Royalties |
|----------|-----------|-------|-----------|----------------------|
|          |           |       |           |                      |

For the month of _____:

| Category | Style No. | Units | Net Sales | Percentage Royalties |
|----------|-----------|-------|-----------|----------------------|
|          |           |       |           |                      |

1

**TOTAL**

**(ii)**  NET SALES BY ACCOUNT

**(iii)**  INVENTORY AS OF THE END OF THE PERIOD:

| **Style Number** | **Units** | **Wholesale Price** |
| --- | --- | --- |

The undersigned, _____ the _____ of Licensee, does hereby certify that the foregoing information provided to PVH pursuant to Section 4.2 of the License Agreement between PVH and Licensee dated as of January 1, 2006 is complete and accurate.

IN WITNESS WHEREOF, the undersigned has executed this Royalty Statement on this ____ day of _____, _____.

LICENSEE:
INTERNATIONAL HOME TEXTILES, INC.

By: _____

Name: _____

Title: _____

2

## ADVERTISING STATEMENT

FORM MUST BE SUBMITTED COMPLETED

# PHILLIPS-VAN HEUSEN CORPORATION

Page _____ of _____

Date _____

NAME OF LICENSEE:     INTERNATIONAL HOME TEXTILES, INC.

LICENSEE'S ADDRESS:  19401 WEST DIXIE HIGHWAY
                     MIAMI, FLORIDA 33180
                     SHEETS, PILLOW CASES AND TOWELS, INCLUDING, WITHOUT
                     LIMITATION, WASH CLOTHS, HAND TOWELS, BATH TOWELS,
                     BATH SHEETS, BATH MATS AND BEACH TOWELS, BUT
LICENSED PRODUCT:    EXCLUDING DISH TOWELS

EXPENDITURES REFLECT THE PERIOD ___/___/___ TO ___/___/___, ALL

TEARSHEETS AND ADVERTISING BILLS MUST ACCOMPANY THIS FORM

PUBLICATION OR TYPE OF ADVERTISING       DOLLAR AMOUNT LICENSEE SPENT

Submit to the attention of:

Phillips-Van Heusen Corporation
200 Madison Avenue
New York, NY  10016
Attention: President - Licensing

**EXHIBIT C**

## STYLE APPROVAL FORM

(ALL SAMPLES SUBMITTED FOR APPROVAL MUST BE IN CORRECT FABRIC)

FORM MUST BE SUBMITTED COMPLETED

# PHILLIPS-VAN HEUSEN CORPORATION

Page _____ of _____

Date _____

NAME OF LICENSEE:    INTERNATIONAL HOME TEXTILES, INC.

LICENSEE'S ADDRESS:    19401 WEST DIXIE HIGHWAY
MIAMI, FLORIDA 33180

LICENSED PRODUCT:    Sheets, pillow cases and towels, including, without limitation, wash cloths, hand towels, bath towels, bath sheets, bath mats and beach towels, but excluding dish towels

SEASON(S) _____ STYLE NUMBER _____ FABRICATION

WHOLESALE PRICE _____ COLORS _____

SIZES _____ FACTORY _____

START TAKING ORDERS _____ END TAKING ORDERS _____

START SHIP _____ END SHIP _____

LICENSEE:  INTERNATIONAL HOME TEXTILES, INC.

By: _____
    Name: _____
    Title: _____

APPROVED _____ DISAPPROVED _____

COMMENTS _____
_____

LICENSOR:

By: _____    By: _____
    Name: _____        Name: _____
    Title: _____        Title: Division Manager

DATE RETURNED TO LICENSEE _____

Submit to the attention of:
Phillips-Van Heusen Corporation
200 Madison Avenue
New York, NY  10016
Attention:  President - Licensing

**THIRD-PARTY**
**MANUFACTURING**
**AGREEMENT**

AGREEMENT, dated _____ \_\_, \_\_\_\_, by and between INTERNATIONAL HOME TEXTILES, INC. (the "Licensee"), having an address at 19401 West Dixie Highway, Miami, Florida 33180, and _____ (the "Manufacturer"), having an address at _____.

