EXHIBIT 4A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

PHILLIPS-VAN HEUSEN CORPORATION,    :

                Plaintiff,    :

                           :

        - against -    :

                           :

INTERNATIONAL HOME TEXTILES, INC.,    :
and SALO GROSFELD,

                           :

              Defendants.    :

-------------------------------------------------------------x

07 Civ. 8169 (AKH)

**ANSWER,
AFFIRMATIVE DEFENSES,
AND COUNTERCLAIM OF
INTERNATIONAL HOME
TEXTILES, INC.**

## ANSWER TO PLAINTIFF'S COMPLAINT

Defendant International Home Textiles, Inc., ("IHT") by its attorneys, Greenberg

Traurig, LLP, for its Answer to the Complaint (the "Complaint"):

### JURISDICTION AND VENUE:

      1.     Denies knowledge or information sufficient to form a belief as to the truth

of the allegations of paragraph 1 of the Complaint, except admits that IHT is a Florida

corporation with its principal place of business in Miami, Florida; defendant Salo

Grosfeld is a citizen of the State of Florida; and Plaintiff purports to bring this action

under 28 U.S.C. § 1332(a)(1), and that, accordingly, jurisdiction is conferred upon this

Court.

      2.     Denies the allegations of paragraph 2 of the Complaint.

      3.     Denies knowledge or information sufficient to form a belief as to the truth

of the allegations of paragraph 3 of the Complaint, except admits that Plaintiff purports to

seek supplemental jurisdictional relief from this Court.

**PARTIES:**

4.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 4 of the Complaint.

5.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 5 of the Complaint.

6.      Admits the allegations of paragraph 6 of the Complaint.

7.      Admits the allegations of paragraph 7 of the Complaint.

8.      Denies the allegations of paragraph 8 of the Complaint, except admits that IHT has been the Licensee of PVH's IZOD trademark since December 2001.

9.      Admits the allegations of paragraph 9 of the Complaint.

10.     Admits the allegations of paragraph 10 of the Complaint.

11.     Denies the allegations of paragraph 11 of the Complaint, except admits that Salo Grosfeld is, and at all relevant times has been, a shareholder of IHT.

12.     Denies the allegations of paragraph 12 of the Complaint, except admits that Salo Grosfeld, solely in his corporate capacity as President of IHT, was involved in the negotiations that led to the execution of the License Agreement between PVH and IHT.

13.     Denies the allegations in paragraph 13 of the Complaint.

**FACTS:**

14.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 14 of the Complaint.

15.     Denies the allegations of paragraph 15 of the Complaint, except admits that PVH entered into the License Agreement with IHT on or about January 1, 2006,

avers that the License Agreement speaks for itself, and refers the Court to that document for its specific contents.

16.    Denies the allegations of paragraph 16 of the Complaint, except admits that the License Agreement was for a term commencing on January 1, 2006 and concluding on December 31, 2008.

17.    Denies the allegations of paragraph 17 of the Complaint, avers that the License Agreement speaks for itself, and refers the Court to that document for its specific contents.

18.    Denies the allegations of paragraph 18 of the Complaint, avers that the License Agreement speaks for itself, and refers the Court to that document for its specific contents.

19.    Denies the allegations of paragraph 19 of the Complaint, avers that the License Agreement speaks for itself, and refers the Court to that document for its specific contents.

20.    Denies the allegations of paragraph 20 of the Complaint, avers that the License Agreement speaks for itself, and refers the Court to that document for its specific contents.

21.    Denies the allegations of paragraph 21 of the Complaint, avers that the License Agreement speaks for itself, and refers the Court to that document for its specific contents.

22.    Denies the allegations of paragraph 22 of the Complaint, avers that the License Agreement speaks for itself, and refers the Court to that document for its specific contents.

23.    Denies the allegations of paragraph 23 of the Complaint, avers that the License Agreement speaks for itself, and refers the Court to that document for its specific contents.

24.    Denies the allegations of paragraph 24 of the Complaint, avers that the License Agreement speaks for itself, and refers the Court to that document for its specific contents.

25.    Denies the allegations of paragraph 25 of the Complaint, avers that the License Agreement speaks for itself, and refers the Court to that document for its specific contents.

26.    Denies the allegations of paragraph 26 of the Complaint, avers that the License Agreement speaks for itself, and refers the Court to that document for its specific contents.

27.    Denies the allegations of paragraph 27 of the Complaint, avers that the License Agreement speaks for itself, and refers the Court to that document for its specific contents.

28.    Denies the allegations of paragraph 28 of the Complaint, avers that the License Agreement speaks for itself, and refers the Court to that document for its specific contents.

29.    Denies the allegations of paragraph 29 of the Complaint, avers that the License Agreement speaks for itself, and refers the Court to that document for its specific contents.

30.    Denies the allegations of paragraph 30 of the Complaint.

31.    Denies the allegations of paragraph 31 of the Complaint.

4

32.    Denies the allegations of paragraph 32 of the Complaint.

33.    Denies the allegations of paragraph 33 of the Complaint.

34.    Denies the allegations of paragraph 34 of the Complaint.

35.    Denies the allegations of paragraph 35 of the Complaint.

36.    Denies the allegations of paragraph 36 of the Complaint.

37.    Denies the allegations of paragraph 37 of the Complaint.

38.    Denies the allegations of both paragraphs 38 of the Complaint.

39.    Denies the allegations of paragraph 40 of the Complaint.

**FIRST CLAIM:**

40.    Repeats and realleges its responses to the allegations of paragraphs 1 through 40 of the Complaint as though fully set forth herein.

41.    Denies the allegations of paragraph 42 of the Complaint.

42.    Denies the allegations of paragraph 43 of the Complaint, except admits that on or about April 27, 2007, PVH sent a letter to IHT purporting to terminate the License Agreement.

43.    Denies the allegations of paragraph 44 of the Complaint.

44.    Denies the allegations of paragraph 45 of the Complaint.

**SECOND CLAIM:**

45.    Repeats and realleges its responses to the allegations of paragraphs 1 through 45 of the Complaint as though fully set forth herein.

46.    Denies the allegations of paragraph 47 of the Complaint.

47.    Denies the allegations of paragraph 48 of the Complaint.

48.    Denies the allegations of paragraph 49 of the Complaint.

49.   Avers that the allegations of paragraph 50 set forth a legal conclusion to which no response is required.

**THIRD CLAIM:**

50.   Repeats and realleges its responses to the allegations of paragraphs 1 through 50 of the Complaint as though fully set forth herein.

51.   Denies the allegations of paragraph 52 of the Complaint.

**FOURTH CLAIM:**

52.   Repeats and realleges its responses to the allegations of paragraphs 1 through 52 of the Complaint as though fully set forth herein.

53.   Denies the allegations of paragraph 54 of the Complaint.

IHT denies any factual allegation contained in any paragraph of the Complaint except as expressly admitted above.

IHT denies that plaintiff is entitled to any of the relief sought in the WHEREFORE clause on page 12 of the Complaint.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the equitable doctrines of waiver and estoppel.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the equitable doctrines of laches and unclean hands.

6

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because plaintiff failed to comply with conditions precedent to its claims.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the Statute of Frauds.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because Plaintiff repudiated and/or rescinded the License Agreement.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because Plaintiff breached the License Agreement.

## EIGHTH AFFIRMATIVE DEFENSE

The Complaint should be dismissed based on the Doctrine of Accommodation.

## NINTH AFFIRMATIVE DEFENSE

IHT hereby gives notice that it intends to rely upon any other defenses that may become available or appear during proceedings in this action.

## COUNTERCLAIMS

International Home Textiles, Inc. ("IHT"), by way of its counterclaim against Phillips-Van Heusen Corp. ("PVH"), alleges as follows:

### Nature of the Action

1.      This is a counterclaim for misrepresentation.

### The Parties

2.      Defendant and Counterclaim Plaintiff IHT is a Florida corporation with its principal place of business at 19401 West Dixie Highway, Miami, Florida 33180.

