Weiss & Hiller, P.C.
Attorneys for the Plaintiff
600 Madison Avenue
New York, New York 10022
Telephone:    (212) 319-4000
Facsimile:    (212) 753-4530
Email: aweiss@weisshiller.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
PHILLIPS-VAN HEUSEN CORPORATION,    :

                             Plaintiff,    :

           -against-    :

                                  :

INTERNATIONAL HOME TEXTILES, INC.
and SALO GROSFELD,    :

                    Defendants.    :
------------------------------------------------------------x

Case No. 07 Civ 8169 (AKH)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT GROSFELD'S MOTION TO DISMISS**

## TABLE OF CONTENTS

Page

Table of Contents ................................................................................. (i)

Table of Authorities ............................................................................ (ii, iii, iv)

PRELIMINARY STATEMENT ............................................................ 1

STATEMENT OF FACTS AND PRIOR PROCEEDINGS ........................................... 2

      The Nature of this Action and the Pleadings ....................................................... 2

      The Pending Motions ................................................................... 3

      Facts Pertinent to Grosfeld's Within Motion ....................................................... 3

POINT I -- GROSFELD'S FRCP 12(b)(6) MOTION TO DISMISS
REQUIRES THE RESOLUTION OF CASE DETER-
MINATIVE ISSUE(S) OF FACT, THEREBY
NECESSITATING ITS CONVERSION INTO
ONE FOR SUMMARY JUDGMENT ................................................... 7

POINT II -- THE PROCEDURAL STANDARD OF REVIEW FOR
SUMMARY JUDGMENT ........................................................ 8

POINT III -- THE RECORD MAKES IT CLEAR THAT, IN VIEW
OF A CONSISTENT LINE OF CASES INTERPRETING
NEW YORK LAW, GROSFELD INTENDED TO
GUARANTEE AND BECOME JOINTLY OBLIGATED
UNDER THE LICENSE AGREEMENT .................................................. 9

POINT IV -- GROSFELD IS BOUND BY THE GUARANTEE
PROVISION OF THE LICENSE AGREEMENT ...................................... 15

POINT V -- GROSFELD'S GUARANTEE/JOINT OBLIGATION PROVISION
FULLY SATISFIES THE REQUIREMENTS OF THE STATUTE
OF FRAUDS.  MOREOVER, GROSFELD'S UNDERTAKING TO BE
JOINTLY AND SEVERALLY LIABLE IS NOT AN AGREEMENT
THAT IS SUBJECT TO THE STATUTE OF FRAUDS.......................... 20

CONCLUSION ........................................................................... 22

## TABLE OF AUTHORITIES

Page

Aksman v. Xiongwei Ju, 21 A.D.3d 260 ........................................................................ 19

Bank of Italy v. Merchants Nat'l Bank, 236 N.Y. 106 (1923) ..................................... 16

CAE Indus. Ltd. v. Aerospace Holdings Co., 741 F.Supp. 388 (S.D.N.Y. 1989) ........ 17

Carmon v. Soleh Boneh and Gray v. LeChase Construction Services, 206 A.D.2d
450 (2d Dep't. 1994); 31 A.D.3d 983, 986-87 (3d Dep't. 2006) .................................. 19

Cavendish Traders, Ltd. v. Nice Skate Shoes, Ltd., 117 F.Supp. 2d 394
(S.D.N.Y. 2000) ........................................................................................................... 16

Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo, 35 F.3d 29
(2d Cir. 1994).............................................................................................................. 9,10,12

Conopco Inc. v. Wathne Ltd., 190 A.D.2d 587 (1st Dep't. 1993) ................................ 17.19

Dyckman v. Barrett, 187 A.D.2d 553 (2d Dep't. 1992) ............................................... 8

Int'l Telemeter Corp. v. Teleprompter Corp., 592 F.2d 49 (2d Cir. 1979) .................. 19

JMD Holding Corp. v. Congress Financial Corp., 4 N.Y.3d 373 (2005) ..................... 8

Lakhaney v. Anzelone, 788 F.Supp. 160 (S.D.N.Y. 1992) ........................................... 16

Lehman Bros., Inc. v. Tutelar Cia Financiera, 1997 WL 403463, *2
(S.D.N.Y. 1997) .......................................................................................................... 9,10,11

Lerner v. Amalgamated Clothing and Textile Workers Union, 838 F.2d 2, 6 (1991) .. 13

Mingoia v. Santa Fe Drywall Corp., 2005 WL 1384013, *5 (S.D.N.Y 2005) ............. 13

Paribas Properties, Inc. v. Benson, 146 A.D.2d 522 (1st Dep't. 1989) ........................ 9,14,21,22

Penn Palace Operating, Inc. v. Two Penn Plaza Associates, 239 A.D.2d 155
(1st Dep't. 1997) ......................................................................................................... 17

Porter v. Property Damage Control Group, Inc., 2007 WL 2907403, *9
(E.D.N.Y. 2007) .......................................................................................................... 7,9,10,11,12

Prospect Street Ventures I, LLC v. Eclipsys Solutions Corp., 23 A.D.3d 213
(1st Dep't. 2005) .......................................................................................................... 19

Salzman Sign Co. v. Beck, 10 N.Y.2d 63 (1961) .......................................................... 9,21

Savoy Record Co., Inc. v. Cardinal Export Corp., 15 N.Y.2d 1 (1964) ............................... 21

Star Video Entertainment v. J & I Video Distributing, Inc., 268 A.D.2d 423
(2d Dep't. 2000) ...................................................................................................... 9,10

Teachers Ins. And Annuity Ass'n of Am. v. Tribune Co., 670 F.Supp. 491
(S.D.N.Y. 1987) ...................................................................................................... 12,19

Tessier v. New York City Health and Hospitals Corp., 177 A.D.2d 626 (2d Dep't. 1991) .... 8

Turtle & Hughes, Inc. v. Browne, 1996 WL 384895, *3 (S.D.N.Y. 1996) ........................... 11

Zarr v. Riccio, 180 A.D.2d 734 (2d Dep't. 1992) ................................................................. 8

Zuckerman v. City of New York, et al., 49 N.Y.2d 557 (1980) ........................................... 8

## Statutes

Fed. R. Civ. P. 12(b)(6) and 9(b) ...................................................................... 3,7

Fed. R. Civ. P. 56(d) ...................................................................... 8

## Affidavit

Affidavit of Kenneth L. Wyse sworn to on January 24, 2008 ...............................................

