UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------- x
PHILLIPS-VAN HEUSEN CORPORATION,  :
                                       Plaintiff, :
                - against -  :

INTERNATIONAL HOME TEXTILES, INC.,  :
and SALO GROSFELD,  :
                                    Defendants. :
----------------------------------------------------------------- x

07 Civ. 8169 (AKH)

**AFFIDAVIT OF
SALO GROSFELD
IN OPPOSITION
TO MOTION TO DISMISS
COUNTERCLAIM**

STATE OF FLORIDA       )
                             ) ss.:
COUNTY OF MIAMI-DADE  )

      SALO GROSFELD, being sworn, on oath, deposes and states as follows:

      1.    I am the President of International Home Textiles, Inc. ("IHT") and a defendant in the above-captioned action. I am familiar with the facts of this case and have read Phillips-Van Heusen's ("PVH") motion to dismiss IHT's counterclaim for misrepresentation (the "Motion"). I submit this sworn affidavit in opposition to the Motion. For the reasons set forth herein, and in IHT's accompanying memorandum of law, I respectfully request that the Motion be denied, or, in the alternative, that the Court allow IHT to amend its Counterclaim to include the following facts.

**Background**

      2.    In 2001, PVH and IHT successfully transacted a license agreement pursuant to which PVH granted IHT the exclusive right to use the IZOD trademark (the "Licensed Mark") in connection with the sale, distribution and promotion of home textile products, including sheets, pillow cases, and towels (the "Licensed Products") on a wholesale basis to retailers approved by PVH (collectively, the "2001 License Agreement").

3.  As the 2001 License Agreement had been financially successful for both parties, upon the conclusion of the term of that agreement, PVH and IHT sought to enter into a second license agreement concerning the same Licensed Mark and Licensed Products.

4.  Throughout the fall and winter of 2005, I participated in several meetings and telephone conversations during which PVH and IHT negotiated the terms of a new license agreement.

5.  In order to increase IHT's business and enhance its prospects for success under the new license agreement, I repeatedly asked Ken Wyse and Mark Weber, PVH's Chief Executive Officer, to expand the list of approved retailers to whom IHT could sell Licensed Products. Specifically, I asked PVH to expand the list to include major "club" retailers, such as Costco and Sam's Club.

6.  Mark Weber orally promised and represented to me several times, and as late as October 2003, that if IHT was able to sell Licensed Products to the retailers PVH had approved for the 2001 License Agreement, PVH would expand the list to include Sam's Club. (A copy of the schedule of approved retailers for the 2001 License Agreement is annexed hereto as Exhibit A.)

**My September 2005 Meetings With Ken Wyse And Malcolm Robinson**

7.  In September 2005 -- I cannot recall the exact date -- I flew to New York and attended two meetings with PVH representatives. The first meeting, which lasted approximately a half hour, took place in Ken Wyse's office on the 12th floor of PVH's offices at 200 Madison Avenue.

8.  During the meeting, Wyse told me several times that the IZOD mark (the License Mark) was very "hot"; that there was no hotter clothing line in the country. He also said that

2

apparel products with the License Mark were selling incredibly well, and that given the popularity of the IZOD mark, IHT would have no problem selling Licensed Products to these retailers.

9. Wyse said that he and IZOD's President, Malcolm Robinson, had personally attended meetings in IZOD showrooms, which were also attended by the management of these retailers, and IZOD salespeople had told him how popular the IZOD mark had become. Wyse represented that IZOD, which was owned by PVH, would help IHT place Licensed Products with approved retailers in the parties' new license agreement (the "Approved Retailers") through PVH's and IZOD's business connections with the upper management of these retailers.

10. He then suggested that I meet with Malcolm Robinson to see how IZOD could help IHT achieve its goals.

11. After my meeting with Wyse, I went to Malcolm Robinson's office on the 16th floor, where I met with Robinson for about an hour. During this meeting, Robinson told me that it would be a "slam dunk" for him to get the Approved Retailers to buy IHT's Licensed Products. He specifically said that he could get retailers Belk and Bon Ton to buy Licensed Products.

