UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

PHILLIPS-VAN HEUSEN CORPORATION,                    :
                                                    :
                              Plaintiff,            :        07 Civ. 8169 (AKH)
                                                    :
            - against -                             :
                                                    :
INTERNATIONAL HOME TEXTILES, INC.,                  :
and SALO GROSFELD,                                  :
                                                    :
                              Defendants.           :

------------------------------------------------------------------ x

**DEFENDANT AND COUNTERCLAIM PLAINTIFF INTERNATIONAL
HOME TEXTILES, INC.'S MEMORANDUM OF LAW IN
OPPOSITION TO MOTION TO DISMISS COUNTERCLAIM**

GREENBERG TRAURIG, LLP
MetLife Building
200 Park Avenue, 15th Floor
New York, New York 10166
(212) 801-9200

One International Place, 20th Floor
Boston, MA  02110
(617) 310-6000

*Attorneys for Defendants
International Home Textiles, Inc.
and Salo Grosfeld*

## TABLE OF CONTENTS

                                                                                        **Page**

Preliminary Statement ................................................................................... 1

Statement of Relevant Facts ......................................................................... 4

    A.    The Parties .................................................................................. 4

    B.    Background .................................................................................. 5

    C.    The License Agreement .............................................................. 8

    D.    PVH Sends IHT An Amended Schedule
           Of Approved Retailers Nearly Six Months
           After The License Agreement Was Executed ............................ 10

    E.    IHT's Misrepresentation Counterclaim ..................................... 11

ARGUMENT ................................................................................................ 13

POINT I    IHT HAS PROPERLY PLED A CLAIM
           FOR MISREPRESENTATION ............................................... 14

POINT II    THE LICENSE AGREEMENT'S GENERAL MERGER
           CLAUSE IS INEFFECTIVE AGAINST IHT'S
           MISREPRESENTATION CLAIM ......................................... 19

POINT III    ALTERNATIVELY, IHT SHOULD BE PERMITTED TO
           REPLEAD ITS MISREPRESENTATION COUNTERCLAIM .............. 23

CONCLUSION ............................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

### Federal Cases

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank,*
    731 F.2d 112, 123 (2d Cir. 1984) .................................................................. 19

*Albany Home Savs. Bank FSB v. Halpin,*
    117 F.3d 669 (2d Cir. 1997) ...................................................................... 22, 23

*Allen v. WestPoint-Pepperell, Inc.,*
    945 F.2d 40 (2d Cir. 1991) ............................................................................ 13

*ATSI Communs., Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007) ............................................................................ 13

*Bernheim v. Litt,*
    79 F.3d 318 (2d Cir. 1996) ............................................................................ 13

*Centronics Fin. Corp. v. El Conquistador Hotel Corp.,*
    573 F.2d 779 (2d Cir. 1978) ............................................................. 20, 21, 23

*Creditsights, Inc. v. Ciasullo,*
    No. 05 CV 9345, 2007 WL 943352 (S.D.N.Y. Mar. 29, 2007) ................... 13

*Curry Road. Ltd. v. K-Mart Corp.,*
    893 F.2d 509 (2d Cir. 1996) ...................................................................... 22, 23

*Emergent Capital Inv. Mgt., LLC v. Stonepath Grp., Inc.,*
    165 F. Supp. 2d 615 (S.D.N.Y. 2001) ....................................................... 21, 22

*Four Star Capital Corp. v. Nynex Corp.,*
    AGS, 183 F.R.D. 91 (S.D.N.Y. 1997) ............................................................ 18

*Harsco Corp. v. MHC,*
    91 F.3d 337 (2d Cir. 1996) ........................................................................ 21, 22

*Jones v. Ballon, Stoll & Itzler,*
    88 Civ. 8459, 1990 WL 113120 (S.D.N.Y. July 27, 1990) ........................... 20

*Koehler v. Bank of Bermuda (New York) Ltd.,*
    209 F.3d 130 (2d Cir. 2000) ...................................................................... 23, 24

*Liberty Mutual Ins. Co., v. Palace Car Servs. Corp.,*
    No. 06 CV 4881, 2007 WL 2287902 (S.D.N.Y. Aug. 8, 2007) ............... 14, 16

*M-101, LLC v. iN Demand L.L.C.*,
   No. 06 Civ. 12938, 2007 WL 4258191, (S.D.N.Y. Dec. 3, 2007) .......................... 13, 19

*Malmsteen v. Berdon, LLP*,
   477 F. Supp. 2d 655 (S.D.N.Y. 2007) ............................................................................ 24

*Morgan Guaranty Trust Co. of N.Y. v. Republic of Palau*,
   657 F. Supp. 1475 (S.D.N.Y. 1987) .............................................................................. 19

*Navigant Consulting, Inc. v. Kostakis*,
   No. CV-07-2302, 2007 WL 2907330 (E.D.N.Y. Oct. 4, 2007) .................................... 13

*Oh v. Imagemark, Inc.*,
   No. 06 Civ. 10187, 2007 WL 2962381 (S.D.N.Y. Oct. 10, 2007) ................................ 24

*O'Hearn v. Bodyonics, Ltd.*,
   22 F. Supp. 2d 7 (E.D.N.Y. 1998) .......................................................................... 20, 23

*Price Bros. Co. v. Olin Constr. Co.*,
   528 F. Supp. 716 (W.D.N.Y. 1981) .............................................................................. 21

*Seiden Assoc., Inc. v. ANC Holdings, Inc.*,
   959 F.2d 425 (2d Cir. 1992) ................................................................................... 22, 23

*United Artists Theatre Circuit, Inc. v. Sun Plaza Enterprise Corp.*,
   352 F. Supp. 2d 342 (E.D.N.Y. 2005) ................................................................... 21, 22

*Wall v. CSX Transp. Inc.*,
   471 F.3d 410 (2d Cir. 2006) ......................................................................................... 20

### State Cases

*Barash v. Pennsylvania Terminal Real Estate Co.*,
   308 N.Y.S.2d 649, 256 N.E.2d 707 (1970) ................................................................. 20

*Board of Mgrs. of 411 E. 53rd Street Condom. v. Dylan Carpet, Inc.*,
   182 A.D.2d 551, 582 N.Y.S.2d 1022 (1st Dep't 1992) ................................................. 18

*Deerfield Communs. Corp. v. Chesebrough-Ponds*,
   510 N.Y.S.2d 88, 502 N.E.2d 1003 (1986) ................................................................. 20