WITNESSETH:

WHEREAS, the Licensee pursuant to a License Agreement with Phillips-Van Heusen Corporation ("PVH") has been granted a license ("License") to use the IZOD trademark (the "Trademark") in connection with the distribution, sale and marketing of certain goods ("Licensed Products");

WHEREAS, PVH is the owner or licensee of the following trademarks: Arrow; Van Heusen; Bass; BCBG Attitude; BCBG Max Azria; Calvin Klein; Calvin Klein Collection; Chaps; ck Calvin Klein; Donald J. Trump Signature Collection; Geoffrey Beene; G.H. Bass & Co.; IZOD; IZOD G; Kenneth Cole New York; Kenneth Cole Reaction; MICHAEL Michael Kors; SEAN JOHN; and UNLISTED, a Kenneth Cole Production which PVH licenses (or sublicenses) to its licensees (or sublicensees) or licenses from others, and PVH's policy is not to place, and to cause its licensees (or sublicensees) not to place, orders with any manufacturer or subcontractor that breaches the provisions contained in this Agreement and similar provisions contained in other third-party manufacturing agreements;

WHEREAS, the License entitles the Licensee to subcontract the manufacture and/or assembly of the Licensed Products to third parties, subject to certain express limitations and conditions; and

WHEREAS, the Licensee has selected the Manufacturer as a manufacturer to produce the Licensed Products for the Licensee subject and pursuant to the terms and conditions set forth below;

NOW, THEREFORE, the parties hereby agree as follows:

1.    The Manufacturer shall have no rights in or to the Trademark or in any mark similar thereto by reason of its manufacture of the Licensed Products and shall only use the Trademark in strict accordance with the Licensee's instructions.

2.    The Manufacturer recognizes the validity of the Trademark and will take no action in derogation of any right or interest of PVH, or of any of PVH's subsidiaries may have, in and to the Trademark.   The Manufacturer will not oppose, petition to cancel or otherwise interfere with any registration PVH, or any of its subsidiaries, has now or may obtain in the future for the Trademark in any jurisdiction nor contest the fact that the Manufacturer's rights are solely those of a manufacturer.

3.    The Manufacturer will manufacture and sell the Licensed Products and/or assemble the Licensed Products and will deliver them only to the Licensee or to the Licensee's authorized representatives or agents. Any and all Licensed Products produced by the Manufacturer which do not meet the Licensee's quality standards or result from overruns or cancellations of the Licensee's orders (collectively, "Rejected Products") will be strictly accounted for and physically maintained, at the Manufacturer's sole expense, in the Manufacturer's warehouse or such other place as may be under the Manufacturer's exclusive access and control. [Rejected Products not bearing the Trademark or any identifying logo may be sold to any third party; provided; however, that all labels, hang tags, and other identifying marks must be removed from such Rejected Products before sale to such a third party. Moreover, after such removal, such Rejected Products must be held at least until the end of the season for which they were produced, which is deemed to be three months after the original shipping date of the Licensee's purchase order. Rejected Products bearing the Trademark or any identifying logo may be sold to a third party only with PVH's prior consent which must be in writing and may be withheld in PVH's sole and absolute discretion; provided, however, that as a condition to such disposal, the Manufacturer must (A) clearly and indelibly mark such goods as "irregulars or "seconds", (b) remove all packaging, hang tags and other materials that contain any of PVH's trademarks or otherwise identify such goods as PVH products; (c) remove all labels, embroidery, embellishments, and other items and markings that contain any of PVH's trademarks or otherwise identify goods as PVH products that can be removed without rendering the products unsaleable and (d) to the extent removal of a label, embroidery, embellishment, or other item or marking would render the products unsaleable, cut or clearly and indelibly redline such labels, embroidery, embellishments, or other items or markings, except in the cases of clauses (c) and (d) only, as PVH may, in its sole and absolute discretion, provide otherwise in advance and in writing. In addition, PVH may subject any such disposal to any additional conditions it may establish, including, without limitation, limiting to whom the goods may be sold and where they may be distributed.]*

4.    The Manufacturer will follow the specifications and standards from time to time stipulated by the Licensee and will permit the Licensee and PVH to inspect the manufacturing processes and provide samples of the Licensed Products in order for the Licensee or PVH, as the case may be, to satisfy itself that the specifications and standards are being met.