3.      Plaintiff and Counterclaim Defendant PVH is, upon information and belief, a Delaware corporation with a principal place of business at 200 Madison Avenue, New York, New York 10016.  PVH has at all relevant times been in the business, inter alia, of the manufacture, sale, distribution, promotion, and licensing the sale and distribution of various items under the trademark "IZOD" (the "Licensed Mark").

### Jurisdiction and Venue

4.      This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332(a)(1) of the United States Code.  The matter in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different states.  The Court has supplemental jurisdiction over any New York State claims pursuant to 28 U.S.C. § 1367(a).

5.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391.  Venue is also proper in New York County pursuant to New York C.P.L.R. §§ 501 and 503, and by virtue of a forum selection clause in a license agreement between PVH and IHT, dated as of January 1, 2006 (the "License Agreement").

## Factual Background

6.     On or about January 1, 2006, PVH entered into the License Agreement
with IHT, pursuant to which, among other things, PVH granted IHT (i) the exclusive
right to use the Licensed Mark in connection with the sale, distribution and promotion of
certain textiles including, without limitation, sheets, pillow cases and towels (collectively,
the "Licensed Products"), solely on a wholesale basis, to specifically approved customers
within the "Territory" as defined in the License Agreement; and (ii) certain limited and
non-exclusive rights to manufacture the Licensed Products. A true and correct copy of
the License Agreement is annexed hereto as Exhibit A.

7.     The license granted by PVH to IHT under the License Agreement was for
a term commencing on January 1, 2006 and ending on December 31, 2008.

8.     The License Agreement strictly limited IHT's right to sell the Licensed
Products to certain approved retailers whose identities were set forth in the License
Agreement (the "Approved Retailers"). *See* Ex. A, Section 6.14 and Schedule 6.14.

9.     IHT entered into the License Agreement based upon PVH's representation
that a number of Approved Retailers, who were in the business of marketing and selling
*apparel* products with the License Mark (but not Licensed Products, *i.e.* home textiles),
would also agree to market and sell Licensed Products.

10.     After entering into, and seeking to perform under the License Agreement,
however, IHT discovered that, contrary to PVH's representations, a number of the
Approved Retailers identified in the License Agreement, who only sold apparel products
with the License Mark, would *not* agree to market and sell Licensed Products.

11.    Given the terms of the License Agreement, which strictly limited the channels through which IHT could sell the Licensed Products, the fact that a number of Approved Retailers would not agree to sell and market Licensed Products negatively impacted IHT's ability to meet certain benchmarks under the License Agreement.

12.    When IHT requested that PVH expand the list of Approved Retailers to include retailers to whom PVH was already selling products with the License Mark, or to otherwise allow IHT to sell the Licensed Products to any other parties, PVH refused.

## COUNTERCLAIM

### (Misrepresentation)

13.    Counterclaim Plaintiff IHT repeats and realleges the allegations set forth in Paragraphs 1 through 12 as if set forth fully herein.

14.    When the parties were negotiating the License Agreement, PVH, through Mark Webber, PVH's President and Chief Executive Officer, and Kenneth Wyse, PVH's President of Licensing, represented to IHT President Salo Grosfeld that certain Approved Retailers, who were in the business of marketing and selling apparel products with the License Mark (and not Licensed Products, *i.e.* home textiles), would also agree to market and sell Licensed Products.

15.    The number of Approved Retailers who would market and sell Licensed Products was a material fact upon which IHT based its assent to the License Agreement.

16.    After it executed the License Agreement and began performance, IHT discovered that in fact, a material number of Approved Retailers who only sold apparel with the License Mark would not agree to market and sell Licensed Products.

10

17.    When PVH made the above representations, it knew, or reasonably should have known, that a material number of Approved Retailers would not agree to market and sell Licensed Products.

18.    In making the above representations notwithstanding its knowledge, or facts of which it should have been aware regarding the Approved Retailers, PVH misrepresented material facts to IHT.

19.    In agreeing to enter into the License Agreement and proceeding to perform thereunder, IHT relied upon PVH's misrepresentations to its detriment.

20.    IHT's reliance upon PVH's misrepresentations regarding Approved Retailers was both reasonable and justifiable.

21.    Due in part to the reduced list of Approved Retailers with whom it could actually market and sell Licensed Products, IHT was unable to perform its obligations under the License Agreement.

22.    Additionally, as a consequence of PVH's misrepresentations, IHT has been, and continues to be, damaged in an amount to be determined at trial, but believed to be not less than $2,000,000 (Two Million Dollars), plus pre-judgment interest at the legal rate.

## PRAYER FOR RELIEF

WHEREFORE, Defendant/Counterclaim Plaintiff IHT having answered the Complaint and having asserted the above Counterclaims for relief, respectfully demands a judgment against Plaintiff as follows:

1.    Dismissal of the Complaint against Defendant/Counterclaim Plaintiff IHT and Defendant Salo Grosfeld with prejudice, and entry of judgment in their favor;

11

2.    An award of compensatory, consequential, and punitive damages to Defendant/Counterclaim Plaintiff IHT in connection with this action;

3.    An award of interest, attorneys' fees, and reasonable costs and disbursements in connection with this action, including expert fees; and

4.    Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Defendant/Counterclaim Plaintiff IHT requests a trial by jury on all issues so triable as a matter of right.

Dated: New York, New York
       November 26, 2007

                              Respectfully submitted,


                              GREENBERG TRAURIG, LLP


                              By:_____
                                  Timothy E. Di Domenico (TD 4900)

                              MetLife Building
                              200 Park Avenue, 15th Floor
                              New York, New York 10166
                              (212) 801-9200

                              -and-

                              Of Counsel:

                              John F. Farraher, Jr.
                              Greenberg Traurig, LLP
                              One International Place, 20th Floor
                              Boston, MA  02110
                              (617) 310-6000

                              *Attorneys for Defendant/Counterclaim
                              Plaintiff International Home Textiles, Inc.
                              and Defendant Salo Grosfeld*

# EXHIBIT A

EXECUTION COPY

LICENSE AGREEMENT

BETWEEN

PHILLIPS-VAN HEUSEN CORPORATION

AND

INTERNATIONAL HOME TEXTILES, INC.

---

IZOD

---

SHEETS, PILLOW CASES AND TOWELS (INCLUDING, WITHOUT LIMITATION, WASH CLOTHS, HAND TOWELS, BATH TOWELS, BATH SHEETS , BATH MATS AND BEACH TOWELS BUT EXCLUDING DISH TOWELS)

---

UNITED STATES OF AMERICA ITS TERRITORIES AND POSSESSIONS

---

JANUARY 1, 2006

---

## TABLE OF CONTENTS

Page

ARTICLE I. GRANT ................................................................................................ 1
   1.1    License ........................................................................................ 1
       1.1.1   Exclusion of E-Commerce Sales. ...................................... 1
       1.1.2   Manufacturing; Right to Manufacture Outside of Territory; No
Exporting. ...................................................................................... 1
   1.2    Reservation ................................................................................ 2
       1.2.1   Retail Sales ....................................................................... 2
       1.2.2   License Strictly Limited ................................................... 2
   1.3    Definitional Disputes .............................................................. 2
   1.4    Exploitation of the License ..................................................... 2
       1.4.1   Commercially Reasonable Efforts ................................... 3
       1.4.2   Additional Licenses Prohibited ...................................... 3
       1.4.3   Limitation on Licensed Products. ................................... 3
       1.4.4   Merchandising Calendar. ................................................. 3
       1.4.5   Distribution Channels ...................................................... 3
       1.4.6   Designer. ........................................................................... 3
   1.5    Showrooms; Trade Shows ....................................................... 3
       1.5.1   Showrooms ....................................................................... 3
       1.5.2   In-Store Shops. ................................................................ 4
       1.5.3   Tradeshows ....................................................................... 4
ARTICLE II. LICENSE PERIOD ........................................................................ 4
   2.1    Initial License Period ............................................................. 4
   2.2    Renewal License Period ......................................................... 4
ARTICLE III. SALES ........................................................................................... 5
   3.1    Sales/Marketing and Production Plans .................................. 5
   3.2    Minimum Sales Levels ........................................................... 5
ARTICLE IV. LICENSE FEES ............................................................................ 5
   4.1    Requirement of Royalties ....................................................... 5
       4.1.1   Percentage Royalties ........................................................ 5
       4.1.2   Gross and Net Sales ......................................................... 5
       4.1.3   Guaranteed Minimum Royalties ..................................... 6
   4.2    Royalty Statements ................................................................. 6
   4.3    Books and Records ................................................................. 7
   4.4    Underpayments ....................................................................... 7
   4.5    Manner of Payment ................................................................ 7
   4.6    Interest on Late Payment ....................................................... 7
   4.7    No Set-Off ............................................................................... 8
   4.8    Taxes ....................................................................................... 8
   4.9    Financial Statements .............................................................. 8
ARTICLE V. ADVERTISING .............................................................................. 8
   5.1    Advertising Obligation ........................................................... 8
       5.1.1   Marketing Obligation ...................................................... 8
   5.2    Advertising Support. .............................................................. 9