Exhibits to Affidavit ...............................................

    1.     Executed License Agreement dated January 1, 2006 ...................................

    2.     Draft License Agreement dated January 1, 2006 .........................................

    3.     Grosfeld's Email to Wyse dated December 23, 2005 ...................................

    4.     Wyse Email to Grosfeld dated October 27, 2005 .........................................

    5.     Wyse letter to Grosfeld dated October 26, 2005 .........................................

    6.     Wyse letter to Grosfeld dated January 4, 2006 .............................................

    7.     Fischer  letter to Grosfeld dated April 27, 2007 ...........................................

    8.     IHT's Answer dated November 26, 2007......................................................

## PRELIMINARY STATEMENT

By this action, plaintiff Phillips-Van Heusen Corporation ("PVH"), seeks, inter alia, nearly $2M against defendant International Home Textiles, Inc. ("IHT") as damages resulting from IHT's various breaches of a license agreement that PVH and IHT entered into dated January 1, 2006 ("License Agreement;" Exh. 1). PVH's action also contains claims against defendant Salo Grosfeld ("Grosfeld"), the president of IHT, who personally guaranteed and agreed to be jointly liable for, IHT's obligations under the License Agreement. Grosfeld interposed his within motion to dismiss, arguing that he never intended to be personally bound by the guarantee and that New York's Statute of Frauds precludes enforcement of the guarantee. As demonstrated more fully below, these contentions are baseless and contrary to applicable law.

Grosfeld argues that because he signed the License Agreement as "President" of IHT, he cannot be personally bound by his personal guarantee contained therein. This claim is flawed because: (a) substantial case law holds that a superficial or facial indication of agency is not determinative where sufficient evidence demonstrates that the agent intended to be personally bound by the guarantee contained in the contract; and (b) Grosfeld ignores the factual record which clearly demonstrates that he knew of the guarantee and actually intended to be personally bound by it.

Grosfeld's claims relating to the Statute of Frauds are based on the inaccurate premise -- that he did not intend to be personally bound by the personal guarantee contained in the License Agreement. The very case law upon which Grosfeld relies reveals that, where the evidence shows that the agent intended to be personally bound -- as it does here -- his signature to the document does in fact, satisfy the Statute of Frauds.

Grosfeld further argues that the guarantee is unenforceable because it expresses future intent to agree to the terms of the guarantee. This allegation is also meritless. Contrary to Grosfeld's

assertion, the guarantee is whole, complete, and enforceable under New York Law. Moreover, the License Agreement's inclusion of an Integration/No Modification Clause (hereinafter defined) coupled with language indicating that the personal guarantee shall be "in form and substance acceptable to PVH," ("Acceptable to PVH Clause") effectively precludes the parties, particularly Grosfeld, from altering or diminishing his material obligations under the License Agreement.

## STATEMENT OF FACTS AND PRIOR PROCEEDINGS

### The Nature of this Action and the Pleadings

PVH is the owner or licensee of a number of valuable and prestigious trademarks, including Calvin Klein, IZOD, DKNY, Van Heusen, Geoffrey Beene, Michael Kors, Sean John, Chaps, Kenneth Cole, ARROW and Donald J. Trump (accompanying affidavit of Kenneth L. Wyse, ¶1; "Wyse Aff.").

By the License Agreement, PVH granted IHT the right to use the trademark "IZOD" ("Licensed Mark") in connection with the manufacture, sale, distribution and promotion of sheets, pillow cases, towels and similar products for a two year period within the United States of America, its possessions and territories (Exh. 1).

On or about April 27, 2007, PVH exercised its right to terminate the License Agreement by reason of a series of breaches by IHT, including, without limitation, IHT's failure to pay royalties and advertising fees, apparent failure to submit proof of marketing expenditures and possible insufficient expenditures of marketing expenses, as required by the Licence Agreement (April 27, 2007 Letter from PVH to IHT terminating the License Agreement; Exh. 7).

By reason of said breaches, on or about September 18, 2007, PVH commenced the within action against IHT seeking damages in excess of $1,839,333. PVH's complaint ("Complaint,"

2

annexed as Exh. A to the moving papers of defendant Grosfeld) contains causes of action against IHT for its breaches of the License Agreement and for an audit and accounting. The Complaint also contains two claims against Grosfeld, who is both the President and a stockholder of IHT. PVH's two claims against Grosfeld are based upon provisions in the License Agreement whereby he guaranteed and agreed to be jointly and severally liable for IHT's performance under the License Agreement.

On or about November 26, 2007, IHT answered the Complaint and asserted counterclaims for fraud and negligent misrepresentation ("Answer;" Exh. 8).

**The Pending Motions**

On or about January 9, 2008, pursuant to FRCP 12(b)(6) and 9(b), PVH moved to dismiss IHT's counterclaims. PVH's said motion is pending before this Court.

On or about November 26, 2007, Grosfeld made his within motion under FRCP 12(b)(6), seeking to dismiss PVH's aforementioned claims against him for guarantee and joint liability. PVH's within Memorandum of Law ("PVH's MOL") is submitted in opposition to that motion. By reason of the issue(s) of fact raised by Grosfeld's motion, PVH's MOL requests that Grosfeld's motion be treated as one for summary judgment, and that upon such motion, that PVH be granted judgment, or at a minimum, that the Court deny IHT's motion and direct that any unresolved issues of fact be resolved at trial.

**Facts Pertinent to Grosfeld's Within Motion**

The last page of the License Agreement contains the following provision whereby the shareholders of IHT guaranteed and became jointly liable for IHT's performance of its obligations under the License Agreement:

3

      11.19 <u>Guaranties</u>. The obligations of the Licensee hereunder, including, without limitation, the obligation to pay Percentage Royalties and Guaranteed Minimum Royalties shall be guaranteed jointly and severally by the shareholders of the Licensee pursuant to a personal guaranty in form and substance acceptable to PVH (Exh. 1, ¶11.19) ("Guarantee/Joint Obligation Provision").