12. Robinson also represented that he would assist IHT in placing Licensed Products with Macy's who previously had refused to buy any Licensed Products from IHT. He said he was working with Macy's to manufacture and sell beach towels to match Macy's swimwear, and he asked IHT to work with him on this project, which it did. We generated samples and art work for the project and sent them to IZOD. Nothing ever came of this, however, and the project was forgotten after IHT signed the new license agreement in January 2006.

### My October 2005 Meeting With Ken Wyse

13.   In October 2005, I met with Ken Wyse again at PVH's New York office to further negotiate the new license agreement between PVH and IHT. His assistant, Maria Maselli, was also present.

14.   During the meeting, Ms. Maselli showed me a schedule of Approved Retailers for the proposed license agreement, which included Sam's Club, as I had previously requested. Needless to say, I was pleased that PVH had satisfied my longstanding request to add Sam's Club as an Approved Retailer. I was not given a copy of the schedule, however.

15.   After the meeting, Wyse and I left the building and had lunch across the street at a small French restaurant whose name I cannot recall.

16.   In subsequent negotiations with Ken Wyse in November and December 2005, I reiterated that I was not satisfied with the list of Approved Retailers from the 2001 License Agreement (Exh. A) and told him that for IHT to succeed in meeting the royalty (and other) benchmarks in the new license agreement, PVH needed to expand the list of Approved Retailers.

17.   Of particular concern was the fact that, unlike the 2001 License Agreement, the proposed license agreement would (and ultimately did) strictly limit IHT's prospective sales of Licensed Products to JC Penney, a major business partner of IHT, to 33%. Thus, under the terms of the new license agreement, no more than 33% of IHT's sales of Licensed Products could be to JC Penney. This is significant because JC Penney provided IHT with approximately 70% of its business with regard to the License Mark.

18.   Due to this onerous restriction, in November and December 2005, I repeatedly requested to Ken Wyse, both in person and in telephone conversations, my request for PVH to expand its list of Approved Retailers.

19.   Wyse repeatedly promised that PVH would do so. He told me several times in November and December 2005 that IHT "would have more people to sell to" in the new license agreement and that "we're going to get you a better list" of Approved Retailers. He promised that an expanded list of Approved Retailers would be forthcoming.

**IHT Executes A New License Agreement
In January 2006 Based On PVH's Misrepresentations**

20.   In December 2005, PVH sent IHT an execution copy of the proposed license agreement. Contrary to PVH's promises and representations, and specifically those of Ken Wyse and Mark Weber, the schedule of Approved Retailers was virtually unchanged from the 2001 License Agreement. In fact, there were *fewer*, not more, Approved Retailers in the new license agreement. (A copy of this schedule is annexed hereto as Exhibit B, and it ultimately became Schedule 6.14 of the license agreement executed between IHT and PVH in January 2006 (the "License Agreement")).

21.   Significantly, I noted that Sam's Club was not on the schedule. As stated above, Sam's Club was on the list that Maria Maselli showed me during our October 2005 meeting at PVH's offices.

22.   Upset that PVH had not kept its promises regarding expanding the list of Approved Retailers, and that Sam's Club had been removed from the list, upon receiving the list in December 2005, I called Ken Wyse. He told me that during the October 2005 meeting, I was shown an incorrect approved retailer list belonging to another licensee. He promised me that he would work to get Sam's Club added to the list of Approved Retailers for IHT. He also promised that an expanded list of Approved Retailers would be forthcoming, but he said that IHT needed to execute the new license agreement "as is" as soon as possible.

5

23. IHT had Licensed Products "on order" and ready to be shipped, and I did not want IHT's ongoing business with J.C. Penney, Linen N' Things, and other retailers to be impacted. Moreover, I had dealt with Ken Wyse and PVH for several years and trusted that Wyse would keep his promise and provide me with an expanded list of Approved Retailers.

24. For these and other reasons, IHT executed the License Agreement in January 2006, with the full expectation that an expanded list of Approved Retailers would soon be forthcoming.