*Fasig-Tipton Co. v. Jaffe*,
   87 A.D.2d 835, 449 N.Y.S.2d 268 (2d Dep't 1982) ..................................................... 21

*P.T. Bank Central Asia v. ABN Amro Bank N.V.*,
   301 A.D.2d 373, 754 N.Y.S.2d 245 (1st Dep't 2003) ............................................. 14, 16

*Sabo v. Delman,*
   3 N.Y.2d 155 (1957)........................................................................19, 20-21

*Swersky v. Dreyer and Traub,*
   219 A.D.2d 321, 643 N.Y.S.2d 33 ...............................................................14

## Statutes

Fed. R. Civ. P. 9(b)........................................................................13, 14

Fed. R. Civ. P. 12(b)(6) ........................................................................13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
PHILLIPS-VAN HEUSEN CORPORATION,                    :
                                                    :
                        Plaintiff,                  :        07 Civ. 8169 (AKH)
                                                    :
        - against -                                 :
                                                    :
INTERNATIONAL HOME TEXTILES, INC.,                  :
and SALO GROSFELD,                                  :
                                                    :
                        Defendants.                 :
-------------------------------------------------------------------x

### DEFENDANT AND COUNTERCLAIM PLAINTIFF INTERNATIONAL HOME TEXTILES, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS COUNTERCLAIM

Defendant and Counterclaim Plaintiff International Home Textiles, Inc. ("IHT"), by its attorneys, Greenberg Traurig, LLP, respectfully submits this memorandum of law in opposition to the motion of Plaintiff and Counterclaim Defendant Phillips-Van Heusen Corporation ("PVH"), to dismiss IHT's counterclaim for failure to state a claim upon which relief can be granted or plead fraud with sufficient particularity.

### Preliminary Statement

In 2001, PVH and IHT transacted a license agreement pursuant to which PVH granted IHT the exclusive right to use the IZOD trademark (the "License Mark") in connection with the sale, distribution and promotion of home textile products, including sheets, pillow cases, and towels (the "Licensed Products") on a wholesale basis to retailers approved by PVH (the "Approved Retailers") (collectively, the "2001 License Agreement"). The 2001 License Agreement was sufficiently successful for both parties that four years later, they sought to execute a second license agreement regarding the same License Mark and Licensed Products.

During the course of negotiations for a second license agreement in the fall of 2005, PVH's Licensing Manager, Kenneth Wyse, and other PVH representatives made a series of oral representations and promises to Salo Grosfeld, IHT's President, to induce IHT to enter into the agreement under less favorable terms than the 2001 License Agreement. Such representations included that certain Approved Retailers who sold apparel products with the License Mark would agree to purchase the home textile Licensed Products sold by IHT. Mr. Wyse and IZOD President,[1] Malcolm Robinson, specifically told Grosfeld that PVH would assist IHT in placing Licensed Products with retailers such as Macy's, Belk, and Bon Ton through their business contacts with the upper management of these companies. Mr. Robinson told Mr. Grosfeld that it was a "slam dunk" that these Approved Retailers would buy Licensed Products from IHT.

To further induce IHT to execute a new license agreement -- the same license agreement that is at issue in this action -- Wyse repeatedly promised Grosfeld during conversations and meetings in September, October, November, and December 2005 that PVH would provide IHT with an *expanded* list of Approved Retailers and that Sam's Club, a major "club" retailer, would be on the list. In fact, during a meeting in October 2005, Wyse's assistant personally showed Mr. Grosfeld a distribution list of Approved Retailers for the new agreement that listed Sam's Club as an Approved Retailer.

In January 2006, IHT executed a new license agreement with PVH (the "License Agreement"), based in substantial part upon the promises and representations made to Mr. Grosfeld by Mr. Wyse and other PVH representatives regarding the Approved Retailers. In addition, as detailed below, Mr. Wyse pressured IHT to execute the License

---

[1]      IZOD is owned and controlled by PVH.

2

Agreement or risk losing PVH's business, as well as that of numerous retailers like JC Penney, whose Licensed Products were "on order" at the time.

After IHT executed the License Agreement, PVH reneged on its previous promises. It failed to assist IHT in placing Licensed Products with Approved Retailers, and the Approved Retailers whom PVH had represented would be a "slam dunk" for IHT, like Macy's, Belk, Bon Ton, and PVH's own retail stores, ultimately refused to buy Licensed Products from IHT. PVH also refused to add Sam's Club to the list of Approved Retailers, contrary to Mr. Wyse's previous promises.

When PVH finally did send a purportedly "expanded" schedule of Approved Retailers to IHT in May 2006 (the "Amended Schedule"), nearly six months after the License Agreement was executed, it knew that a material number of Approved Retailers on the list had already refused to purchase Licensed Products from IHT in the past, or did not sell Licensed Products at all. Once these non-viable retailers were removed from the list, IHT was essentially left with the same list of Approved Retailers it had in the 2001 License Agreement, and under much less favorable terms. In its Counterclaim, IHT alleges that the above was part and parcel of a fraudulent scheme by PVH to induce IHT to enter into the onerous License Agreement, with little to no likelihood of success.

Remarkably, on its motion, PVH contends that it lacks sufficient information regarding IHT's misrepresentation claim. Putting aside the disingenuousness of such a assertion, since PVH is manifestly aware of the promises its representatives made to IHT and when, the claim lacks any legal merit. Contrary to PVH's contention, IHT has adequately alleged a claim for misrepresentation, and it has done so with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. Moreover, the claim is not

barred by the integration clause in the License Agreement, which is general in nature and contains no specific disclaimer regarding reliance upon PVH's oral promises regarding Approved Retailers.

Nor is it barred by the parol evidence rule. IHT's misrepresentation claim clearly alleges fraud, which is an exception to the parol evidence rule in a situation, as here, involving a general merger clause with no specific disclaimer regarding the misrepresentations at issue. In addition, parol evidence may be admitted in this case because two relevant provisions in the License Agreement, one pertaining to "commercially reasonable efforts," and one pertaining to the suspension of IHT's obligations in the face of causes beyond its control (such as Approved Retailers who refuse to purchase Licensed Products) are ambiguous.

For these reasons and those set forth below, PVH's contentions are without merit and its motion should therefore be denied.