5.    The Manufacturer acknowledges that the Licensee may provide it with certain prints, designs, ideas, sketches and other materials or trade secrets which may or will be used in connection with the Licensed Products and/or lines of merchandise other than the Licensed Products which have not been announced to the public or entered the stream of commerce. The Manufacturer recognizes that such materials are exclusive and valuable property of PVH and acknowledges the need to preserve the confidentiality and secrecy of such materials. The Manufacturer agrees to take all reasonable precautions to protect the secrecy of the materials, samples and designs prior to their commercial distribution or the showing of samples

---

*    Bracketed language should be deleted where agreement is with subcontractor.

2

of same for sale. The Manufacturer will also take all reasonable precautions to protect the secrecy of the original designs created either by PVH or the Licensee for Licensed Products prior to their advertisement, commercial distribution or the showing of samples for sale. During the term of this Agreement, the Manufacturer will not disclose or use for any purpose not contemplated by this Agreement any confidential information or data that is proprietary to either PVH or the Licensee.

6.    The Manufacturer shall institute procedures to control the storage, requisition from storage and use all labels, packages and other materials bearing the Trademark to safeguard against the escape or unauthorized use of the Trademark or Licensed Products.

7.    The Manufacturer will adhere to the standards and guidelines set forth in PVH's publication "A Shared Commitment - Requirements for Suppliers, Contractors, Business Partners" and PVH's "Statement of Corporate Responsibility," copies of which the Manufacturer acknowledges it has received. The Manufacturer further acknowledges that it has read and understands such publications. The Manufacturer will communicate immediately to the Licensee any departure from such standards and guidelines. The Manufacturer acknowledges that compliance with such standards and guidelines is a prerequisite to a continuing relationship with the Licensee. The Manufacturer shall also comply with all laws, rules, regulations and requirements of any governmental body which may be applicable to the operations of Manufacturer contemplated hereby, including, without limitation, as they relate to the manufacture of Licensed Products, notwithstanding the fact that Licensee may have approved such item or conduct.

8.    The Manufacturer agrees that PVH shall be a third party beneficiary of this Third Party Manufacturing Agreement and shall generally have the right (a) to exercise, and enforce against the Manufacturer, the rights of Licensee hereunder, if Licensee fails to exercise such rights, and (b) to exercise, and enforce against the Manufacturer the same rights as Licensee hereunder in addition to (and not in lieu of) the rights of Licensee hereunder. Nothing herein shall be deemed to give the Manufacturer any rights to make any claim against PVH.

9.    The Manufacturer will indemnify and hold harmless Licensee and PVH, and their respective affiliates, officers, directors, employees, agents and representatives from and against any and all claims, actions, proceedings, losses, expenses, costs and other damages (including without limitation, fees of counsel and allocated costs of in-house counsel) incurred by any of them as a result of the breach by the Manufacturer of this Third Party Manufacturing Agreement and its obligations hereunder and the enforcement of the same by Licensee or PVH.

10.    The Manufacturer acknowledges and agrees that any breach or threatened breach by the Manufacturer of this Third Party Manufacturing Agreement and its obligations hereunder will cause irreparable injury and incalculable harm to PVH and that PVH will, accordingly, in addition to damages and reasonable attorneys' fees, be entitled to preliminary and injunctive or other equitable relief, without the necessity of proving actual damages. The Manufacturer hereby waives any requirement for the posting of a bond by PVH with respect to any such matter.

3

11.    In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect in any jurisdiction, the validity, legality and enforceability of such provisions shall not be affected or impaired in any other jurisdiction, nor shall the remaining provisions contained herein in any way be affected or impaired thereby.