i

| | | | |
|---|---|---|---|
| 5.3 | | Use of Advertising and Promotional Materials. | 9 |
| **ARTICLE VI. QUALITY AND STANDARDS** | | | 9 |
| 6.1 | | Distinctiveness and Quality of the Trademark | 9 |
| | 6.1.1 | Distinctiveness and Quality. | 9 |
| | 6.1.2 | Form of Trademark. | 10 |
| 6.1.3 | | Pricing. | 10 |
| | 6.2 | Product Approval; Quality Control. | 10 |
| 6.3 | | Manufacture of Licensed Products by Third Parties. | 10 |
| 6.4 | | Non-Conforming Products | 11 |
| 6.5 | | Approvals | 11 |
| 6.6 | | Marking, Labeling and Packaging | 11 |
| 6.7 | | Inspection of Facilities | 12 |
| 6.8 | | Samples and Artwork | 12 |
| 6.9 | | PVH Designs. | 12 |
| 6.10 | | Know-how. | 13 |
| 6.11 | | Market Weeks | 13 |
| 6.12 | | Meetings. | 13 |
| 6.13 | | Design Rights. | 13 |
| 6.14 | | Approved Accounts | 13 |
| 6.15 | | Disposal of Seconds and Close-Outs | 14 |
| | 6.15.1 | Seconds | 14 |
| | 6.15.2 | Close-Outs. | 15 |
| 6.16 | | Non-Approved Sales. | 15 |
| 6.17 | | Standards of Conduct. | 15 |
| | 6.17.1 | Standards. | 15 |
| | 6.17.2 | Audit Requirement. | 15 |
| | 6.17.3 | Approval | 16 |
| | 6.17.4 | Use of Facility. | 16 |
| **ARTICLE VII. THE TRADEMARK** | | | 16 |
| 7.1 | | Rights to the Trademark. | 16 |
| | 7.1.1 | Ownership of Trademark | 16 |
| | 7.1.2 | No Adverse Actions | 16 |
| | 7.1.3 | Additional Registrations | 17 |
| | 7.1.4 | Survival | 17 |
| 7.2 | | Protecting the Trademark. | 17 |
| 7.3 | | Use of the Trademark. | 17 |
| | 7.3.1 | Compliance with Legal Requirements. | 17 |
| | 7.3.2 | Use with Other Name. | 17 |
| | 7.3.3 | Execution of Documents. | 18 |
| 7.4 | | Ownership of Copyright | 18 |
| 7.5 | | Infringements, Counterfeits and Parallel Imports. | 18 |
| | 7.5.1 | Infringements. | 18 |
| | 7.5.2 | Counterfeits and Parallel Imports. | 19 |
| | | 7.5.2.1 PVH and Licensee to Cooperate | 19 |
| | | 7.5.2.2 Diversion | 19 |
| | 7.5.3 | Legal Proceedings. | 19 |

| | | |
|---|---|---|
| 7.6 | Trademark Security | 20 |
| | 7.6.1 Counterfeit Protection | 20 |
| | 7.6.2 Trademark Security Plan | 20 |
| 7.7 | Use of Trademark on Invoices, etc | 20 |
| 7.8 | Monitoring | 20 |
| ARTICLE VIII. TERM AND TERMINATION | | 20 |
| 8.1 | Expiration | 20 |
| 8.2 | Other Rights Unaffected | 20 |
| 8.3 | Immediate Right of Termination of the License | 21 |
| 8.4 | Termination With Notice and Right to Cure | 22 |
| 8.5 | Effect of Termination | 22 |
| | 8.5.1 Expiration or Full Termination | 22 |
| | 8.5.2 Partial Termination. | 22 |
| 8.6 | Inventory Upon Termination | 23 |
| 8.7 | Freedom to License | 23 |
| 8.8 | Rights Personal | 24 |
| 8.9 | Trustee in Bankruptcy | 24 |
| 8.10 | Compensation | 24 |
| ARTICLE IX. INDEMNIFICATION AND INSURANCE | | 25 |
| 9.1 | Indemnification by Licensee | 25 |
| 9.2 | Notice of Suit or Claim | 26 |
| 9.3 | Indemnification by PVH | 26 |
| 9.4 | Insurance | 26 |
| | 9.4.1 Requirement | 26 |
| | 9.4.2 Theft and Destruction Coverage | 27 |
| | 9.4.3 General Provision | 27 |
| | 9.4.4 Approved Carrier/Policy Changes | 27 |
| | 9.4.5 Evidence of Coverage | 27 |
| | 9.4.6 Territory | 27 |
| ARTICLE X. COMPLIANCE WITH LAWS | | 27 |
| 10.1 | Compliance with Laws | 27 |
| 10.2 | Equitable Relief | 28 |
| ARTICLE XI. MISCELLANEOUS | | 28 |
| 11.1 | Warranties and Representations of the Parties | 28 |
| 11.2 | Definitions | 29 |
| 11.3 | Notices | 29 |
| 11.4 | No Assignment Without Consent | 30 |
| 11.5 | No Sublicense or Distribution Agreement Without Consent. | 30 |
| 11.6 | Assignment by PVH | 30 |
| 11.7 | No Agency | 30 |
| 11.8 | Suspension of Obligations | 30 |
| 11.9 | Benefit | 30 |
| 11.10 | Entire Agreement; Amendment | 30 |
| 11.11 | Non-Waiver | 31 |
| 11.12 | Severability | 31 |
| 11.13 | Headings | 31 |

11.14  Counterparts ................................................................................................. 31
11.15  Governing Law ............................................................................................. 31
11.16  Jurisdiction ................................................................................................... 31
11.17  Non-Solicitation ........................................................................................... 32
11.18  Confidentiality. ............................................................................................ 32
11.19  Guaranties. ................................................................................................... 33
11.20  Construction ................................................................................................. 33

SCHEDULES

6.14    APPROVED ACCOUNTS
6.15    APPROVED SECONDS AND CLOSE-OUT ACCOUNTS

EXHIBITS

EXHIBIT A    ROYALTY STATEMENT
EXHIBIT B    ADVERTISING EXPENDITURE FORM
EXHIBIT C    SAMPLE SUBMISSION FORM
EXHIBIT D    THIRD-PARTY MANUFACTURING AGREEMENT
EXHIBIT E    "A SHARED COMMITMENT –REQUIREMENTS FOR SUPPLIERS,
CONTRACTORS, BUSINESS PARTNERS" and "STATEMENT OF
CORPORATE RESPONSIBILITY"
EXHIBIT F    PRODUCTION FACILITY EVALUATION FORM

<u>LICENSE AGREEMENT</u>

LICENSE AGREEMENT, dated as of January 1, 2006, between PHILLIPS-VAN HEUSEN CORPORATION ("PVH"), a Delaware corporation, and INTERNATIONAL HOME TEXTILES, INC. (the "Licensee"), a Florida corporation, with offices located at 19401 West Dixie Highway, Miami, Florida 33180.