Defendant Grosfeld was, at all relevant times, a shareholder of IHT (Exh. 8, ¶11; accompanying affidavit of Kenneth L. Wyse, PVH's President of Licensing and Public Relations ("L&PR"), sworn to on January 24, 2008 ("Wyse Aff."), ¶9; Grosfeld's November 26, 2007 Moving Memorandum of Law on this motion, p. 3, "Grosfeld's MOL"). In fact, Grosfeld was the primary operator of IHT, conducting that corporation's business like a "one man dance" (Wyse Aff., ¶9).

It is uncontroverted that Grosfeld executed the License Agreement. IHT's corporate name appears above his signature, and his title (President) appears below it (Exh. 1, p. 33). And Grosfeld's signature was affixed to the same page upon which the Guarantee/Joint Obligation Provision is set forth (<u>Id.</u>).

Despite the apparent format of Grosfeld's signature as President of IHT, the record strongly supports the conclusion that in signing the License Agreement, Grosfeld understood that he was guaranteeing and assuming joint responsibility for IHT's obligations under the License Agreement. For example:

      --as noted, Grosfeld's signature on the License Agreement appears just below and on the very same page as the Guarantee/Joint Obligation Provision (Exh. 1, p.33);

      --Grosfeld, alone, negotiated the License Agreement on behalf of IHT (Wyse Aff., ¶¶3-7);

      --Grosfeld's negotiation of the License Agreement covered a six month period in which he engaged in negotiations, a series of meetings, telephone conversations, and correspondence with PVH (<u>Id.</u>, ¶¶4-7);

      --during such negotiations, Grosfeld's repeated reference to, and discussion of,

4

various of the provisions of the License Agreement evinces that he had reviewed and was familiar with the terms of the License Agreement (Id., ¶¶3-7);

--Grosfeld maintained a copy of a draft license agreement ("Draft License Agreement;" Exh. 2) in his possession for review for two months before he responded to PVH with his final requests for changes to the said agreement (Id., ¶¶5-6). Moreover, the Draft License Agreement was substantially similar to the License Agreement (compare Exh. 1, with Exh. 2); most importantly, the last page of the Draft License Agreement also contained a guarantee/joint obligation provision just above the signature block wherein Grosfeld executed the License Agreement, which provision was identical to the Guarantee/Joint Obligation Provision which was ultimately included in the License Agreement (compare Exh. 2, Art. 11.19, with Exh. 1, Art. 11.19);

--during the course of Grosfeld's extended negotiation of the License Agreement, he was represented by and consulted with an attorney who also had reviewed the License Agreement (Wyse Aff., ¶6; Grosfeld's December 23, 2005 email to PVH, "Grosfeld Email;" Exh. 3);

--the Grosfeld Email to PVH underscores not only Grosfeld's familiarity with the specific terms and provisions of the License Agreement, it further reveals that Grosfeld took personal control over the negotiations from his attorney and selected which provisions of the License Agreement he desired to negotiate and modify. The Grosfeld Email states in pertinent part:

> He [my attorney] made about 30 comments I erased most of them to try to make this simple and easy. There are now only 8 comments (Exh. 5) (punctuation error in original);

--the Grosfeld Email thereupon sets forth the 8 revisions that Grosfeld chose to be made to the License Agreement (Id.);

--Grosfeld's requests for modification of 8 specific clauses of the License Agreement did not include a request for any modification, whatsoever, of the Guarantee/Joint Obligation Provision. Nor did Grosfeld, throughout the negotiations of the License Agreement, make any request for modification of the Guarantee/Joint Obligation Provision (Wyse Aff., ¶7); and

--During the course of his interactions with PVH's President of L&PR, Kenneth Wyse, Grosfeld acknowledged to Wyse that he was aware of the fact that PVH wanted him to guarantee the License Agreement (Id., ¶8).

The record also makes clear that Grosfeld had a significant financial interest in IHT, which

explains his motivation in agreeing to guarantee and to jointly obligate himself to IHT's

responsibilities under the License Agreement.  For example, the record reflects that:

--not only was Grosfeld a shareholder of IHT, the other shareholders are members of
his family (Id., ¶9; Exh. 8, ¶17);

--not only did Grosfeld represent IHT throughout the entire negotiation of the License
Agreement, virtually all of PVH's operational interaction with IHT under the License
Agreement was conducted through Grosfeld who, as noted above, held himself out
as a "one man dance" on behalf of IHT (Wyse Aff., ¶9); and

--Grosfeld's dominance of IHT is underscored by the provisions in the License
Agreement that (i) permit PVH to terminate same if: "Salo Grosfeld shall at any time
for any reason cease to be active in the management of the licensee" (Exh. 1, Art.
8(3)(l)); and (ii) designate Grosfeld as the sole individual to receive all of PVH's
notices to IHT under the License Agreement (e.g., of any claimed breach and/or
opportunity for IHT to cure the same) (Id., Art. 11.3).  Indeed, no attorney is named
by IHT to receive duplicate notice for IHT (Id.).

The record also makes clear that Article 11.19 of the License Agreement was a full and

complete guarantee and assumption of joint and several liability by Grosfeld without need for any

further documentation:

--Article 11.19 of the License Agreement contains all of the elements necessary to
constitute a guarantee and assumption of joint liability (Exh. 1, Art. 11.19);

--the License Agreement contains an integration\ clause ("Integration/No
Modification Clause")[1] that requires, among other things, that any modification,
including of the Guarantee/Joint Obligation Provision, is effective only upon the
written consent of both parties (Id., Art. 11.10);

---

[1]The Integration/No Modification provision contained in the License Agreement provides:

11.10 Entire Agreement: Amendment.  This Agreement, including the exhibits and
schedules hereto, constitutes the entire agreement of the parties hereto with respect to the
subject matter hereof, and supersedes all prior agreements, contracts, promises,
representations and statements between them, if any, whether written or oral, with respect
thereto including, without limitation, the License Agreement between PVH and Licensee
dated December 2001, as the same may have been heretofore amended.  This Agreement
may not be modified except in a writing signed by both parties hereto.