**PVH Sends IHT An Amended Schedule
Of Approved Retailers In May 2006**

25. On May 26, 2006, after I had called Ken Wyse several more times to complain that IHT had not yet received an expanded list of Approved Retailers as promised, PVH's General Counsel, Mark Fischer, sent me a letter (copied to Ken Wyse and others at PVH) annexing an amended schedule of Approved Retailers that purportedly expanded upon the prior Approved Retailer list (the "Amended Schedule"). (*See* Exh. C.)

26. While the Amended Schedule contained additional Approved Retailers who purportedly were ready, willing, and able to buy Licensed Products from IHT, in actuality, twenty-one of the Approved Retailers on the Amended Schedule refused to buy any Licensed Products from IHT whatsoever.

27. These retailers include: Bass Pro Shops, Bob's Stores, Dick's Sporting Goods, Foot-Locker, Paragon Sports, AS Cooper, Casual Male, Dawahares, Dunlaps, Stage Stores/SSI/SRI, Macy's East/Hecht Co./Filene's/Kaufmann's, Macy's Florida/Burdines, Macy's Midwest/Famous Barr, Macy's North/Marshall Fields, Macy's Northwest/Bon Marche/Meier & Frank, Macy's South/Foley's, Macy's West/Robinson's/May, Macy's Central/Rich's/Lazarus, Macy's.com, Lord & Taylor, and PVH Stores.

28. Notably, Sam's Club was not on the Amended Schedule.

29. Thus, notwithstanding Ken Wyse's prior representations, IHT was essentially left with the same number of Approved Retailers that had existed under the 2001 License Agreement. At the same time, under the new agreement it was required to limit its business with JC Penney, one of its largest and best retail customers. IHT had not been required to do under the 2001 License Agreement.

30. PVH was fully aware that most of the new Approved Retailers either had refused to purchase Licensed Products from IHT in the past, or would do so in the future.

31. For example, through its knowledge of the industry and Ken Wyse and Malcolm Robinson's prior business dealings with me, PVH was fully aware that Macy's was refusing to buy any Licensed Products from IHT. Yet PVH decided to include ten Macy's retailers in the purportedly "expanded" Amended Schedule.

32. PVH also added PVH Stores to the Amended Schedule. PVH Stores comprises a group of retailers, including IZOD, who are owned and controlled by PVH. <u>Yet, even though PVH owned and controlled these retailers, PVH Stores refused to buy *any* Licensed Products from IHT</u>. This directly contradicted express oral representations made to me by Ken Wyse and Malcolm Robinson in late 2005, such as their representation that they would work with upper management of the Approved Retailers to assist IHT in selling Licensed Products. Remarkably, PVH did not even do so with its own stores.

33. Finally, from his business experience and knowledge and personal discussions with me, Ken Wyse was aware as of May 26, 2006 that the retailers listed under "Sporting Goods" -- Bass Pro Shops, Bob's Stores, Dick's Sporting Goods, Foot-Locker, and Paragon Sports -- did not, and would not sell Licensed Products.

34. In short, the Amended Schedule was a sham, and it contradicted the promises and representations that Ken Wyse, Malcolm Robinson, and Mark Weber made to me in late 2005, before IHT executed the License Agreement.

35. I believe that these promises and representations were false when made and were designed to induce IHT to enter into the License Agreement, which contained much less favorable terms than the 2001 License Agreement.

36. Once IHT executed the License Agreement, PVH no longer felt obligated to fulfill its prior promises and representations.

37. For its part, PVH's failure to fulfill its representations severely undermined IHT's ability to perform under the License Agreement, and caused IHT to suffered damages through its lost business with JC Penney and other retailers, and through the expenditures and costs it incurred in attempting to perform under the License Agreement.

38. For the foregoing reasons, I respectfully request that the Court deny PVH's motion to dismiss, or, in the alternative permit IHT to file an amended counterclaim that includes the facts set forth herein.

_____
SALO GROSFELD

SUBSCRIBED AND SWORN
TO BEFORE ME THIS 12TH
DAY OF FEBRUARY, 2008

_Olga N. Croadsaile_
NOTARY PUBLIC

NOTARY PUBLIC-STATE OF FLORIDA
O. Croadsaile
Commission #DD436525
Expires: JUNE 02, 2009
Bonded Thru Atlantic Bonding Co., Inc.

8