### **Statement of Relevant Facts**

A.    <u>The Parties</u>

Defendant and Counterclaim Plaintiff IHT is a Florida corporation with a principal place of business in Miami, Florida. (Compl., ¶ 6). IHT distributes, among other things, sheets, pillow cases and towels. (*Id.*, ¶ 7). Defendant Salo Grosfeld ("Grosfeld") is a Florida citizen and the President of IHT. (*Id.*, ¶¶ 9, 10). He is also a stockholder of IHT. (*Id.*, ¶ 11). Plaintiff and Counterclaim Defendant PVH is a Delaware corporation with a principal place of business in New York, New York. (Compl., ¶ 4). PVH is the owner of the IZOD trademark in the United States and its territories, and engages in the manufacture, sale, distribution, promotion, and licensing of products bearing the IZOD mark. (Compl., ¶ 5, 14).

B.    Background

In 2001, PVH and IHT successfully transacted a license agreement pursuant to which PVH granted IHT the exclusive right to use the License Mark in connection with the sale, distribution and promotion of home textile products, including sheets, pillow cases, and towels (previously defined as the Licensed Products) on a wholesale basis to retailers approved by PVH (previously defined as the 2001 License Agreement).[2] (Grosfeld Aff., ¶ 2.)   As the 2001 License Agreement had been financially successful for both parties, upon the conclusion of the term of that agreement, PVH and IHT sought to enter into a second license agreement concerning the same Licensed Mark and Licensed Products. (*Id.*, ¶ 3.)

Throughout the fall and winter of 2005, Mr. Grosfeld participated in several meetings and telephone conversations during which PVH and IHT negotiated the terms of a new license agreement. (*Id.*, ¶ 4.)  In order to increase IHT's business and enhance its prospects for success under the new license agreement, Mr. Grosfeld repeatedly asked Ken Wyse, PVH's Licensing Manager, and Mark Weber, PVH's Chief Executive Officer, to expand the list of approved retailers to whom IHT could sell Licensed Products. (*Id.*, ¶ 5.)   Specifically, he asked PVH to expand the list to include major "club" retailers, such as Costco and Sam's Club. (*Id.*)

Mark Weber had orally promised and represented to Grosfeld as late as October 2003 that if IHT was able to sell Licensed Products to the retailers PVH had approved for the 2001 License Agreement, PVH would expand the list to include Sam's Club and

---

[2]       "Grosfeld Aff." denotes the supporting Affidavit of Salo Grosfeld, IHT's President, sworn to on February 12, 2008, which is submitted in opposition to PVH's motion.

other retailers.   (A copy of the schedule of approved retailers for the 2001 License Agreement is annexed to the Grosfeld Aff. as Exhibit A.)

In September and October 2005, Mr. Grosfeld participated in meetings at PVH's New York offices during which Mr. Wyse told him, among other things, that IZOD, which was owned by PVH, would help IHT place Licensed Products with approved retailers in the parties' new license agreement (previously defined as the Approved Retailers) through PVH's and IZOD's business connections with the upper management of these retailers.  (Grosfeld Aff., ¶¶ 7-19.)

After a meeting with Wyse in September 2005, Grosfeld went to the office of Malcolm Robinson, IZOD's President, which was a few floors up from Wyse's, in the same building.  (*Id.*, ¶ 11.)   There, he met with Robinson, who told him that it would be a "slam dunk" to get Approved Retailers to buy IHT's Licensed Products.   (*Id.*) Robinson specifically told Grosfeld that he could get retailers Belk and Bon Ton to buy Licensed Products.  (*Id.*)   Robinson also represented that he would assist IHT in placing Licensed Products with Macy's who previously had refused to buy any Licensed Products from IHT. (*Id.*, ¶ 12.)

In October 2005, Grosfeld met with Wyse again at PVH's New York office to continue negotiating the new license agreement between PVH and IHT.  (Grosfeld Aff., ¶ 13)   Wyse's assistant, Maria Maselli, was also present. (*Id.*)   During the meeting, Ms. Maselli showed Grosfeld a schedule of Approved Retailers for the new license agreement, which included Sam's Club, as Grosfeld had previously requested.  (*Id.*, ¶ 14.)   Grosfeld was not given a copy of the schedule, however.   (*Id.*)

6

In subsequent negotiations with Ken Wyse in November and December 2005, Grosfeld reiterated that he was not satisfied with the list of Approved Retailers from the 2001 License Agreement and told Wyse that for IHT to succeed in meeting the royalty (and other) benchmarks in the new license agreement, PVH needed to expand the list of Approved Retailers. (Grosfeld Aff., ¶ 14.)   Of particular concern was the fact that, unlike the 2001 License Agreement, the proposed license agreement would (and ultimately did) strictly limit IHT's prospective sales of Licensed Products to JC Penney, a major business partner of IHT, to 33%. (*Id.*, ¶ 17.)   Thus, under the terms of the new license agreement, no more than 33% of IHT's sales of Licensed Products could be to JC Penney.  (*Id.*)

Wyse repeatedly promised that PVH would expand the list. (*Id.*, ¶ 19.)   He told Grosfeld several times in November and December 2005 that IHT "would have more people to sell to" in the new license agreement and that "we're going to get you a better list" of Approved Retailers.  (*Id.*)   Wyse also promised that an expanded list of Approved Retailers would be forthcoming soon.  (*Id.*)

In December 2005, PVH sent IHT an execution copy of the proposed license agreement.  (Grosfeld Aff., ¶ 20.)   Contrary to PVH's promises and representations, and specifically those of Ken Wyse and Mark Weber, the schedule of Approved Retailers was virtually unchanged from the 2001 License Agreement.  (*Id.*)   In fact, there were *fewer*, not more, Approved Retailers in the new license agreement.  (A copy of this schedule is annexed as Exh. B to the Grosfeld Aff.)

In addition, Sam's Club was not on the schedule.  (*Id.*, ¶ 21.)   Upset that PVH had not kept its promises regarding expanding the list of Approved Retailers, and that Sam's Club had been removed from the list, Grosfeld called Wyse, who told him that

during their October 2005 meeting, Grosfeld had been shown an incorrect approved retailer list, one that belonged to another licensee. (*Id.*, ¶ 22.) Wyse promised Grosfeld that he would work to get Sam's Club added to the list of Approved Retailers for the new license agreement. (*Id.*) Wyse also promised that an expanded list of Approved Retailers would be forthcoming, but told Grosfeld that IHT needed to execute the new license agreement "as is" as soon as possible. (*Id.*)

At the time, IHT had Licensed Products "on order" and ready to be shipped and did not want its ongoing business with J.C. Penney, Linen N' Things, and other retailers to be negatively impacted. (*Id.*, ¶ 23.) Moreover, Grosfeld, who had dealt with Ken Wyse and PVH for several years, trusted that Wyse would keep his promise and provide IHT with an expanded list of Approved Retailers. (*Id.*) For these and other reasons, IHT executed the License Agreement in January 2006, with the full expectation that an expanded list of Approved Retailers would soon be forthcoming, as promised. (*Id.*, ¶ 24.)