12.    THE MANUFACTURER ACKNOWLEDGES AND AGREES THAT, IF PERMISSIBLE UNDER THE LAWS OF THE COUNTRY IN WHICH THE MANUFACTURER IS DOMICILED, THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT, THE MANUFACTURER'S OBLIGATIONS HEREUNDER OR WITH RESPECT TO ANY BREACH OR THREATENED BREACH HEREOF SHALL BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES OF AMERICA LOCATED IN THE CITY OF NEW YORK AND THE COMPANY ACCEPTS THE EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS. THE MANUFACTURER CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE MANUFACTURER AT THE ADDRESS SET FORTH ABOVE, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

LICENSEE:
INTERNATIONAL HOME TEXTILES, INC.

By: _____
    Name:
    Title:

MANUFACTURER:

By: _____
    Name:
    Title:

4

**EXHIBIT E**

A SHARED COMMITMENT

VAN HEUSEN

# IZOD

Calvin Klein

Bass

ARROW

PVH

PVH

## GUIDELINES FOR VENDORS

While respecting cultural differences and economic variances that reflect the particular countries where we and our vendors do business, our goal is to create, and encourage the creation of, model facilities that not only provide good jobs at fair wages but which also improve conditions in the community at large. Therefore, we actively seek business associations with those who share our concerns.

### • LEGAL REQUIREMENTS

We expect our vendors to be law-abiding citizens and to comply with all legal requirements, including those relevant to the conduct of their business. We will seek vendors who respect the legal and moral rights of the employees.

### • NONDISCRIMINATION

We will not do business with any vendor who discriminates in employment, including hiring, salary, benefits, advancement, discipline, termination or retirement, on the basis of gender, race, religion, age, disability, sexual orientation, nationality, political opinion and social or ethnic origin.

### • CHILD LABOR

Employees of our vendors must be over the applicable minimum legal age requirement, or be at least 15 years old (or 14 years old where the law of the country of manufacture allows) or older than the age for completing compulsory education in the country of manufacture, whichever is greater. Vendors must observe all legal requirements for work of authorized minors, particularly those pertaining to hours of work, wages, minimum education and working conditions. We encourage vendors to support night classes and work study programs.

### • FORCED LABOR

We will not be associated with any vendor who uses any form of mental or physical coercion. We will not do business with any vendor who utilizes forced labor whether in the form of prison labor, indentured labor, bonded labor or otherwise.

### • HARASSMENT AND ABUSE

Vendors must treat employees with respect and dignity. No employees shall be subject to any physical, sexual, psychological or verbal harassment and/or abuse.

### • HEALTH AND SAFETY

Employers shall provide a safe and healthy work environment to prevent accident and injury occurring in the course of work due to or linked with the operation of the employer's facility. We encourage vendors to make a responsible contribution to the health care needs of their employees.

### • WAGES AND BENEFITS

We recognize that wages are essential to meeting employees basic needs. We will only do business with vendors who pay employees, as a floor, at least the minimum wage required by local law or the prevailing industry wage – when available, whichever is higher, and who provide all legally mandated benefits. Employees shall be compensated for overtime hours at the rate established by law in the country of manufacture or, in those countries where such laws do not exist, at a rate at least equal to their regular hourly compensation rate.

### • HOURS OF WORK

While permitting flexibility in scheduling, we will only do business with vendors who do not exceed prevailing local work hours and who appropriately compensate overtime. No employer should be scheduled for more than sixty hours of work per week, except in extraordinary business circumstances. Employees shall be entitled to at least one day off per seven day period.

### • FREEDOM OF ASSOCIATION

Employees should be free to join organizations of their own choice. Vendors shall recognize and respect the right of employees to freedom of association and collective bargaining. Employees should not be subject to intimidation or harassment in the exercise of their right to join or to refrain from joining any organization.

### • ENVIRONMENTAL REQUIREMENTS

We require our vendors to meet all applicable environmental laws in their countries and encourage the nurturing of a better environment of their facilities and in the communities in which they operate.

### • COMMITMENT TO COMMUNITIES

We will favor vendors who share our commitment to contribute to the betterment of the communities in which they operate.