WITNESSETH:

WHEREAS, PVH is the owner in the United States of America, its possessions and territories (the "Territory") of the IZOD trademark and Licensee desires to obtain from PVH, and PVH is willing to grant to Licensee, a license to use the Trademark (as defined herein) in connection with the manufacture, sale, distribution and promotion of sheets, pillow cases and towels, including, without limitation, wash cloths, hand towels, bath towels, bath sheets, bath mats and beach towels but excluding dish towels (collectively, the "Products") in the Territory, subject to the terms contained in this Agreement. Products bearing the Trademark are hereinafter referred to as "Licensed Products." Capitalized terms referred to in Section 11.2 are defined in the Sections set forth therein.

NOW, THEREFORE, the parties hereto agree as follows:

## ARTICLE I. GRANT

1.1    <u>License</u>. PVH hereby grants to Licensee an exclusive license (the "License") during the License Period, without the right to sublicense or assign, and subject to and in accordance with all of the terms contained in this Agreement, to use the Trademark, solely in the forms approved by PVH, in connection with the sale, distribution and promotion of the Licensed Products, solely on a wholesale basis, to approved customers in the Territory. Licensee may authorize its Affiliates to distribute Licensed Products on a wholesale basis to approved customers in the Territory, subject to and accordance with the terms contained herein, provided Licensee shall remain responsible to PVH for the performance of all obligations hereunder, and, provided further that Licensee pay to PVH Percentage Royalties on such sales of Licensed Products in accordance with the terms of Section 4.1.1 hereof.

1.1.1    <u>Exclusion of E-Commerce Sales</u>. The License excludes the sale, distribution and promotion of Licensed Products via commerce conducted on, made available through or facilitated by interactive or electronic media, whether now known or hereafter developed, including, without limitation, the Internet and on-line service providers, regardless of the means through which it is conducted ("E-Commerce"), other than on a wholesale basis to approved customers in the Territory.

1.1.2    <u>Manufacturing; Right to Manufacture Outside of Territory; No Exporting</u>. Licensee shall have the non-exclusive right to manufacture Licensed Products in or outside of the Territory and the right to import into the Territory Licensed Products manufactured outside the Territory; provided, however, that the right to manufacture Licensed Products outside of the Territory and import such goods into the Territory is conditioned upon Licensee taking all reasonable precautions to prevent any and all labels, tags, packaging material,

business supplies and advertising and promotional materials and any and all other forms of identification bearing the Trademark (collectively, the "Labels") from being used otherwise than in connection with the distribution and sale of Licensed Products within the Territory. Licensee shall neither export Licensed Products from the Territory nor sell Licensed Products to any entity which it knows or has any reason to believe intends to export Licensed Products from the Territory.

      1.2    Reservation. PVH reserves all rights in and to the Trademark except as specifically granted herein including, without limitation, those rights set forth in this Section. PVH may exercise any of its rights, or authorize others to exercise such rights at any time.

      1.2.1    Retail Sales. PVH reserves the exclusive right to use the Trademark upon and/or in connection with the retail sale, distribution and promotion of Licensed Products, including, without limitation, in PVH's company-controlled retail stores and via E-Commerce in and outside of the Territory. PVH reserves the right in connection with such sale, distribution and promotion to manufacture or purchase Licensed Products from any supplier PVH chooses, including Licensee; provided, however that PVH shall purchase Licensed Products from the Licensee for such stores to the extent that PVH reasonably determines that the Licensee is competitive in cost, quality, service and availability with other suppliers. Licensee acknowledges and agrees that sales to PVH's company-controlled stores are subject to a corporate discount from the agreed upon wholesale price. Such discount is established by PVH from time to time and is currently 3% off of the invoice price. Nothing herein shall prohibit approved customers from selling Licensed Products purchased from Licensee in the customers' approved locations, subject to the terms hereof.

      1.2.2    License Strictly Limited. Nothing contained in this Agreement shall be construed as an assignment or grant to Licensee of any right, title or interest in or to the Trademark, it being understood and acknowledged by Licensee that all rights relating thereto are reserved by PVH except for the rights specifically granted to Licensee in this Agreement. Licensee understands and agrees that PVH, and its other licensees and sublicensees, may manufacture or authorize third parties to manufacture Licensed Products in the Territory for sale outside of the Territory, or to manufacture and sell or authorize third parties to manufacture and sell products of any and all types and descriptions other than the Products under the Trademark in or outside the Territory. In addition, no license is granted hereunder for the manufacture, sale or distribution of the Licensed Products to be used for publicity purposes (other than publicity of the Licensed Products), in combination sales or as premiums or giveaways, or to be disposed of under or in connection with similar methods of merchandising, such rights being specifically reserved for PVH.

      1.3    Definitional Disputes. Licensee acknowledges that due to the nature of the marketplace, the definition of Products may change or may not be amenable to precise delineation. Licensee agrees that if there is a dispute over the definition of Licensed Products, PVH shall render a reasonable written determination which shall be conclusive and binding on Licensee without legal recourse.

      1.4    Exploitation of the License.

2

1.4.1   <u>Commercially Reasonable Efforts</u>.  At all times during the License Period, Licensee shall use commercially reasonable efforts to exploit the License throughout the Territory, including, but not limited to, selling a sufficiently representative quantity of all styles, fabrications, colors and sizes of the Licensed Products; offering for sale the Licensed Products so that they may be sold to consumers on a timely basis; maintaining a sales force sufficient to provide effective distribution throughout all areas of the Territory; and cooperating with marketing, merchandising, sales and anti-counterfeiting programs of PVH and any of its licensees.

1.4.2   <u>Additional Licenses Prohibited</u>.  Licensee shall not enter into or obtain from any third party any license that would directly or indirectly compete with the Licensed Products without the prior written consent of PVH; <u>provided, however</u>, this provision shall not apply to any existing licenses owned by Licensee on or prior to the date hereof, or any renewals thereof, or any license hereafter entered into with Martha Stewart, Pillowtex, Cannon or Fieldcrest for any of their respective brands.

1.4.3   <u>Limitation on Licensed Products</u>.  To the extent that Licensee, in PVH's reasonable opinion, is unable to sell a commercially reasonable quantity of a category of Products (e.g. sheets, beach towels, etc.), PVH shall give Licensee written notice thereof. Licensee shall submit to PVH a marketing plan with respect to such category of Licensed Products setting forth in reasonable detail steps to be taken by Licensee to increase the sales thereof within 30 days of its receipt of such notice.  In the event that Licensee's sales of such category of Products continue to be commercially unreasonable in PVH's reasonable opinion for the 12-month period following the receipt of PVH's initial written notice, PVH shall have the right, upon 30 days' written notice to Licensee, to terminate the License with respect to such category of Product.  Thereupon, the provisions of Section 8.5.2 shall control the disposition of Inventory of such category of Product.

1.4.4   <u>Merchandising Calendar</u>.  Licensee shall, as promptly as shall be practicable, provide PVH with a merchandising calendar for each product category and, after consultation with PVH, a detailed timeline for each product category launch.

1.4.5   <u>Distribution Channels</u>.  Licensee agrees that its sales of Licensed Products will be appropriately distributed among the various channels of distribution.

1.4.6   <u>Designer</u>.  Licensee shall appoint and maintain at all times during the License Period, a designer as a full-time employee of Licensee dedicated exclusively to the design of the Licensed Products.  At all times, Licensee must maintain sufficient staffing to support the business properly and to endeavor to maximize sales of Licensed Products.

1.5    <u>Showrooms; Trade Shows</u>.

1.5.1   <u>Showrooms</u>.  Licensee shall display the Licensed Products for sale in a separate showroom at its Miami headquarters and such other showrooms as PVH shall from time to time approve.  All such showrooms shall be designed in conformity with the prestige associated with PVH and the Trademark, and the plans therefore shall be subject to the prior written approval of PVH, which approval shall not be unreasonably withheld or delayed.  The

maintenance and renovation of such showrooms shall be subject to the ongoing direction and approval of PVH, which approval shall not be unreasonably withheld or delayed. Subject to prior written approval by PVH, Licensee may display the Trademark on showroom doors and office directories. Immediately upon execution of this Agreement, Licensee shall send photographs of its current IZOD showroom to PVH for PVH's approval.