6

--Article 11.19 provides PVH with the option of securing additional documentation of the guarantee and assumption "in form and substance acceptable to PVH" (Id., Art. 11.19)

--Grosfeld never requested that any further documentation be made of his guarantee (Wyse Aff., ¶9); and

--Wyse, who negotiated the License Agreement on behalf of PVH, understood that the Guarantee/Joint Obligation Provision provided PVH with the option of requesting further documentation of the guarantee acceptable to PVH, but had no obligation to do so (Id.).

## POINT I

**GROSFELD'S FRCP 12(b)(6) MOTION TO DISMISS REQUIRES THE RESOLUTION OF CASE DETERMINATIVE ISSUE(S) OF FACT, THEREBY NECESSITATING ITS CONVERSION INTO ONE FOR SUMMARY JUDGMENT**

As Point III hereof demonstrates, the question of whether Grosfeld is to be deemed a guarantor and/or a joint obligor of the License Agreement requires resolving whether Grosfeld intended to be so bound. Similarly, Point I of Grosfeld's MOL may create another issue of fact, to wit, whether the parties understood that Article 11.19 of the License Agreement bound Grosfeld as guarantor/joint obligor without the need for further documentation (Grosfeld's MOL, p. 2).

It is apparent that the resolution of either of these factual issues requires consideration of material outside of the pleadings (e.g., the testimony contained in the Wyse Aff., the Grosfeld Email, and the Draft License Agreement). Accordingly, the Court can and should convert Grosfeld's 12(b)(6) motion into a motion for summary judgment. For example, in Porter v. Prop. Damage Control Group, the Southern District stated:

> when matters outside the pleadings are presented in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material.

7

2007 WL 2907403, *1 (E.D.N.Y. 2007) (quoting Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000)). In Porter, the court converted the motion to dismiss to motion for summary judgment; PVH is entitled to the same determination here.

It is respectfully submitted that Points III and IV hereof, and the testimonial and documentary evidence introduced by PVH on this motion, conclusively establish that Grosfeld fully understood that, by his signature to the License Agreement, he was then and there binding himself as IHT's guarantor and joint obligor. On that basis, after conversion of the motion to one for summary judgment, the Court should dismiss Grosfeld's within motion.

At a minimum, if the Court finds any of the above issues of fact unresolved, it may permit both further discovery and submissions by the parties on any such issue, and/or designate such issue for resolution at trial. See Fed. R. Civ. P. 56(d).

## POINT II
## THE PROCEDURAL STANDARD OF REVIEW FOR SUMMARY JUDGMENT

It is well-settled that a court may grant summary judgment where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; See also, e.g., Zarr v. Riccio, 180 A.D.2d 734, 734 (2d Dep't. 1992) (citing Zuckerman v. City of New York, et al., 49 N.Y.2d 557, 560 (1980)). "The proponent of a motion for summary judgment 'must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absense of any material fact.'" JMD Holding Corp. v. Congress Financial Corp., 4 N.Y.3d 373, 384 (2005) (citations omitted)); Tessier v. New York City Health and Hospitals Corp., 177 A.D.2d 626, 626 (2d Dep't. 1991). The burden then shifts to the opposing party to "produce evidentiary proof in admissible form sufficient to require trial of material questions

8

of fact on which he rests his claim." <u>Tessier</u>, 177 A.D.2d at 626 (<u>citing Zuckerman v. City of New</u>

<u>York</u>, 49 N.Y.2d 557, 562 (1980)). Yet a defendant's conclusory allegations set forth in opposition

are insufficient to raise a triable issue of fact. <u>Id.</u>; <u>see also</u>, <u>JMD Holding Corp.</u>, 4 N.Y.3d at 384.

"The burden of a court in deciding a motion for summary judgment is not to resolve issues of fact

or to determine matters of credibility, but merely to determine whether such issues exist." <u>Dyckman</u>

<u>v. Barrett</u>, 187 A.D.2d 553, 554 (2d Dep't. 1992).

**POINT III**

**THE RECORD MAKES IT CLEAR THAT, IN VIEW OF A CONSISTENT LINE OF CASES INTERPRETING NEW YORK LAW, GROSFELD INTENDED TO GUARANTEE AND BECOME JOINTLY OBLIGATED UNDER THE LICENSE AGREEMENT**

In Point II of Grosfeld's MOL, Grosfeld argues that since his signature appears, facially, to

be on behalf of IHT, he cannot be bound by his personal guarantee that appears just above his

signature.  Grosfeld's contention entirely lacks both legal and factual support.

As a general proposition, an agent that signs a contract on behalf of his disclosed principal

will not be held individually liable under that contract. <u>See</u>, <u>e.g.</u>, <u>Salzman Sign Co. v. Beck</u>, 10

N.Y.2d 63, 66-67 (1961); <u>Paribas Properties, Inc. v. Benson</u>, 146 A.D.2d 522, 525 (1st Dep't. 1989).

The rule is designed to avoid a "trap for any unwary agent." <u>Paribas Properties</u>, 146 A.D.2d at 525

(citations omitted).

However, it is equally well-settled that this general proposition does not preclude a finding

of personal liability in cases where there exists "clear and explicit evidence of the agent's intention

to substitute or superadd his personal liability for, or to, that of his principal." <u>Lehman Bros., Inc.</u>

<u>v. Tutelar Cia Financiera</u>, 1997 WL 403463, *2 (S.D.N.Y. 1997); <u>see also</u>, <u>Cement & Concrete</u>

9

Workers Dist. Council Welfare Fund v. Lollo, 35 F.3d 29, 35 (2d Cir. 1994) (accord); Porter v. Property Damage Control Group, Inc., 2007 WL 2907403, *9 (E.D.N.Y. 2007) (accord); Star Video Entertainment v. J & I Video Distributing, Inc., 268 A.D.2d 423, 423-24 (2d Dep't. 2000) (accord). In each of these cases, the individual who signed the contract appeared to be signing facially for his disclosed principal. Nevertheless, the courts ruled that the agent could be held individually liable as a guarantor, because of evidence that supported his intent to be so bound. For example, in Lehman Bros., 1997 WL 403463 the placement of corporate name below the individual defendants' signatures did not necessarily connote their intent to be bound in an official capacity. Similarly, in Porter, 2007 WL 2907403 at *3-4, an issue of fact existed as to whether the agent intended to be personally bound, despite having signed the agreement only once and in an apparent official capacity. Significantly, in Star Video, as in the case at bar, the agent signed his name, followed by the word "Pres." to a personal guarantee. 268 A.D.2d at 424. Yet the court in Star Video, nonetheless, held that "there is a triable issue as to whether [the Corporate agent] may be held personally liable on the basis of that signature." Id.