C.    The License Agreement

On or about January 1, 2006, PVH entered into a License Agreement ("License Agreement") with IHT, pursuant to which it again granted IHT the exclusive right to use the IZOD trademark in connection with the "sale, distribution, and promotion of the sheets, pillow cases and towels, including without limitation, wash cloths, hand towels, bath towels, bath sheets, bath mats, and beach towels, excluding dish towels" (the Licensed Products) on a wholesale basis, to certain approved customers (Approved Retailers). (Compl., ¶ 15). PVH also granted IHT certain limited and non-exclusive rights to manufacture the Licensed Products. (*Id.*)

The License Agreement, which was for a term commencing on January 1, 2006 and concluding on December 31, 2008, strictly limited IHT's right to sell the Licensed

Products to certain approved retailers whose identities were set forth in the agreement (the "Approved Retailers"). (Compl., ¶ 16; Counterclaim, at ¶ 8; Ex. A to Di Domenico Aff., Section 6.14 and Schedule 6.14.)

The License Agreement contains the following provisions, which are relevant to the instant motion:

> 1.4.1 <u>Commercially Reasonable Efforts</u>.   At all times during the License Period, <u>Licensee shall use commercially reasonable efforts to exploit the License throughout the Territory</u>, including, but not limited to, selling a sufficiently representative quantity of all styles, fabrications, colors and sizes of the Licensed Products; offering for sale the Licensed Products so that they may be sold to consumers on a timely basis; maintaining a sales force sufficient to provide effective distribution throughout all areas of the Territory; and coopering with marketing, merchandising, sales and anti-counterfeiting programs of PVH and any of its licensees.

> 11.8   <u>Suspension of Obligations</u>.   If Licensee shall be prevented from performing any of its obligations because of governmental regulation or order, or by strike or war, declared or undeclared, or other calamities such as fire, earthquake, or similar acts of God, <u>or because of other similar or dissimilar cause beyond the control of Licensee, Licensee's obligations shall be suspended during the period of such conditions</u>.  If such condition continues for a period of more than 60 days, PVH shall have the right to terminate this Agreement.

> 11.10   <u>Entire Agreement; Amendment</u>.  This Agreement, including the exhibits and schedules hereto, constitutes the entire agreement of the parties hereto with respect to the subject matter hereof, and supersedes all prior agreements, contracts, promises, representations and statements between them, if any, whether written or oral, with respect thereto including, without limitation, the License Agreement between PVH and Licensee dated December 2001, as the same may have been heretofore amended.  This Agreement may not be amended or modified, except in a writing signed by both parties hereto.

(Exh. A to Di Domenico Aff., at 3, 30-31.)

D.    PVH Sends IHT An Amended Schedule Of Approved Retailers
      <u>Nearly Six Months After The License Agreement Was Executed</u>

On May 26, 2006, after Grosfeld had called Ken Wyse several more times to complain that IHT had not yet received an expanded list of Approved Retailers as promised, PVH's General Counsel, Mark Fischer, sent Grosfeld a letter (copied to Ken Wyse and others at PVH) annexing an amended schedule of Approved Retailers that purportedly expanded upon the prior Approved Retailer list (previously defined as the Amended Schedule).[3]    (Grosfeld Aff., ¶ 25.)    (A copy of the Amended Schedule is annexed as Exh. C to the Grosfeld Aff.)

While the Amended Schedule contained additional Approved Retailers who purportedly were ready, willing, and able to buy Licensed Products from IHT, in actuality, twenty-one of the Approved Retailers on the Amended Schedule refused to buy any Licensed Products from IHT whatsoever.    (Grosfeld Aff., ¶ 26.)  These retailers included:  Bass Pro Shops, Bob's Stores, Dick's Sporting Goods, Foot-Locker, Paragon Sports, AS Cooper, Casual Male, Dawahares, Dunlaps, Stage Stores/SSI/SRI, Macy's East/Hecht Co./Filene's/Kaufmann's, Macy's Florida/Burdines, Macy's Midwest/Famous Barr, Macy's North/Marshall Fields, Macy's Northwest/Bon Marche/Meier & Frank, Macy's South/Foley's, Macy's West/Robinson's/May, Macy's Central/Rich's/Lazarus, Macy's.com, Lord & Taylor, and PVH Stores. (*Id.*, ¶ 27.)    Moreover, Sam's Club was not on the Amended Schedule, contrary to Wyse's promises. (*Id.*, ¶ 28.)

Thus, notwithstanding PVH's prior representations, IHT was essentially left with the same number of Approved Retailers that had existed under the 2001 License

---

[3]    The Amended Schedule, which is signed by PVH's General Counsel, but was not signed by anyone at IHT, purported to amend the License Agreement. *See* Exh. C to Grosfeld Aff., at 2. This belies PVH's assertion that the License Agreement could not be "amended or modified except in a writing signed by both parties. . . ." (PVH Br. at 5.)  PVH itself did so.

Agreement. (*Id.*, ¶ 29.) At the same time, under the new License Agreement, it was required to limit its business with JC Penney, one of its largest and best retail customers. IHT had not been required to limit its business with JC Penney under the 2001 License Agreement. (*Id.*)

Macy's would not purchase and Licensed Products. (Grosfeld Aff., ¶ 27, 31.) Neither would Bon Ton or Belk, nor PVH Stores, which comprised a group of retailers including IZOD, who are owned and controlled by PVH. (*Id.*, ¶¶ 27, 32.) Thus, even though PVH owned and controlled these retailers, PVH Stores refused to buy *any* Licensed Products from IHT. This directly contradicted express oral representations made to Grosfeld by Ken Wyse and Malcolm Robinson in late 2005, including the representation that PVH and IZOD would work with upper management of the Approved Retailers to place Licensed Products with these retailers.

E.    IHT's Misrepresentation Counterclaim

Alleging various breaches of the License Agreement, PVH terminated the License Agreement on or about April 27, 2007. (Compl., ¶ 43). PVH then commenced an action on or about September 18, 2007, asserting breach of contract and accounting claims against IHT, and claims for joint and several liability and liability pursuant to an alleged personal guarantee against Grosfeld.