---

## A SHARED COMMITMENT

*The guidelines you are about to read are of utmost importance to the Phillips-Van Heusen Corporation and in the relationships we form with suppliers, contractors and business partners.*

*While we place tremendous importance on these relationships, many of which qualify as genuine friendships of long-standing, certain values and standards have always been, and will always remain, paramount. Adherence to these values and standards by the people and companies we do business with is a prerequisite for continuing or establishing relationships with our company.*

*Indeed, we cannot do business with any company that fails to adhere to these ideals.*

*We believe that by working together to see these standards enforced, our company and its suppliers, contractors and business partners can help achieve a genuine improvement in the lives of working people around the world.*

*This mission has been a guiding principle of our company for more than a century, and it shall guide us in the future and take precedence over any economic or business concerns.*

**Bruce J. Klatsky**
Chairman, Chief Executive Officer

**Mark Weber**
President, and Chief Operating Officer

STATEMENT OF CORPORATE
RESPONSIBILITY

IZOD

Calvin Klein

Bass

## STATEMENT OF CORPORATE RESPONSIBILITY

At Phillips-Van Heusen Corporation we are guided by the principle that success in business is dependent on putting "human" issues first. Indeed, we know that our company would not have grown as it has if we did not place the highest priority on making a genuine contribution to improving the quality of life and upholding the basic right's of our associates, their families and the communities in which we operate.

*We are publishing this statement of corporate responsibility to clearly spell out our concerns and commitments.*

## STATEMENT OF COMMITMENT TO OUR ASSOCIATES

Our foremost concern, even in the most challenging economic climate, must be for our associates; the thousands of people who have made our company one of the most successful apparel and footwear manufacturers in the world today.

For over 100 years, our credo has been:

- To conduct all business in keeping with the highest moral, ethical and legal standards.

- To recruit, train, and provide career advancement to all associates without regard to gender, race, religion, age, disability, sexual orientation, nationality, or social or ethnic origin. Diversity in the workplace will be encouraged. Bigotry, racism, and sexual or any other form of harassment will not be tolerated.

- To maintain workplace environments that encourage frank and open communications.

- To be concerned with the preservation and improvement of our environment.

- To be ever mindful that our dedication to these standards is absolute—it will not be compromised.

## A SHARED RESPONSIBILITY

This commitment must be shared by the companies with which we do business.

We categorically state:

- We will not discriminate based on race, gender, religion or sexual orientation, and we will not do business with any company that does.

- We will treat our employees fairly with regard to wages, benefits and working conditions including a safe and healthy environment and we will not do business with any company that does otherwise.

- We will never violate the legal or moral rights of employees in any way, and we will not do business with any company that does.

- We will only do business with companies who share our commitment to preserving and improving the environment.

- We will never employ children in our facilities, nor will we do business with any company that makes use of child labor. Our employees and those of our partners and vendors must be over the applicable minimum legal age requirement, or be at least 15 years old (or 14 years old where the law of the country of manufacture allows), or older than the age for completing compulsory education in the country of manufacture, whichever is greater.

- Phillips-Van Heusen is committed to an ongoing program of monitoring all our facilities and those of companies with whom we do business in accordance with our code of conduct, "A Shared Commitment". This code defines PVH standards and values, which must be upheld in our facilities and those of our suppliers, contractors and business partners.

## PRODUCTION FACILITY EVALUATION FORM

FORM MUST BE SUBMITTED COMPLETED

# PHILLIPS-VAN HEUSEN CORPORATION

Page _____ of _____

Date _____

**NAME OF LICENSEE:**    INTERNATIONAL HOME TEXTILES, INC.

**LICENSEE'S ADDRESS:**    19401 WEST DIXIE HIGHWAY
MIAMI, FLORIDA 33180

**LICENSED PRODUCT:**    Sheets, pillow cases and towels, including, without limitation, wash cloths, hand towels, bath towels, bath sheets, bath mats and beach towels, but excluding dish towels

**PRODUCTION FACILITY:**

Name:_____

Name of President of Production Facility:_____

Address:_____

_____

Product:_____

Date Factory Evaluation Completed:_____

Signed: _____

(Note: Must be corporate officer)

_____

(Print Name)

Submit to the attention of:

Phillips-Van Heusen Corporation.
200 Madison Avenue
New York, NY   10016
Attention:  President - Licensing