       1.5.2   In-Store Shops. Licensee will, at PVH's request, participate in any in-store shop or main floor fixturing programs with any Approved Accounts. All such programs shall be designed in conformity with the prestige associated with PVH and the Trademark, and the plans therefor shall be subject to the prior written approval of PVH. To the extent that the same is not paid for by Licensee's customers, Licensee shall pay for the necessary fixturing for the display of the Licensed Products.

       1.5.3   Tradeshows. Licensee shall display the Licensed Products all tradeshows attended by Licensee at which Products are promoted for sale in the Territory, at Licensee's sole cost and expense. PVH may require Licensee to participate in PVH's booth at the MAGIC Convention at a cost to Licensee equal to a pro rata portion of the total costs of PVH's participation at the MAGIC Convention, allocated equally among all of PVH's other licensees participating in PVH's booth for the Trademark.

## ARTICLE II.  LICENSE PERIOD

       2.1   Initial License Period. The initial license period shall commence on January 1, 2006 and shall end on December 31, 2008 (the "Initial License Period"), unless sooner terminated as herein provided.

       2.2   Renewal License Period. Licensee shall have the right, provided that Licensee is not then in default of any of the provisions of this Agreement, including, without limitation, the provisions of Section 3.2, to request an extension of the License for an additional license period (the "Renewal License Period"; the Initial License Period and any Renewal License Period together are referred to as the "License Period"). Said right to request an extension shall be exercised by written notice by Licensee to PVH, received by PVH not more than nine months nor less than six months prior to the expiration of the Initial License Period. Any extension of this License shall be for a duration and on terms (including appropriate revisions of Sections 3.2 and 4.1.3) mutually acceptable to PVH and Licensee, in their sole and absolute discretion. Licensee acknowledges that the six to nine-month period is necessary in order to maintain the continuity of PVH's licensing and marketing programs and to protect the goodwill associated with the Trademark. Licensee agrees that "time is of the essence" and that Licensee's failure to exercise timely its option to request an extension of the License or to reach agreement with PVH on terms, shall be construed as a decision by Licensee that it has elected not to extend the License and shall permit PVH immediately to replace Licensee by executing a new license agreement with a third party, to commence after the Initial License Period has ended, without any liability to Licensee.

4

## ARTICLE III.  SALES

3.1    Sales/Marketing and Production Plans.  Not later than the execution hereof with respect to the 2006 calendar year and not later than 60 days prior to the beginning of each subsequent calendar year during the License Period, Licensee shall submit to PVH a written marketing plan, forecast and pro forma business plan (a "Licensing Forecast"), which shall contain a reasonable, good faith estimate of Net Sales for such Annual Period.  The term "Annual Period" refers to each calendar year during the License Period.

3.2    Minimum Sales Levels.  During each Annual Period, Licensee shall be required to meet the following minimum Net Sales levels, not including sales to PVH or sales in breach of any provision hereof, including, but not limited to, sales of Non-Conforming Products, Close-Outs or Seconds in excess of the amounts permissible under this Agreement (the "Minimum Sales"):

| Annual Period | Minimum Sales |
|---|---|
| 01/01/06-12/31/06 | $8,000,000 |
| 01/01/07-12/31/07 | $11,000,000 |
| 01/01/08-12/31/08 | $13,000,000 |

## ARTICLE IV. LICENSE FEES

4.1    Requirement of Royalties.  All Licensed Products sold by Licensee or its Affiliates require the payment of royalties by Licensee to PVH as set forth in this Article IV. "Affiliates" of any party means all persons and business entities, whether corporations, partnerships, joint ventures or otherwise, which now or hereafter control, or are owned or controlled, directly or indirectly, by such party, or are under common control with such party.

4.1.1    Percentage Royalties.  In respect of each Annual Period or portion thereof during the License Period, Licensee shall pay PVH percentage royalties (the "Percentage Royalties") in the amount of 5.0% of all Net Sales other than (i) sales to PVH which shall be in the amount of 3.0% of Net Sales and (ii) as set forth in Section 6.16 herein.  Percentage Royalties shall be payable in quarterly installments not later than April 30, July 31, October 31 and January 31 during the License Period commencing April 30, 2006; provided that the last payment of Percentage Royalties during the Initial License Period shall be payable on January 31, 2009.  All royalties shall accrue upon the sale of the Licensed Products regardless of the time of collection of the proceeds from such sale by Licensee or the failure to collect such proceeds.  For purposes of this Agreement, a Licensed Product shall be considered "sold" upon the date of billing, invoicing, shipping or payment, whichever occurs first.

4.1.2    Gross and Net Sales.  "Gross Sales" means the invoiced amount of Licensed Products, including, but not limited to, Seconds and Close-Outs, sold by Licensee, or on a wholesale basis by Licensee's Affiliates, before any deductions for returns, allowances, discounts, insurance or freight.  "Net Sales" means the Gross Sales of Licensed Products less returns actually allowed and actually received by Licensee, price allowances and customary and usual trade discounts granted.  The combined deductions from the Gross Sales for returns,

5

allowances and trade discounts shall not exceed 8% of the Gross Sales of the Licensed Products in any Annual Period. No other deductions shall be taken. It is the intention of the parties that Percentage Royalties will be based on the bona fide wholesale prices at which Licensee sells Licensed Products to independent retailers in arms' length transactions. In the event Licensee shall sell Licensed Products to its Affiliates for retail sales direct to consumers, Gross Sales, Net Sales and Percentage Royalties shall be calculated on the basis of such a bona fide wholesale price irrespective of Licensee's internal accounting treatment of such sales.

       4.1.3    Guaranteed Minimum Royalties.  In respect of each Annual Period or portion thereof during the License Period, Licensee shall pay to PVH the minimum royalties listed below, excluding (i) royalties paid on sales to PVH; (ii) royalties paid on sales in breach of any provision hereof, including, without limitation, royalties paid pursuant to Section 6.16 hereof; and (iii) royalties paid on sales of Non-Conforming Products, Seconds and Close-Outs (the "Guaranteed Minimum Royalties"), in four equal installments no later than April 30, July 31 and October 31, and January 31 for the immediately preceding calendar quarter commencing April 30, 2006 and ending on January 31, 2009; provided, however, that (x) the installment of the Guaranteed Minimum Royalties for any calendar quarter shall be payable only to the extent of the excess, if any, of such installment over the Percentage Royalties under Section 4.1.1 for such calendar quarter and (y) if the actual payments under Section 4.1.1 and this Section 4.1.3 for all prior calendar quarters in respect of such Annual Period, exceed the Guaranteed Minimum Royalties payable for such Annual Period, no further Guaranteed Minimum Royalties shall be payable in respect of such Annual Period.

| Annual Period | Guaranteed Minimum Royalties |
|---|---|
| 01/01/06-12/31/06 | $400,000 |
| 01/01/07-12/31/07 | $550,000 |
| 01/01/08-12/31/08 | $650,000 |

       4.2    Royalty Statements.  At the time each payment of Guaranteed Minimum Royalties and Percentage Royalties is due, Licensee shall deliver to PVH a royalty statement, substantially in the form of Exhibit A, signed by the chief financial officer of Licensee and certified by such officer as complete and accurate, setting forth for each month during the immediately preceding calendar quarter, and for such calendar quarter in the aggregate, and, in the case of the statement for each calendar quarter ending December 31, for each Annual Period in the aggregate, all of the following information: (i) Gross Sales by product category; (ii) the amount of returns, allowance and discounts from Gross Sales which properly may be deducted therefrom in calculating Net Sales; (iii) Net Sales by product category; (iv) a computation of the amount of Percentage Royalties by the number of units in each product category by size of the Licensed Products; (v) Net Sales by account, including separately Net Sales to PVH, Net Sales of Seconds, total units of Seconds sold, Net Sales of Close-Outs and total units of Close-Outs sold; and (vi) all of Licensee's inventory of Licensed Products and of related work in process (collectively, the "Inventory"). Licensee shall identify separately in such statements all sales to Affiliates. Within 90 days after the end of each Annual Period, Licensee will also deliver to PVH a certification from its independent auditors that the royalty statement for the calendar quarter ending December 31 is in accordance with the requirements of this Section 4.2.  Receipt or acceptance by PVH of any statement furnished, or of any sums paid by Licensee, shall not

preclude PVH from questioning their correctness at any time; provided, however, that reports submitted by Licensee shall be binding and conclusive on Licensee.