The courts have promulgated the following five factors to consider when determining whether an agent intended to substitute or superadd his personal liability:

(1)    the length of the contract;
(2)    the location of the liability provision(s) in relation to the signature line;
(3)    the presence of the signatory's name in the agreement itself;
(4)    the nature of the negotiations leading to the contract; and
(5)    and the signatory's role in the corporation

Porter, 2007 WL 2907403, at *8; Cement, 35 F.3d at 35.

It is apparent that these factors are directed to determining: (i) whether -- e.g., by reason of the guarantee's placement in the agreement and the agent's participation in the negotiation of the

document, among other things -- it is apparent that the agent was aware of the personal guarantee contained within the document that he executed; and (ii) whether, as an aid to such inquiry into the agent's intent, the agent had an incentive to guarantee (e.g., an equity interest in the corporation that he guaranteed).

Grosfeld's MOL acknowledges the five factors, sets them forth, and then asserts that these five factors "weigh overwhelmingly against imposing personal liability against Mr. Grosfeld" (Grosfeld's MOL, at p.12). Indeed, in seeking to support this startling claim, Grosfeld's MOL simply avoids providing the Court with any review of the fourth and fifth factors. Moreover, Grosfeld cites cases that are patently dissimilar to the case at bar, primarily because the bulk of the factors in such cases weighed heavily against a finding of personal liability.

A point by point review of all of the five factors reveals that the factors weigh overwhelmingly against Grosfeld. The factors are reviewed in reverse order so as to deal, first, with the two factors that Grosfeld simply ignored.[2]

The fifth factor, which Grosfeld failed to review, is the "signatory's role in the corporation." Grosfeld neglected to advise the Court that: (i) IHT was owned by Grosfeld and his family; (ii) he ran IHT virtually alone as a "one man dance;"[3] (iii) during the course of the License Agreement, Grosfeld was essentially the only IHT representative that dealt with PVH with regard to any significant operational issues that arose -- and as the Wyse Aff. points out, there were many such

---

[2] The facts cited in support of this analysis are derived from PVH's within Statement of Facts and Prior Proceedings, which sets forth the source of each said fact.

[3] See e.g., Porter, 2007 WL 2907403, at *3 (finding that agent's "pivotal role" as president and sole shareholder of principal corporation weighed in favor of finding personal liability); Lehman Bros, 1997 WL 403463, at *3 (recognizing that agents' roles in corporation as president, vice president, directors, and who held 82% of the stock were likely to be personally liable on guarantee).

11

issues; (iv) as noted above, Grosfeld alone represented IHT during the extensive negotiations leading

to the License Agreement;[4] (v) Grosfeld was so important to IHT's performance under the License

Agreement, that PVH reserved for itself the right to terminate that agreement if Grosfeld "at any time

for any reason cease[d] to be active in the management of" IHT; and (vi) Grosfeld was also

important enough, and trusted enough, by IHT to be the sole person designated by IHT to receive

critical notices from PVH (e.g., PVH's declaration of a breach, or of IHT's right to cure a breach).

Indeed, IHT relied so heavily on Grosfeld, that IHT decided not to name an attorney to receive

duplicate copies of any such critical notices.

The fourth factor, which Grosfeld failed to review, is "the nature of the negotiations leading

to the contract." Grosfeld entirely neglected to advise the Court of facts relevant to this factor, and

purposefully avoided disclosing that: (i) Grosfeld, alone, on behalf of IHT, negotiated the License

Agreement with PVH; (ii) Grosfeld's negotiations with PVH were extensive (meetings, telephone

conferences and correspondence) and covered a lengthy period of time (from mid-2005 through

---

[4] See Turtle & Hughes, Inc. v. Browne, 1996 WL 384895, *3 (S.D.N.Y. 1996) (recognizing that a corporate officer is more likely to be personally liable on a guarantee that is negotiated, as opposed to a mere contract of adhesion). In this case, not only does the Wyse Aff. sufficiently demonstrate that the License Agreement was heavily negotiated, the presence of the Acceptable to PVH Clause establishes that the guarantee was not only negotiated, but tailored and drafted specifically with regard to the contracting parties. See also, Cement, 35 F.3d at 35 (finding that a contract "expressly bargained for by the purported guarantor and reached after much negotiation" militated in favor of finding personal liability); Porter, 2007 WL 2907403, at *5 (finding agent who "participated actively in negotiating the contract's final language" may be personally liable on the contract at issue, because he "presumably had an opportunity to insist that he not be identified as a party") (emphasis added). Since Grosfeld, as shown, personally selected which provisions of the License Agreement to modify, he could have -- but chose not to -- delete or modify the Guarantee/Joint Obligation Provision.

However, it is clear that Grosfeld could not have created obligations outside the scope of what was settled in the License Agreement. Aside from the Acceptable to PVH Clause, in Teachers Ins. and Annuity Ass'n of Am. v. Tribune Co., 670 F. Supp. 491, 498 (S.D.N.Y. 1987), the court duly recognized that "parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement."

January, 2006); (iii) for two months before Grosfeld furnished PVH with his final comments to the License Agreement, he kept a draft of the License Agreement in his possession for his review; (iv) Grosfeld's repeated reference to, and discussion of, various provisions of the License Agreement and the Grosfeld Email make it unmistakably clear that Grosfeld reviewed the License Agreement and was fully familiar with its terms and provisions; (v) Grosfeld was assisted in the negotiation process by legal counsel who reviewed the License Agreement and consulted with him regarding its specific provisions; and (vi) Grosfeld took control of the negotiations from his attorney, ignored 22 of his attorney's recommendations, and negotiated with PVH, 8 provisions that <u>he</u> selected for modification.