On November 26, 2007, IHT answered the Complaint and asserted a Counterclaim for Misrepresentation against PVH based on the above fraudulent statements by PVH. Among other things, IHT alleged that prior to entering into the License Agreement with IHT, PVH's representatives affirmatively represented to IHT that a number of Approved Retailers, who were in the business of marketing and selling apparel products with the License Mark (but not Licensed Products, *i.e.* home textiles)

would also agree to market and sell Licensed Products.  (Counterclaim, at ¶ 9.)  It asserted that when the parties were negotiating the License Agreement, Mark Webber, PVH's then-President and Chief Executive Officer, and Kenneth Wyse, PVH's President of Licensing, represented to IHT President Salo Grosfeld that certain Approved Retailers, who were in the business of marketing and selling apparel products with the License Mark would also agree to market and sell Licensed Products. (Counterclaim, ¶ 14.)  IHT further claimed that the number of Approved Retailers who would market and sell Licensed Products was a material fact upon which it based its assent to the License Agreement.  (Counterclaim, ¶ 15.)

After entering into, and seeking to perform under the License Agreement, however, IHT discovered that, contrary to PVH's representations, these Approved Retailers would *not* agree to sell Licensed Products.  (Counterclaim, ¶ 16.)  For example, contrary to PVH's representations, neither Macy's, nor PVH's own stores would buy Licensed Products.  (Grosfeld Aff., ¶¶ 27, 31, 32.)  Moreover, contrary to its prior representations, PVH refused to add Sam's Club as an Approved Retailer.  (Grosfeld Aff., ¶ 28.)

Given the License Agreement's strict limitation on the retailers to whom IHT could sell the Licensed Products, the fact that these Approved Retailers would not agree to market and sell Licensed Products prevented IHT from meeting the benchmarks set forth in the License Agreement, and caused IHT to lose profits it otherwise would have earned had it not entered into the License Agreement with PVH.  (Counterclaim, ¶¶ 22; Grosfeld Aff., ¶ 37.)

# ARGUMENT

On a motion to dismiss a complaint pursuant to Rule 12(b)(6), the Court "must accept the factual allegations of the complaint as true" and "must draw all reasonable inferences in favor of the plaintiff." *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir. 1996); *Creditsights, Inc. v. Ciasullo*, No. 05 CV 9345, 2007 WL 943352, *5 (S.D.N.Y. Mar. 29, 2007) (same).[4]  A complaint may not be dismissed pursuant to Rule 12(b)(6) unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991) (internal quotations and citation omitted).

In addition, where, as here, a fraud claim is alleged, Rule 9(b) of the Federal Rules of Civil Procedure requires that the circumstances constituting the fraud be stated with particularity. *M-101, LLC v. iN Demand L.L.C.*, No. 06 Civ. 12938, 2007 WL 4258191, *2 (S.D.N.Y. Dec. 3, 2007); *Navigant Consulting, Inc. v. Kostakis*, No. CV-07-2302, 2007 WL 2907330, *3 (E.D.N.Y. Oct. 4, 2007) (same).   Malice, knowledge, and intent "[m]ay be averred generally." *M-101, LLC*, 2007 WL 4258191, at *2 (quoting *ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)).   In order to satisfy Rule 9(b), a complaint's allegations must specify the fraudulent statement, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent. *Id.*

For the reasons set forth below, IHT has properly pled its counterclaim for misrepresentation in accordance with Rule 9(b).  PVH's motion to dismiss should therefore be denied.

---

[4]     PVH's motion omits any discussion of the legal standard applicable to a motion to dismiss pursuant to Rule 12(b)(6).

**POINT I**

**IHT HAS PROPERLY PLED A CLAIM FOR MISREPRESENTATION**

In order to state a claim for misrepresentation under New York law, a plaintiff must establish that: (1) the defendant made a material false representation; (2) with intent to defraud or mislead the plaintiff; (3) the plaintiff reasonably relied upon the representation; and (4) the plaintiff suffered damages as a result of its reliance on the defendant's misrepresentation. *P.T. Bank Central Asia v. ABN Amro Bank N.V.*, 301 A.D.2d 373, 376, 754 N.Y.S.2d 245, 250 (1st Dep't 2003); *Swersky v. Dreyer and Traub*, 219 A.D.2d 321, 326, 643 N.Y.S.2d 33, 36-37; *Liberty Mutual Ins. Co., v. Palace Car Servs. Corp.*, No. 06 CV 4881, 2007 WL 2287902, *2 (S.D.N.Y. Aug. 8, 2007) (citing *Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940 (2d Cir. 1998)).[5]  Such a claim must also be alleged in accordance with the requirements of Rule 9(b), described above.

IHT has met this standard.  It alleges that when the parties were negotiating the License Agreement with PVH, PVH's CEO, Mark Weber, and its Licensing Manager, Ken Wyse, affirmatively represented to IHT President Salo Grosfeld that certain Approved Retailers who were in the business of marketing and selling apparel products with the License Mark would also agree to market and sell *home textile* products with License Mark, i.e., the Licensed Products manufactured by IHT.  (Counterclaim, at ¶ 14.) Elaborating on these allegations, IHT's President, Salo Grosfeld asserts that these retailers included: Bass Pro Shops, Bob's Stores, Dick's Sporting Goods, Foot-Locker, Paragon Sports, AS Cooper, Casual Male, Dawahares, Dunlaps, Stage Stores/SSI/SRI,

---

[5]     IHT has not alleged a claim for negligent misrepresentation.  Accordingly, Point IV of PVH's memorandum of law, and the cases cited therein, are irrelevant.

Macy's East/Hecht Co./Filene's/Kaufmann's, Macy's Florida/Burdines, Macy's Midwest/Famous Barr, Macy's North/Marshall Fields, Macy's Northwest/Bon Marche/Meier & Frank, Macy's South/Foley's, Macy's West/Robinson's/May, Macy's Central/Rich's/Lazarus, Macy's.com, Lord & Taylor, and PVH Stores. (Grosfeld Aff., ¶ 27.)

The number of Approved Retailers who would market and sell Licensed Products was a material fact upon which IHT based its assent to the License Agreement. (Counterclaim, ¶ 15; Grosfeld Aff., ¶¶ 5, 6, 16, 19, 22, 24.)    Indeed, the number of Approved Retailers would agree to market and sell Licensed Products was crucial to IHT's ability to meet its benchmarks under the License Agreement, including minimum sales requirements, advertising expense payments, and minimum guaranteed royalty payments. (Grosfeld Aff., ¶ 16.)