4.3    Books and Records. Licensee shall, at its sole cost and expense, maintain complete and accurate books and records (specifically including, without limitation, the originals or copies of documents supporting entries in the books of account) covering all transactions arising out of or relating to this Agreement. Such books and records shall be maintained in accordance with generally accepted accounting principles. PVH and its duly authorized representatives shall have the right once with respect to each Annual Period, during normal business hours, during the License Period and for three years thereafter, to examine and copy said books and records and all other documents and materials in the possession of or under the control of Licensee with respect to all transactions arising out of or relating to this Agreement. The exercise by PVH of any right to audit at any time or times or the acceptance by PVH of any statement or payment shall be without prejudice to any of PVH's rights or remedies and shall not bar PVH from thereafter disputing the accuracy of any payment or statement, and Licensee shall remain fully liable for any balance due under this Agreement. The Licensed Products shall be assigned style numbers unique from any other Products Licensee may manufacture or sell. The style number assigned to each Licensed Product shall be identical to the style number utilized to identify that Licensed Product in all Licensee's books and records. All documents evidencing the sale of Licensed Products shall state the style number of each of such Products. The Licensee shall not use terms such as "assorted" or "irregular" without a style specification with respect to the Licensed Products.

4.4    Underpayments. If, upon any examination of Licensee's books and records pursuant to Section 4.3, PVH shall discover any royalty underpayment by Licensee, Licensee will make all payments required to be made to correct and eliminate such underpayment within 10 days of PVH's demand. In addition, if said examination reveals a royalty underpayment of 3% or more for any royalty period, Licensee will reimburse PVH for the cost of said examination within 10 days of PVH's demand.

4.5    Manner of Payment. All payments required by Licensee hereunder shall be made to PVH in U.S. Dollars at the following address:

Phillips-Van Heusen Corporation
1001 Frontier Road
Bridgewater, New Jersey 08807
Attention: Finance Department
Telephone: (908) 698-6640
Facsimile: (908) 704-3412

All references in this Agreement to dollars shall mean U.S. Dollars. In the event that Licensee is required to withhold certain amounts for payment to the appropriate governmental authorities, Licensee will supply to PVH the official receipts evidencing payment therefor.

4.6    Interest on Late Payment. In addition to any other remedy available to PVH, if any payment due under this Agreement is delayed for any reason, including, without limitation, as a result of any royalty underpayment, interest shall accrue and be payable, to the

7

extent legally enforceable, on such unpaid principal amounts from and after the date on which the same became due at the lower of 1½% per month and the highest rate permitted by law in New York.

4.7     No Set-Off.  The obligation of Licensee to pay royalties hereunder shall be absolute, notwithstanding any claim which Licensee may assert against PVH.  Licensee shall not have the right to set-off, compensate or make any deduction from such royalty payments for any reason whatsoever.

4.8     Taxes.  Licensee will bear all taxes, duties and other governmental charges in the Territory relating to or arising under this Agreement, including, without limitation, any state or federal income taxes (except taxes on PVH's income), any stamp or documentary taxes or duties, turnover, sales or use taxes, value added taxes, excise taxes, customs or exchange control duties or any other charges relating to or on any royalty payable by Licensee to PVH. Licensee shall obtain, at its own cost and expense, all licenses, Federal Reserve Bank, commercial bank or other bank approvals, and any other documentation necessary for the importation of materials and Products and the transmission of royalties and all other payments relevant to Licensee's performance under this Agreement.  If any tax or withholding is imposed on royalties, Licensee shall obtain certified proof of the tax payment or withholding and immediately transmit it to PVH.

4.9     Financial Statements.  Once during each Annual Period, upon at least 60 days' written notice to Licensee, Licensee shall deliver to PVH an interim financial statement certified to by Licensee's chief financial officer.  Within 120 days after the end of each fiscal year of Licensee, Licensee shall deliver to PVH an annual financial statement certified to by Licensee's independent, certified public accountant.

## ARTICLE V.  ADVERTISING

5.1     Advertising Obligation.  In each Annual Period, Licensee shall pay to PVH an amount equal to the greater or (i) 2.0% of Net Sales for the immediately prior Annual Period and (ii) 2.0% of the Minimum Sales for the immediately prior Annual Period as specified in Section 3.2 hereof (the "Advertising Obligation") in four equal payments to be made at the time each payment of Guaranteed Minimum Royalties and Percentage Royalties is due; provided, however, that the Advertising Obligation for the first Annual Period shall be equal to 2.0% of Net Sales for the calendar year immediately preceding the first Annual Period, which sales were made pursuant to the prior license agreement between the parties.  The Advertising Obligation shall be used by PVH, in its sole and absolute discretion, for advertising and promoting the Trademark.  PVH, in its sole and absolute discretion, shall determine how to advertise and promote the Trademark, including, without limitation, the amount, type, media and method of such advertising and promotion.

5.1.1     Marketing Obligation.  In each Annual Period, Licensee shall spend an amount equal to at least the greater of (i) 3.0% of Net Sales for the immediately prior Annual Period and (ii) 3.0% of the Minimum Sales for the immediately prior Annual Period as specified in Section 3.2 hereof (the "Marketing Obligation") for trade shows, cooperative

8

advertising, materials, catalogues, point of sale promotions, in-store fixturing, visual marketing programs, special events and signage; provided, however, that the Marketing Obligation for the first Annual Period shall be equal to 3.0% of Net Sales for the calendar year immediately preceding the first Annual Period which sales were made pursuant to the prior license agreement between the parties. If in any Annual Period the Marketing Obligation has not been satisfied, then the Licensee shall spend such amount for the designated expenses within the first 90 days of the subsequent Annual Period. If the Marketing Obligation has not been satisfied by the end of such 90-day period, then the amount which should have been expended and which was not expended shall be paid over to PVH to be used by PVH for advertising the Trademark; provided, however, that if the Marketing Obligation has not been fulfilled within 90 days after the termination of the License Period, the unexpended Marketing Obligation shall be paid over to PVH absolutely. Proof of expenditure shall be submitted each quarter using the Marketing Expenditure Form, attached hereto as Exhibit B.

      5.2    Advertising Support. If Licensee requests advertising support including, without limitation, the acquisition of rights to use images of models in jurisdictions within the Territory where rights have not been obtained or for uses for which authorization has not been granted, the Licensee shall pay over to PVH the incremental costs associated with such advertising support. At PVH's request, Licensee shall provide Licensed Products at Licensee's sole expense for use in PVH's photo shoots related to advertising for the Trademark.

      5.3    Use of Advertising and Promotional Materials. Licensee shall only use graphics and images supplied by or approved by PVH. It is understood and agreed that all costs involved with using the images in the Territory, including production costs, for advertising and marketing materials supplied by PVH to Licensee shall be the responsibility of Licensee. The use and release of any and all promotional material (printed or otherwise) relating to the Licensed Products or Licensee's activities pursuant to this Agreement in the nature of press releases, interviews or other similar public relations events, and any other corporate release, data or information which will or is likely to become public will be prepared or conducted in consultation with, and subject to the prior approval of, PVH's public relations and legal departments, it being acknowledged and agreed by Licensee that any such public event or release could affect the image and prestige of PVH and the Trademark. After any such approval, Licensee will not modify the approved material or activity in any respect unless such modification is specifically approved by PVH's public relations and legal departments.