The third factor is the "presence of the signatory's name in the agreement itself." As noted above, Grosfeld was specifically referenced by name <u>twice</u> in the agreement.[5] Grosfeld's efforts to downplay these references to him are meritless; indeed, both references connote significant responsibilities on Grosfeld's part: (i) Article 8(3)(l), providing PVH with the right to terminate the License Agreement if Grosfeld left the active management of IHT, underscores Grosfeld's critical importance to IHT, and to PVH; (ii) Article 11.3 places upon Grosfeld, alone, the responsibility for IHT's receiving, and then reacting to, critical notices from PVH. Additionally, although not specifically named in the Guarantee/Joint Obligation Provision, Grosfeld can hardly deny that both he and PVH knew that he was included in the term "shareholders" as it appeared in the Guarantee/Joint Obligation Provision. In that regard, Grosfeld and PVH each acknowledge that

---

[5]The case <u>Mingoia v. Santa Fe Drywall Corp.</u>, upon which Grosfeld relies for his general proposition that there must be "'overwhelming evidence' of the signatory's intention to assume personal liability," (Grosfeld MOL, p. 11) is blatantly distinguishable on this third factor, given that the agent's name in <u>Mingoia</u> appeared "<u>no where</u> in the printed text of the 45 page agreement" 2005 WL 1384013, *5 (S.D.N.Y 2005) (emphasis added). In this case, as noted above, Grosfeld's name appears <u>twice</u>.

Grosfeld is a shareholder of IHT.[6]

The second factor is the "location of the liability provision(s) in relation to the signature line." The liability provision could not have been more prominently placed to impact Grosfeld. It is located on the very same page as Grosfeld's signature block, just above the signature line. The guarantee/joint obligation provision contained in the Draft License Agreement, which as noted above, Grosfeld had in his possession for review for two months, also appeared on the same page as the signature block. In light of the extended and extensive negotiation of the License Agreement and Grosfeld's active participation and control of such negotiation and patent familiarity with its provisions, Grosfeld can hardly assert his ignorance of this liability provision placed just above his signature. Indeed, during the course of his interactions with Wyse, Grosfeld acknowledged to Wyse that he was aware of the fact that PVH wanted him to guarantee the License Agreement (Wyse Aff., ¶8).

Finally, the first factor is the "length of the contract." The License Agreement's 33 page length provides Grosfeld with his only "comfort." But that comfort is illusory. The cases make clear that the length factor seeks to protect such agents from long printed boilerplate agreements which agents are not expected to review in detail. See e.g., Paribas, 146 A.D.2d at 525 (recognizing the "great danger in allowing a single sentence in a long contract to bind individually a person who signs

---

[6]To support his position that Grosfeld signed solely in his representative capacity, Grosfeld cites to Lerner v. Amalgamated Clothing and Textile Workers Union, 838 F.2d 2, 6 (1991) (Grosfeld's MOL, at p.10). However, Lerner is clearly distinguishable on the bases that inter alia, the bulk of the factors weighed against finding personal liability (unlike the case here) and, more importantly, the document at issue in Lerner employed the phrase, "he is a member," with regard to the signatory, and the document further defined "member" as the principal. Lerner, 838 F.2d at 6. In the case at bar, the guarantee clearly refers to "shareholders," as distinct from the principal and its agents. The court in Lerner further confirmed that intent to be bound personally was found where "the signatory was the president and principal shareholder of the corporation." Id. at 5 (citing Paribas, supra).

only as a corporate officer") (citations omitted).  But in this case, the length of the License

Agreement is of no significance because Grosfeld was clearly aware of the existence of the

Guarantee/Joint Obligation Provision.  Without question, (i) the provision was placed immediately

above his signature on the last page of both the License Agreement and Draft License Agreement

(not buried within pages of lengthy, complicated provisions); (ii) he reviewed the Draft License

Agreement for two months before providing comments to PVH; (iii) as noted above, during the

extensive negotiation process in which he was personally involved, Grosfeld disclosed, orally and

in writing, that he was intimately familiar with the terms and provisions of the License Agreement;

(see e.g., Exh. 3); and (iv) during his negotiations with Wyse, Grosfeld acknowledged that he was

aware of the fact that PVH wanted him to guarantee IHT's obligations under the License Agreement

(Wyse Aff., ¶8).  Under these circumstances, the License Agreement's length is of minor, if any,

significance and certainly does not weigh against a finding of Grosfeld's personal liability.

     The five factors taken as a whole overwhelmingly demonstrate that Grosfeld was aware that

by executing the License Agreement, he was guaranteeing and becoming jointly obligated with IHT

under the License Agreement.  Accordingly, he is bound by it.

**POINT IV**

### GROSFELD IS BOUND BY THE GUARANTEE PROVISION OF THE LICENSE AGREEMENT

     Grosfeld's claim that the guarantee portion of the Guarantee/Joint Obligation Provision

("Guarantee") is conditioned upon execution of another personal guarantee is without merit.  The

first portion of Article 11.19 of the License Agreement sets forth all of the necessary elements

constituting a guarantee.  The remainder of that Article in no way negates the Guarantee or subjects

15

it to a condition; rather it provides PVH with the option of restating or reconfirming the Guarantee "in form and substance acceptable to PVH") (emphasis added). Furthermore, the integration clause contained in Article 11.10 of the License Agreement ("Integration/No Modification Clause") fully precludes modification of the License Agreement, including the Guarantee, absent the consent of both parties.

In New York, it is well-settled that guarantees are governed by the law of contracts and are enforceable as long as they are set forth "in a written instrument" that expressly contains all of the essential elements of a guarantee -- to wit, that a person "guarantees payment of another's debt and describes with precision the obligation to which the person is bound." Cavendish Traders, Ltd. v. Nice Skate Shoes, Ltd., 117 F. Supp. 2d 394, 401 (S.D.N.Y. 2000); Lakhaney v. Anzelone, 788 F. Supp. 160, 163 (S.D.N.Y. 1992) (citing, e.g., Bank of Italy v. Merchants Nat'l. Bank, 236 N.Y. 106, 109 (1923).