In assenting to the terms of the License Agreement, IHT relied upon the veracity of PVH's representations regarding the Approved Retailers. (*Id.*) The feasibility of IHT's performance under the terms of the License Agreement profoundly depended upon PVH's representations that the Approved Retailers were legitimate sources of distribution for IHT and that IHT would receive an expanded list of <u>viable</u> Approved Retailers after it executed the License Agreement.

After it executed the License Agreement and began performance, IHT discovered that, contrary to PVH's representations, numerous Approved Retailers, including Macy's, Bon Ton, Belk, and <u>PVH's own stores</u> would not agree to market and sell Licensed Products. (Counterclaim, ¶ 16; Grosfeld Aff., ¶¶ 27, 32.) Mr. Grosfeld complained to PVH Licensing Manager Ken Wyse and requested that PVH send an expanded list of

Approved Retailers as he previously promised. (Grosfeld Aff., ¶ 22.)    PVH did not do
so until six months after the execution of the License Agreement, and the Amended
Schedule it sent contained numerous Approved Retailers who PVH already knew were
not viable sources of distribution to IHT, *i.e.*, who did not sell Licensed Products and
would not purchase any Licensed Products from IHT. (*Id.*, ¶¶ 25-34.)

 IHT alleges that when PVH made these representations through Mr. Wyse,
Mr. Weber, and Mr. Robinson, it knew, or reasonably should have known, that the
Approved Retailers were not purchase Licensed Products and were not viable avenues for
distribution for IHT. (Counterclaim, ¶ 17; Grosfeld Aff., ¶¶ 30-33.)    It also alleges that
PVH, through Wyse and Weber, misrepresented material facts to IHT, that IHT
reasonably relied upon these misrepresentations when it entered into the License
Agreement, and that it suffered damages as a result. (Counterclaim, ¶¶ 15-20.)    This
properly states a claim for fraudulent misrepresentation under New York law. *Liberty
Mutual Ins. Co.*, 2007 WL 2287902, at *2; *P.T. Bank Central Asia*, 301 A.D.2d at 376,
754 N.Y.S.2d at 250; *Swersky*, 219 A.D.2d at 326, 643 N.Y.S.2d at 36-37.

 PVH's predictable complaint that IHT has not pled its misrepresentation claim
with sufficient particularity should be rejected.    PVH contends that IHT's Counterclaim
fails to identify the specific Approved Retailers whom PVH represented would agree to
sell the Licensed Products and who subsequently did not do so (PVH Br. at 9); fails to
distinguish between the statements made by Mr. Weber and Mr. Wyse (PVH Br. at 10);
and fails to identify when and where the statements were made (PVH Br. at 10).

 PVH protests too much, as it is well aware of the "particulars" surrounding the
misrepresentations at issue.    First, the Approved Retailers are listed in Schedule 6.14 of

16

the License Agreement, which both parties possess, and which is appended to PVH's motion. PVH comprises a massive conglomerate of corporate entities who deal with the apparel business and the License Mark each and every day. From the experience of its representatives Ken Wyse and Malcolm Robinson, among others, as well as from its discussions with Mr. Grosfeld, it was well aware of which Approved Retailers were viable distribution outlets for the Licensed Products. Before it sent IHT the Amended Schedule, it already knew that Macy's was refusing to buy Licensed Products. It already knew that sporting goods companies do not sell home textile products. It already knew that its own stores were refusing to buy Licensed Products from IHT. And still it included these retailers as Approved Retailers on the sham Amended Schedule. (*See* Exh. C to the Grosfeld Aff.)   Finally, it knew that it would not allow IHT to sell to Sam's Club, notwithstanding its prior promises to the contrary.

PVH also professes to be unclear on when and where the alleged representations were made, even though the Counterclaim clearly states (and PVH acknowledges) that the misrepresentations took place when the parties were negotiating the License Agreement, which, as PVH knows, took place in the fall of 2005. As Mr. Grosfeld states in his Affidavit, the negotiations took place between September and November 2005, and he personally attended meetings with Mr. Wyse and Malcolm Robinson of IZOD where PVH represented and promised that it would provide IHT with an expanded list of Approved Retailers, that Sam's Club would be on the list, that PVH would assist IHT in placing Licensed Products with a number of retailers through its business contacts with the management of these companies, and that it was a "slam dunk" that these Approved Retailers would buy Licensed Products from IHT. (Grosfeld Aff., at ¶¶ 11, 12, 14, 23.)

Since PVH is clearly aware of the circumstances surrounding the misrepresentations at issue, its protests regarding particularity ring hollow.[6]

IHT was not required to further distinguish between the specific representations made by Mr. Wyse or Mr. Weber, since its counterclaim as a whole alleges a fraudulent scheme by PVH involving both Wyse and Weber. *See, e.g., Four Star Capital Corp. v. Nynex Corp., AGS*, 183 F.R.D. 91, 109 (S.D.N.Y. 1997) (rejecting defendants' assertion that plaintiff failed to identify which NYNEX executives were responsible for alleged misrepresentations since "complaint as a whole adequately allege[d] a scheme involving both defendants") (quoting *Board of Mgrs. of 411 E. 53rd Street Condom. v. Dylan Carpet, Inc.*, 182 A.D.2d 551, 551, 582 N.Y.S.2d 1022, 1023-24 (1st Dep't 1992)).

Contrary to PVH's assertion, the alleged misrepresentations -- which include PVH's promise to provide IHT with an expanded list of Approved Retailers, including Sam's Club and assist IHT in placing Licensed Products with Approved Retailers -- were not an "expression of future expectation." (PVH Br. at 6-7.) Rather, they were material statements of present facts, facts of which PVH representatives Wyse, Weber, and Robinson were aware when the statements were made. Such misrepresentations are