## ARTICLE VI. QUALITY AND STANDARDS

      6.1    Distinctiveness and Quality of the Trademark.

      6.1.1    Distinctiveness and Quality. Licensee shall maintain the distinctiveness of the Trademark and the image and high quality of the goods and merchandise bearing the Trademark presently manufactured and sold by PVH and its other licensees, and the prestigious marketing of same as presently maintained by PVH and its other licensees. Licensee agrees that all Licensed Products manufactured or sold by it will be of high quality as to workmanship, fit, design and materials, and shall be at least equal in quality, workmanship, fit, design and material to the samples of Licensed Products submitted by Licensee and approved by

9

PVH pursuant to Section 6.2. All manufacturing and production shall be of a quality in keeping with the prestige of PVH and the Trademark.

6.1.2   Form of Trademark. Licensee agrees that it will only use the Trademark in the form thereof then approved by PVH, and that all Licensed Products shall bear the Trademark in such approved form. PVH shall give Licensee reasonable prior notice of any change in the form of the Trademark and shall permit Licensee to use a superseded form of the Trademark for up to six months in order to enable Licensee to sell inventory, complete and sell work-in-process, and to deplete inventories of labels, tags, packaging, and other materials bearing the Trademark. In the event PVH elects to change the form of the Trademark, Licensee's obligations in respect to the image and high quality of the goods and merchandise bearing the Trademark, and the prestigious marketing of same as required by this Section 6.1, shall be consistent with the actions of PVH and its other licensees in respect to Licensed Products bearing such new form of the Trademark.

6.1.3   Pricing. Licensee acknowledges that in order to preserve the goodwill attached to the Trademark, the Licensed Products should be sold at prices and terms reflecting the prestigious nature of the Licensed Products, and the reputation of the Trademark as appearing on goods of high quality and reasonable price, it being understood, however, that PVH is not empowered to fix or regulate the prices for which the Licensed Products are to be sold, either at the wholesale or retail level.

6.2   Product Approval; Quality Control.   Before producing, selling or distributing any Licensed Product, Licensee shall submit for PVH's review, revision and approval samples of each of the Licensed Products. Any such request for approval shall be submitted to PVH on the form annexed hereto as Exhibit C. Such samples shall be submitted sufficiently far in advance to permit Licensee time to make such changes as PVH deems necessary. Any approval given hereunder shall be limited to the time period during the Annual Period set forth in such request, or as otherwise modified in PVH's discretion. Once samples have been approved, Licensee will manufacture only in accordance with such approved samples and will not make any changes without PVH's prior written approval. Upon PVH's request, Licensee shall submit to PVH additional samples of Licensed Products. No Licensed Products (including samples) shall be distributed and/or sold by Licensee unless such Licensed Products are in substantial conformity with, and at least equal in quality to, the samples previously approved by PVH in accordance with this Section 6.2. Upon request by PVH, Licensee shall supply PVH with a reasonable quantity of production samples in order for PVH to assess the conformity of production with the approval samples. All samples of Licensed Products submitted to PVH pursuant to this Section 6.2 shall be provided at Licensee's sole cost and expense.

6.3   Manufacture of Licensed Products by Third Parties. All contractors wherever located which Licensee desires to use in connection with the manufacture of Licensed Products are subject to the prior written approval of PVH. In order to maintain PVH's high standard of quality control and to insure that appropriate measures are taken against counterfeiting, Licensee shall provide PVH with the following information: (i) name and address of each proposed manufacturer; (ii) type of Licensed Products to be manufactured; (iii)

quantity of Licensed Products to be manufactured; and (iv) any other relevant information. Licensee shall obtain the signature of an authorized representative from each approved third-party manufacturer used by Licensee on an agreement (a "Third-Party Manufacturing Agreement"), substantially in the form of Exhibit D. Licensee shall not knowingly enter into a Third-Party Manufacturing Agreement with any third party that has breached a similar agreement with PVH or its Affiliates or any licensee of PVH or its Affiliates. Licensee acknowledges that it shall remain primarily liable and completely obligated under all of the provisions of this Agreement in respect of such contracting or assembly arrangements.

        6.4    Non-Conforming Products. In the event that any Licensed Products are, in the judgment of PVH, not being manufactured, distributed or sold with first quality workmanship or in strict adherence to all details and characteristics furnished by PVH, PVH shall notify Licensee thereof in writing, and Licensee shall promptly change such Licensed Product to conform thereto. If Licensed Products as changed do not strictly conform after PVH's request and such strict conformity cannot be obtained after one resubmission, such Licensed Products (the "Non-Conforming Products") shall be disposed of in a way which shall not reduce the value of the Trademark or detract from its reputation. Licensee shall obtain the express prior written consent of PVH with respect to the terms, conditions and method of their disposal, which may include, without limitation, the destruction of the Non-Conforming Products, the donation of such Non-Conforming Products to eleemosynary institutions, the sale of such Non-Conforming Products in a private sale, with proceed to be given to charity, or the removal of Labels and other identification prior to sale. PVH may require Licensee to recall any Licensed Products that not consistent with approved quality standards or may purchase at Licensee's expense any such Licensed Products found in the marketplace. Licensee must pay royalties on sales of Non-Conforming Products.

        6.5    Approvals. All approvals by PVH required under this Agreement must be obtained in advance of use of the item subject to approval, which approval must be in writing from PVH to Licensee. Except as otherwise expressly provided hereunder, a submission for approval shall be deemed approved unless PVH delivers a notice of disapproval within 30 days after receipt of a written request for approval. All matters requiring approval of PVH shall be granted or withheld in the sole and absolute discretion of PVH and may be based solely on PVH's subjective aesthetic standards. PVH shall provide an explanation for disapprovals, unless such disapproval reflects an issue of taste or subjective judgment. PVH has no obligation to approve, review or consider any item which does not strictly comply with the required submission procedures. Approval by PVH shall not be construed as a determination that the approved matter complies with all applicable regulations and laws. No disapproved item shall be manufactured, sold, used, distributed or advertised by Licensee under the Trademark. Licensee may revise any disapproved item and resubmit it. Licensee must strictly comply with all of PVH's decisions. PVH may amend the approval forms as appropriate. In the event that it is reasonably necessary for PVH to do on-site approvals, Licensee will pay any and all expenses and airfare incurred by PVH with respect to such on-site approvals.

        6.6    Marking, Labeling and Packaging. All Labels must be approved by PVH. The use of any Label that has not been approved is expressly prohibited. PVH reserves the right to require Licensee to purchase Labels to be used on the Licensed Products only from sources designated by PVH, provided that such sources provide the Labels to Licensee in a reasonably

competitive manner as to price and delivery schedules. All Licensed Products manufactured, distributed or sold by, or on behalf of, Licensee shall be marked, labeled, packaged, advertised, distributed and sold in accordance with this Agreement, in accordance with all applicable laws, rules and regulations in the Territory, and in such a manner as will not tend to mislead or deceive the public. At the request of PVH, Licensee shall cause to be placed on all Licensed Products an appropriate notice designating PVH as the owner of the Trademark. The manner of presentation of such notice shall be determined by PVH.

6.7    Inspection of Facilities. PVH and its duly authorized representatives shall have the right, during normal business hours and upon reasonable notice, to inspect all facilities utilized by Licensee (and its contractors and suppliers to the extent Licensee may do so) in connection with the manufacture, sale, storage or distribution of Licensed Products, and to examine the Licensed Products in the process of manufacture and when offered for sale within Licensee's and its contractors' operation.