In this case, the Guarantee precisely satisfies these requirements. Specifically, the first portion of Article 11.19 provides:

> 11.19 Guaranties. The obligations of Licensee hereunder, including, without limitation, the obligation to pay Percentage Royalties and Guaranteed Minimum Royalties shall be guaranteed jointly and severally by the shareholders ...

There can be no question that the clause, "obligations of Licensee hereunder," unequivocally refers to, or "with precision" describes, the scope of the obligations undertaken by the guarantor as equivalent to the scope of the obligations of the licensee under the License Agreement. And Grosfeld, who executed the License Agreement, is undeniably a shareholder (Wyse Aff. at ¶9; Exh. 8, ¶11). Like the guarantee that was enforced in Cavendish, the Guarantee here, as embodied in the License Agreement, clearly sets forth the date that the License Agreement was agreed upon, its

16

parties, what specifically is guaranteed, and that the obligations of the guarantors, i.e., Grosfeld's, are joint and several. See Cavendish, 117 F. Supp. 2d at 401. Accordingly, this Court should enforce the Guarantee because it is patently clear that all of the essential terms of a guarantee are present.

Defendant's assertion that Article 11.19 of the License Agreement is an unenforceable "agreement to agree," is untenable in view of controlling precedent. Additionally, as shown below, defendant grossly misstates the applicable law, particularly in view of the: (i) Acceptable To PVH Clause; (ii) Integration/No Modification Clause; and (iii) facts indicating that Grosfeld did intend to be bound.

Indeed, where the court finds that the contracting parties intended to be bound to a guarantee and the guarantee at issue contains all of the essential terms, "the fact that the parties intended a 'fuller agreement' does not negate its legal effect." Conopco, 190 A.D.2d at 588. For example, in CAE Indus. Ltd. v. Aerospace Holdings Co., the Southern District found that a guarantee providing that the guarantor would subsequently provide the plaintiff with an irremovable letter of credit "with face amount to be mutually agreed" was not so vague as to render the guarantee unenforceable. 741 F.Supp. 388, 394 (S.D.N.Y. 1989). And in Penn Palace Operating, Inc. v. Two Penn Plaza Associates, the First Department agreed that "the fact that nonmaterial terms still needed to be negotiated before the lease would be 'mutually satisfactory' did not render the lease a mere agreement to agree." 239 A.D.2d 155, 155-56 (1st Dep't. 1997). Again, here, Article 11.19 already contains all of the material terms of a guarantee.

Underscoring the conclusion that there was no understanding that any material term was left for subsequent resolution are the Acceptable To PVH Clause and the Integration/No Modification

17

Clause. In fact, the "acceptable to PVH" language negates any notion of open material terms that are subject to future negotiation. Essentially, this clause contemplates, at most, that any additional restatement of the guarantee be satisfactory to PVH, alone. It demonstrates that the parties never intended to vest Grosfeld with the capacity to modify or diminish his obligations under the Guarantee, never mind to eliminate them altogether.

The Integration/No Modification Clause, among other things, provides that any modifications must be subscribed by <u>both parties</u>. Indeed, the very existence of the Integration/No Modification Clause further underscores the fact that the parties intended <u>no material modification</u> of any of the provisions of the agreement, including without limitation, the Guarantee. To suggest that the parties intended a "subsequent document" to create <u>new</u> or <u>material</u> obligations distinct from those in the Guarantee effectively reads the Integration/No Modification clause out of existence. Similarly, to suggest that any subsequent agreement could be added to the License Agreement which would diminish Grosfeld's obligations under the Guarantee, reads the Acceptable To PVH Clause out of the Licence Agreement.

Indeed, the record is replete with evidence that the parties did not intend, expressly or impliedly, to condition the Guarantee. For example, at no time during the negotiation of the License Agreement did Grosfeld ever suggest that any further documentation would be necessary in order to effectuate the Guarantee (Wyse Aff., ¶7). Moreover, without Grosfeld's objection, Article 11.19 provided PVH with the option, but not the obligation, to secure further documents from Grosfeld consistent with the Guarantee (<u>Id.</u>). In fact, the Guarantee's language constitutes an enforceable, unconditional guarantee, and the parties did not leave any material terms open. As noted above, the only matter that the parties arguably left open is immaterial and, as per the Acceptable To PVH

18

Clause, was for PVH's benefit, alone.

Even assuming _arguendo_ that the License Agreement expresses future intent -- which it does not -- in New York, "a contract does not necessarily lack all effect merely because it expresses the idea that something is left to future agreement." Conopco Inc. v. Wathne Ltd., 190 A.D.2d 587, 588 (1st Dep't. 1993) (citing, inter alia, N.Y. Jur. 2d Contracts §29); Teachers Ins., 670 F.Supp. at 498. For example, in Int'l Telemeter Corp. v. Teleprompter Corp., the Second Circuit cited at least seven federal and state cases in New York as well as the Restatement of Contracts in concluding that an agreement may be enforced without inclusion of a contemplated term. 592 F.2d 49, 56 (2d Cir. 1979) (citations omitted). Here, of course, as noted above, all of the material terms required for a guarantee are contained in Article 11.19 and any terms arguably left open are certainly not material.

Grosfeld cites a series of cases relating to unenforceable "agreements to agree" that are inapposite. Unlike the case at bar, in each case cited by Grosfeld, there was no question that the parties did not intend to be bound _unless and until_ future agreement was reached; the facts in Grosfeld's cases each amply demonstrated that the parties, either expressly or impliedly conditioned their contractual obligations upon the happening of some future event.[7] Moreover, none of the cases that Grosfeld cites contains a clause similar to the Acceptable To PVH Clause.