---

[6]    In contending that IHT has not alleged that Mr. Weber's and Mr. Wyse's misrepresentations regarding the Approved Retailers were false, PVH carefully parses two allegations in IHT's counterclaim and takes the words "a number of" out of context. (PVH Br. at 8.) IHT does not allege that Weber and Wyse simply promised that some Approved Retailers would agree to sell Licensed Products and some would not. Rather, it asserts that Weber and Wyse falsely promised that certain Approved Retailers "who were in the business of marketing and selling *apparel* products with the License Mark (but not Licensed Products, *i.e.* home textiles), would also agree to market and sell Licensed Products" and that this group (*i.e.*, AS Cooper, Casual Male, Dawahares, Dunlaps, Stage Stores/SSI/SRI, Bass Pro Shops, Bob's Stores, Dick's Sporting Goods, Foot-Locker, Paragon Sports, PVH Stores, Macy's East/Hecht Co./Filene's/Kaufmann's, Macy's Florida/Burdines, Macy's Midwest/Famous Barr, Macy's North/Marshall Fields, Macy's Northwest/Bon Marche/Meier & Frank, Macy's South/Foley's, Macy's West/Robinson's/May, Macy's Central/Rich's/Lazarus, Macy's.com, and Lord & Taylor) "would not agree to market and sell Licensed Products." (Counterclaim, ¶ 17; Grosfeld Aff., ¶ 27.)    Further, Mr. Grosfeld states in his Affidavit his belief that the representations from Mr. Wyse and Mr. Robinson were false when made, and were calculated to induce IHT to enter into the License Agreement, which had more onerous and far more restrictive terms than the prior 2001 License Agreement between the parties. (Grosfeld Aff., ¶¶ 17-19, 22, 29-37.)

actionable. *See M-101, LLC*, 2007 WL 4258191 at *3 ("M-101 alleges that iND induced

it to enter the contract by making a misrepresentation of present fact *regarding marketing*

*commitments by third-party MSOs*. . . . This allegation pleads a fraud claim that is

collateral and extraneous to the contract claim.") (emphasis added); *Morgan Guaranty*

*Trust Co. of N.Y. v. Republic of Palau*, 657 F. Supp. 1475 (S.D.N.Y. 1987) ("During the

course of negotiations surrounding a business transaction, a duty to disclose may arise . . .

where one party possesses superior knowledge, not readily available to the other, and

knows that the other is acting on the basis of mistaken knowledge.") (quoting *Aaron*

*Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 123 (2d Cir. 1984)); *Sabo v.*

*Delman*, 3 N.Y.2d 155, 160 (1957) ("While mere promissory statements as to what will

be done in the future are not actionable, it is well settled that, if a promise was actually

made with a preconceived and undisclosed intention of not performing it, it constitutes a

misrepresentation of a 'material existing fact' upon which an action . . . may be

predicated.") (citation and internal quotations omitted).

## POINT II

### THE LICENSE AGREEMENT'S GENERAL MERGER CLAUSE IS INEFFECTIVE AGAINST IHT'S MISREPRESENTATION CLAIM

PVH contends that the License Agreement's integration clause (Section 11.10)

"precludes the consideration of any prior agreements" between the parties, and that IHT's

misrepresentation claim is barred by the parol evidence rule. (PVH Br. at 2-5.)   PVH

assumes too much and misstates the law regarding the application of the parol evidence

rule in a case of fraud, as is alleged in this case.

Contrary to PVH's suggestion, it is well-established that a general merger clause

like Section 11.10 "will not exclude proof of fraudulent misrepresentation." *Centronics*

19

*Fin. Corp. v. El Conquistador Hotel Corp.*, 573 F.2d 779, 782 (2d Cir. 1978); *Wall v. CSX Transp. Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) (same); *Barash v. Pennsylvania Terminal Real Estate Co.*, 308 N.Y.S.2d 649, 656 256 N.E.2d 707, 711 (1970); *Sabo v. Delman*, 3 N.Y.2d 155, 161, 143 N.E.2d 906, 908 (1957). While the parol evidence rule bars evidence of prior oral statements that seek to refute unambiguous terms of a written, integrated contract, parol evidence *is* admissible to prove fraud, even if the contract at issue contains a standard merger clause "stating that the signatories acknowledge the written document supersedes all prior agreements and constitutes the sole embodiment of their obligations." *O'Hearn v. Bodyonics, Ltd.*, 22 F. Supp. 2d 7, 13 (E.D.N.Y. 1998); *Jones v. Ballon, Stoll & Itzler*, 88 Civ. 8459, 1990 WL 113120, *8 (S.D.N.Y. July 27, 1990) (same).

As stated by the Second Circuit Court of Appeals in *Centronics Fin. Corp. v. El Conquistador Hotel Corp.*, 573 F.2d 779, 782 (2d Cir. 1978):

> New York quite clearly <u>rejects any strict application of the parol evidence rule when fraud is claimed.</u> An oral representation which is fraudulent and which induces reliance <u>may be a defense even though it contradicts a provision of a written contract.</u>

(Emphasis added). *See also Deerfield Communications Corp. v. Chesebrough-Ponds*, 956, 510 N.Y.S.2d 88, 89, 502 N.E.2d 1003, 1004 (1986) (holding that counterclaim for fraud in the inducement based on alleged oral agreement on geographical restrictions was not barred by general merger clause in contract); *Sabo v. Delman*, 3 N.Y.2d 155, 161, 143 N.E.2d 906, 908 (1957) (parol evidence rule and general merger clause did not bar fraud claim based on alleged oral representations made by defendant that he would finance plaintiff's machine and use his best efforts to promote its sale and lease).

20

An integration clause will only be given effect, and the parol evidence rule applied, if the contract *expressly* disclaims the parties' reliance upon the "specified, extra-contractual representations" that are the subject of the complained of fraud. *O'Hearn*, 22 F. Supp. 2d at 13 (emphasis added); *Centronics Fin. Corp.*, 573 F.2d at 782 ("Only if the written contract included a specific disclaimer of the very representation later alleged to be the foundation for rescission would such proof [of fraud] be barred. . . .") (citation omitted); *see Price Bros. Co. v. Olin Constr. Co.*, 528 F. Supp. 716, 721 (W.D.N.Y. 1981) (denying motion for summary judgment and holding that contract's general merger clause did not preclude evidence regarding counterclaim based on unconscionability and fraud); *see Fasig-Tipton Co. v. Jaffe*, 87 A.D.2d 835, 836, 449 N.Y.S.2d 268, 269 (2d Dep't 1982) (allowing parol evidence regarding alleged representations where merger clause in resale agreements at issue did not contain specific disclaimer).