6.8    Samples and Artwork. PVH shall make available to Licensee certain samples, sketches, designs, colors, fabric samples, tags, labels, packaging, catalogues and artwork available to PVH, and, except as provided in Section 5.3 hereof, the cost of providing such materials shall be borne by Licensee at PVH's cost, for the development of Products and Labels. All right, title and interest, including any copyrights or other intellectual property rights, in and to samples, sketches, designs, and other materials furnished to Licensee by PVH or submitted by Licensee to PVH in connection with the Licensed Products, including any modifications or improvements thereof which may be created by PVH, but excluding Excluded Designs (collectively the "Artwork Designs"), shall remain the sole property of PVH as between Licensee and PVH, and are licensed hereunder solely and exclusively for use in connection with the manufacture, sale, distribution and promotion of Licensed Products in the Territory in accordance with the terms of this Agreement. "Excluded Design" means a design (i) submitted by Licensee and not approved by PVH; (ii) not distinguishable from similar generic products generally available in the marketplace; or (iii) not distinguishable from a product which has previously appeared in Licensee's product line and Licensee advised PVH of such condition at the time of submission. In the event of clause (i) or (iii) above, Licensee shall retain title to such designs but shall permit PVH to use such designs in perpetuity. PVH may use and permit others to use said designs and other materials in any manner it desires, provided that such use does not conflict with any rights granted Licensee hereunder. Licensee specifically acknowledges that such designs and other materials may be used by PVH and other licensees on Licensed Products in jurisdictions outside the Territory, on products other than Licensed Products anywhere in the world, and on all products including Licensed Products anywhere in the world after the expiration or termination of this Agreement.

6.9    PVH Designs. PVH may provide Licensee with creative concepts and fashion direction as to each seasonal collection of Licensed Products, including recommendations as to color, material, design and styling of such Products and such additional design assistance as PVH determines in its sole discretion. For each such collection , Licensee shall utilize substantially all of the designs, fabrics, trim submitted or approved by PVH and shall produce on a timely basis pre-production prototypes for PVH's review and approval.

12

6.10   Know-how. Licensee shall have the right to cause its personnel to visit PVH's offices, factories, showrooms and other places of business, and also to attend PVH's sales meetings, in order to obtain additional know-how and assistance, all as PVH deems appropriate. The scheduling of such visits shall be at times mutually convenient to the parties hereto.  In connection with such visits, Licensee shall bear all expenses of Licensee's representatives.

6.11   Market Weeks.  In the event PVH desires to market the Licensed Products in conjunction with its goods or the merchandise of other licensees bearing the Trademark, Licensee shall, upon receipt of reasonable notice from PVH, have sales personnel present at PVH's showroom in New York during each major market week during the License Period, and Licensee shall be permitted to utilize such showrooms to market and sell the Licensed Products during such market week.

6.12   Meetings. PVH may from time to time hold meetings of PVH's licensees during the License Period.  Licensee shall, upon receipt of reasonable notice, attend such meetings at its own expense but shall not be required to attend more than two such meetings per year.

6.13   Design Rights.  Al designs created hereunder by or on behalf of Licensee shall be original works.  Licensee acknowledges and agrees that PVH owns or shall own all rights in and to the Artwork Designs regardless of whether such designs are created by PVH or by or on behalf of Licensee, except Excluded Designs.  Licensee agrees to make, procure and execute all assignments necessary to vest ownership of such rights in PVH.  Licensee shall place appropriate notices, reflecting ownership of such rights by PVH, on all Licensed Products, Labels and other promotional materials.  Licensee shall not do or allow to be done anything which may adversely affect any of PVH's rights in the Artwork Designs.  All designs used by Licensee for the Licensed Products shall be used exclusively for the Licensed Products and may not be used under any other mark, whether during the License Period or any time thereafter, without the prior written consent of PVH.  Licensee shall disclose and freely make available to PVH any and all developments or improvements it may make relating to the Licensed Products and to their manufacture, promotion and sales, including, without limitation, developments and improvements in any machine, process or product design, that may be disclosed or suggested by PVH or regarding any patent or trademark which Licensee is entitled to utilize.

6.14   Approved Accounts.  Subject to Section 6.15, the Licensed Products sold by Licensee may be sold only to those specialty shops, department store and retail outlets (i) which carry high quality and prestige merchandise; (ii) whose location, merchandising and overall operations are consistent with PVH's reputation and sales policies and with the prestige of PVH and the Trademark;  and (iii) which have been expressly approved by PVH, including, without limitation, the customers listed on Schedule 6.14.  No warehouse club, mass merchandiser, value retailer or account or store of comparable characterization is or will be an Approved Account.  Whenever Licensee shall wish to sell Licensed Products to customers not previously approved by PVH, Licensee shall submit to PVH for its approval, a written list of proposed customers, together with such other information as PVH may reasonably request, such as photographs, address and information regarding the Products and other merchandise sold by such proposed customer. The proposed customers approved by PVH, together with the customers listed on Schedule 6.14, are referred to as the "Approved Accounts."

13

Notwithstanding PVH's approval of any customer, including customers listed on <u>Schedule 6.14</u>, PVH may at any time subject sales to such customer to any conditions or limitations PVH considers appropriate; <u>provided, however,</u> that in order to be effective, any such conditions or limitations must be set forth in a writing provided to Licensee. Without limiting the generality of the foregoing, the Licensee acknowledges and agrees that no more than 33% of its sales (both by units and Net Sales) may be to J.C. Penney Company, Inc. Nothing herein shall be deemed to prohibit PVH from withdrawing its approval of any Approved Account, including, without limitation, any customer on <u>Schedule 6.14</u>, upon written notice to Licensee (at which time, such customer shall cease to be an Approved Account for purposes of this Agreement); <u>provided, however,</u> that Licensee may fulfill any firm orders entered into prior to Licensee's receipt of PVH's withdrawal of approval. Licensee shall not (i) market or promote or seek customers for the Licensed Products outside of the Territory; (ii) maintain any Inventory outside of the Territory, except in connection with the manufacture of Licensed Products outside of the Territory in accordance with the terms hereof pending shipment to Licensee or its approved customers; (iii) sell or distribute any Licensed Products to wholesalers, jobbers, diverters, or any other entity which does not operate retail stores exclusively; (iv) sell the Licensed Products directly to the public in retail stores, via E-Commerce, or otherwise; (v) use the Licensed Products as giveaways, prizes or premiums, except for promotional programs which have received the prior written approval of PVH; (vi) sell the Licensed Products to any third party or Affiliate of Licensee or any of its directors, officers, employees or any person having an equity participation in or any other affiliation to Licensee, without the prior written approval of PVH, except for incidental sales for personal use only; or (vii) sell Licensed Products to any third party that intends to resell the Licensed Products (a) outside of the Territory or (b) via E-Commerce.

      6.15   <u>Disposal of Seconds and Close-Outs</u>. Seconds and Close-Outs sold by Licensee may be sold only to those customers set forth on the Approved Accounts and Approved Seconds and Close-Outs Accounts. Whenever Licensee shall wish to sell Seconds and Close-Outs to customers not previously approved by PVH, Licensee shall submit a written list of the proposed customers for Seconds and Close-Outs for PVH's prior written approval. The proposed customers approved from such list, together with the customers listed on Schedule 6.15, are referred to as the "<u>Approved Seconds and Close-Outs Accounts</u>." Notwithstanding PVH's approval of any customer including, without limitation, any customer listed on <u>Schedule 6.15</u>, PVH may at any time subject sales to any such customer to any conditions or limitations PVH considers appropriate; <u>provided, however,</u> that in order to be effective, any such conditions or limitations must be set forth in a writing provided to Licensee. Nothing herein shall be deemed to prohibit PVH from withdrawing its approval of any Approved Seconds and Close-Outs Account, including, without limitation, any customer listed on <u>Schedule 6.15</u>, upon written notice to Licensee (at which time, such customer shall cease to be an Approved Seconds and Close-Outs Account for purposes of this Agreement); <u>provided, however,</u> that Licensee may fulfill any firm orders entered into prior to Licensee's receipt of PVH's withdrawal of approval.

      6.15.1   <u>Seconds</u>. Licensee shall only sell Licensed Products which are damaged, imperfect, non-first quality or defective goods ("<u>Seconds</u>") in a way which shall not reduce the value of the Trademark or detract from its reputation and shall obtain the express prior written consent of PVH with respect to the terms and method of their disposal. All Seconds approved for sale by PVH shall be clearly marked "Seconds" or "Irregular." The percentage of Seconds of any of the Licensed Products which may be disposed of pursuant to this Section