It is clear that Grosfeld is bound to his Guarantee and that no new document can materially

---

[7]For example, in Aksman v. Xiongwei Ju, the court concluded that the parties intended for their contractual obligations to be triggered upon their future agreement because the parties expressly stated that the contract would not go into effect "until such time . . ." and that the subject letter "will be replaced by a contract" 21 A.D.3d 260, 261-62. Similarly, in Prospect Street Ventures I, LLC v. Eclipsys Solutions Corp., the parties expressed their intent not to be bound to the subject letter until future agreement was reached, by referring to the letter as a "proposed commitment," or "proposed transaction." Prospect, 23 A.D.3d 213, 213 (1st Dep't. 2005). In Carmon v. Soleh Boneh and Gray v. LeChase Construction Services, the courts held that omission of certain necessary, material terms may demonstrate an implied condition not to be bound until agreement of such terms. 206 A.D.2d 450, 451 (2d Dep't. 1994); 31 A.D.3d 983, 986-87 (3d Dep't. 2006).

alter Grosfeld's obligations thereunder. Indeed, by virtue of the Acceptable to PVH Clause and the

Integration /No Modification Clause, the parties consciously provided PVH with an effective veto

over any new material terms. Grosfeld's challenge to the completeness of the Guarantee is without

basis and should be rejected. At worst, if the Court should find the existence of an issue of fact (e.g.,

a conflict between any portion of the Guarantee on the one hand and the Acceptable To PVH Clause

or the Integration/No Modification Clause on the other hand), said issue should be resolved at trial.

See Eldor v. Contracting Corp. v. County of Nassau, 6 A.D.3d 654, 655 (2d Dep't. 2004).

## POINT V

**GROSFELD'S GUARANTEE/JOINT OBLIGATION PROVISION FULLY SATISFIES THE REQUIREMENTS OF THE STATUTE OF FRAUDS. MOREOVER, GROSFELD'S UNDERTAKING TO BE JOINTLY AND SEVERALLY LIABLE IS NOT AN AGREEMENT THAT IS SUBJECT TO THE STATUTE OF FRAUDS**

The Statute of Frauds requires that an agreement to guarantee the debt of another "be in

writing, and subscribed by the party to be charged therewith" (N.Y. General Obligations Law, §5-

701).

Contrary to Grosfeld's assertions, Grosfeld's Guarantee fully complies with those

requirements. The Guarantee is in writing and Grosfeld does not challenge the fact that he signed

the License Agreement. Additionally, Point III hereof demonstrates that, by signing the License

Agreement, Grosfeld understood he personally guaranteed IHT's performance under the License

Agreement, and Point IV hereof demonstrates that Article 11.19 contained all of the essential

elements of a guarantee.

The case upon which Grosfeld bases his Statue of Frauds argument, Savoy Record Co., Inc.

v. Cardinal Export Corp., 15 N.Y.2d 1, 5-6 (1964) is neither "squarely on point with this case" as

20

Grosfeld claims, nor does it supply any support for Grosfeld's said claim. In fact, <u>Savoy</u> actually negates Grosfeld's asserted Statute of Frauds defense. In <u>Savoy</u>, the particular guarantee at issue was held to contravene the Statue of Frauds because there was no demonstration of direct and explicit evidence that the signatory who facially signed for the corporation, intended to be personally bound as well. The <u>Savoy</u> Court held:

> the statement in the contract purporting to bind ... individually 'the party signing in a representative capacity' is not sufficient for Statute of Fraud purposes without some <u>direct and explicit evidence of actual intention on his part to be so bound</u>.

10 N.Y.2d at 67 (<u>quoting</u> <u>Salzman</u>, <u>supra</u>) (emphasis supplied).

In the case at bar, PVH has presented substantial evidence demonstrating that Grosfeld, by subscribing his signature to the License Agreement, knew that he was guaranteeing and intended to guarantee, IHT's obligations under that document. Hence, the Statue of Frauds does not preclude enforcement of the Guarantee.[8] Indeed, in each of the cases cited in Point III hereof, where evidence showed that the individual intended to be bound (<u>e.g.</u>, <u>Paribas</u>, <u>Lehman</u>, <u>Cement</u>, <u>Porter</u> and <u>Star Video)</u> the Statute of Frauds provided no defense.

Additionally, Grosfeld's MOL (p. 2) refuses to recognize that an agreement to be held jointly and severally liable (<u>i.e.</u>, an undertaking of primary liability) is distinct from an agreement to guarantee (<u>i.e.</u>, an undertaking of secondary liability). In fact, one of the cases cited in Grosfeld's MOL (p. 9), <u>Paribas</u>, expressly acknowledges that an agreement to be held jointly and severally liable is different from a guarantee. 146 A.D.2d at 525. Moreover, the court in <u>Paribas</u> also recognized that since an agreement to be held jointly and severally liable is <u>not</u> a promise to

---

[8]Furthermore, Grosfeld's contention to the contrary, <u>Savoy</u> does not suggest or imply that the Statute of Frauds negates a signed written guarantee agreement that could be restated or formalized in a subsequent contemplated document.

guarantee, it is not subject to the Statute of Frauds. Specifically, the <u>Paribas</u> court stated:

> The asserted Statute of Frauds defense is also unavailing. To be enforceable, a special promise to answer for the debt or default of another must be in writing and subscribed to by the party against whom enforcement is sought (General Obligations Law §5-701 [a] [2]). In this case, however, defendants Benson and CPMI did not undertake to guarantee payment in the event CPI defaulted, but to be primarily liable, jointly and severally, for payment of Paribas' fee and expenses. <u>Id.</u>

Here, PVH asserted two separate causes of action against Grosfeld: one for his guarantee, and the other for his undertaking to be jointly and severally liable. <u>Paribas</u>, demonstrates that the Statue of Frauds is inapplicable to PVH's cause of action based upon Grosfeld's undertaking joint and several liability.

Indeed, Grosfeld's Statute of Frauds defense is without merit.

## CONCLUSION

**WHEREFORE**, PVH respectfully requests that the Court convert Grosfeld's motion to dismiss into one for summary judgment, and that, upon such conversion, dismiss said motion in its entirety, or, at a minimum, provide for further discovery and submissions by the parties, and/or, designate any unresolved factual issues for resolution at trial, and award any other relief it deems just and proper.

Dated: New York, New York
      January 28, 2008

                             **WEISS & HILLER, PC**
                             Attorneys for Plaintiff
                             600 Madison Avenue
                             New York, New York 10022
                             (212) 349-4000

By:                              
                             Arnold M. Weiss (AW0942)

22