Here, the integration provision at issue -- Section 11.10 of the License Agreement -- is a standard clause that is general in nature. It does not specifically disclaim reliance upon any of the alleged representations by PVH regarding the Approved Retailers that are the subject of IHT's counterclaim. (*See* Exh. A to the Di Domenico Aff., at 30-31; Counterclaim, ¶¶ 14-21; Grosfeld Aff., ¶¶ 25-34.) The provision contains no express reference to Approved Retailers or "Approved Accounts" at all. Nor is any such specific disclaimer contained elsewhere in the License Agreement.[7]

---

[7]    *Harsco Corp. v. MHC*, 91 F.3d 337 (2d Cir. 1996), *Emergent Capital Inv. Mgt., LLC v. Stonepath Grp., Inc.*, 165 F. Supp. 2d 615 (S.D.N.Y. 2001), and *United Artists Theatre Circuit, Inc. v. Sun Plaza Enterprise Corp.*, 352 F. Supp. 2d 342 (E.D.N.Y. 2005), cited by PVH, are inapposite. *Harsco* is distinguishable on its face because unlike here, the agreement at issue in that case contained disclaimers which specifically precluded reliance upon the oral representations at issue. *Harsco*, 91 F.3d at 342, 345-48. Similarly, *Sun Plaza* has no application here, because in that case, a lessee sought to allege that the parties never reached final agreement on the terms of a lease. 352 F. Supp. 2d at 348-49. IHT makes no such claim with regard to the License Agreement.

As a matter of law, parol evidence may also be introduced where the contract at issue is ambiguous. *Albany Home Savings Bank FSB v. Halpin*, 117 F.3d 669, 673 (2d Cir. 1997); *Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992); *Curry Road. Ltd. v. K-Mart Corp.*, 893 F.2d 509, 511-12 (2d Cir. 1996). In this case, there are at least two relevant provisions in the License Agreement that are ambiguous: Section 1.4.1, entitled "Commercially Reasonable Efforts," and Section 11.8, entitled "Suspension of Obligations."    Section 1.4.1 states in pertinent part that IHT was obligated to use "commercially reasonable efforts" to exploit the License Agreement. Section 11.8 states in pertinent part that if IHT was prevented from performing its obligations because of some "dissimilar cause beyond the control of Licensee [IHT], Licensee's obligations shall be suspended during the period of such conditions." (*See* Exh. A to Di Domenico Aff., at 3, 30.)

These provisions are ambiguous on their face.    Among other things, it is manifestly unclear precisely what constitutes "commercially reasonable efforts" or a "dissimilar cause beyond the control of Licensee," which would allow IHT to suspend performance under the License Agreement.    Parol evidence regarding the above-referenced promises and representations PVH made to IHT regarding the Approved Retailers is profoundly relevant to whether IHT exercised commercially reasonable

---

Finally, in *Stonepath*, a securities fraud case involving a multi-million dollar private placement transaction, the issue was whether or not the defendants' verbal statements regarding the size of the offering could be justifiably relied upon "in view of all the facts" and the merger clause in the Stock Purchase Agreement at issue, which contained 29 separate representations and warranties and 16 separate covenants in favor of the plaintiff investors, and did not include any reference to the size of the offering. 165 F. Supp. 2d at 622. After reviewing the integration clause, the entire contract, and the sophistication and knowledge of the parties, the court determined on a full, summary judgment record that the investors' reliance was not reasonable and dismissed the fraud claim. *Stonepath* is not this case. Here, given the parties' prior business dealings regarding the 2001 License Agreement and Mr. Grosfeld's more personal relationship with Mr. Wyse and Mr. Weber, Mr. Grosfeld was fully justified in relying upon the oral promises repeatedly made to him by Wyse and other IHT representatives.

efforts under the License Agreement, and whether its obligations under the License Agreement were suspended due to a "dissimilar cause beyond its control," *i.e.*, the unwillingness of Approved Retailers to purchase Licensed Products, particularly those whom PVH represented would do so, when it was fully aware they would not, such as Macy's, Bon Ton, Belk, PVH Stores, and various sporting goods companies. Given the ambiguity of Section 1.41. and 11.8 of the License Agreement, parol evidence relevant these issues is admissible, notwithstanding the agreement's merger clause. *Halpin*, 117 F.3d at 673; *Seiden Assoc., Inc.*, 959 F.2d at 428; *Curry Road. Ltd.*, 893 F.2d at 511-12.

For these reasons, neither the integration clause nor the parol evidence rule bar IHT's counterclaim, and PVH's motion should be denied. *See Centronics Fin. Corp.*, 573 F.2d at 782 (holding that fraud in the inducement counterclaim predicated on alleged pre-contractual representations by lessor was not barred by parol evidence rule or general merger clause); *O'Hearn*, 22 F. Supp. 2d at 13 (general merger clause did not preclude counterclaim for rescission that was based on alleged extra-contractual oral representations by plaintiffs).

**POINT III**

**ALTERNATIVELY, IHT SHOULD BE PERMITTED TO
REPLEAD ITS MISREPRESENTATION COUNTERCLAIM**

Alternatively, in the event that the Court finds that IHT has not adequately pled the elements of a misrepresentation claim, or has not pled its counterclaim with sufficient particularity, then IHT respectfully requests leave to amend its counterclaim pursuant to Rule 15(a) of the Federal Rules of Civil Procedure to include the assertions contained in the Grosfeld Affidavit. There has been no undue delay or bad faith on the part of IHT, and PVH certainly will not be prejudiced by an amendment at this early stage of the

litigation. Finally, for the reasons set forth herein and in the Grosfeld Affidavit, the claim is not futile. Such leave is freely granted in this Circuit. *See Koehler v. Bank of Bermuda (New York) Ltd.*, 209 F.3d 130, 138 (2d Cir. 2000) ("Leave to amend should be freely granted, especially when dismissal is based on Rule 9(b)."); *Oh v. Imagemark, Inc.*, No. 06 Civ. 10187, 2007 WL 2962381, *3 (S.D.N.Y. Oct. 10, 2007) (granting leave to plaintiffs to replead location and date of meeting relating to alleged fraudulent misrepresentation); *Malmsteen v. Berdon, LLP*, 477 F. Supp. 2d 655, 664 (S.D.N.Y. 2007) (granting plaintiff leave to replead misrepresentation claim to comply with Rule 9(b)).

## CONCLUSION

For the foregoing reasons, Defendant and Counterclaim Plaintiff IHT respectfully requests that the Court deny PVH's motion to dismiss, and grant such other and further relief as it deems proper.

Dated: New York, New York
       February 12, 2008

Respectfully submitted,

GREENBERG TRAURIG, LLP

By: _____
       Timothy E. Di Domenico (TD-4900)

MetLife Building
200 Park Avenue, 15th Floor
New York, New York  10166
(212) 801-9200

      -and-

Of Counsel:

John F. Farraher, Jr.
Thomas H. Good
Greenberg Traurig, LLP
One International Place, 20th Floor
Boston, MA  02110
(617) 310-6000

*Attorneys for Defendant/Counterclaim-*
*Plaintiff International Home Textiles, Inc.*
*and Defendant Salo Grosfeld*