# EXHIBIT 5

Execution
December 2001

LICENSE AGREEMENT

BY AND BETWEEN

PHILLIPS-VAN HEUSEN CORPORATION

AND

INTERNATIONAL HOME TEXTILES, INC.

---

IZOD

---

Bed and Bath

---

United States

---

December  , 2001

---

# TABLE OF CONTENTS

Page

ARTICLE I. GRANT .................................................................................................... 1
   1.1    License ...................................................................................................... 1
   1.2    Reservation .............................................................................................. 1
          1.2.1   Company-Controlled Stores ................................................ 1
          1.2.2   E-Commerce ......................................................................... 2
          1.2.3   License Strictly Limited ....................................................... 2
   1.3    Definitional Disputes ............................................................................. 2
   1.4    Exploitation of the License .................................................................... 2
          1.4.1   Commercially Reasonable Efforts ...................................... 2
          1.4.2   Merchandising Calendar ...................................................... 2
          1.4.3   Distribution Channels ........................................................... 2
          1.4.4   Additional Licenses Prohibited ........................................... 3
   1.5    Showrooms; In-Store Shops; Trade Shows ......................................... 3
          1.5.1   Showrooms ............................................................................ 3
          1.5.2   In-Store Shops ...................................................................... 3
ARTICLE II. LICENSE PERIOD ............................................................................... 3
   2.1    Initial License Period ............................................................................. 3
   2.2    Renewal License Period ......................................................................... 3
ARTICLE III. SALES .................................................................................................. 4
   3.1    Sales/Marketing and Production Plans ................................................ 4
   3.2    Minimum Sales Levels .......................................................................... 4
   3.3    Certification ............................................................................................ 4
ARTICLE IV. LICENSE FEES .................................................................................... 4
   4.1    Requirement of Royalties ...................................................................... 4
          4.1.1   Percentage Royalties ............................................................ 5
          4.1.2   Gross and Net Sales ............................................................. 5
          4.1.3   Guaranteed Minimum Royalties ........................................ 5
   4.2    Royalty Statements ................................................................................ 6
   4.3    Books and Records ................................................................................. 7
   4.4    Underpayments ....................................................................................... 7
   4.5    Manner of Payment ............................................................................... 7
   4.6    Interest on Late Payment ....................................................................... 7
   4.7    No Set-Off ............................................................................................... 7
   4.8    Taxes ....................................................................................................... 7
   4.9    Financial Statements ............................................................................. 8
ARTICLE V. ADVERTISING ..................................................................................... 8
   5.1    Advertising .............................................................................................. 8
          5.1.1   Advertising Launch .............................................................. 8
          5.1.2   Advertising Obligation ........................................................ 8
   5.2    Marketing Obligation ............................................................................ 8
   5.3    Advertising Support ............................................................................... 9
   5.4    Approval of Packaging, Labeling and Advertising ............................ 9
ARTICLE VI. QUALITY AND STANDARDS ......................................................... 9

| | | |
|---|---|---|
| 6.1 | Distinctiveness and Quality of the Trademark | 9 |
| 6.2 | Samples of Licensed Products | 9 |
| 6.3 | Non-Conforming Products | 10 |
| 6.4 | Approvals | 10 |
| 6.5 | Manufacture of Licensed Products by Third Parties | 11 |
| 6.6 | Marking, Labeling and Packaging in Accordance with Applicable Laws | 11 |
| 6.7 | Inspection of Facilities | 11 |
| 6.8 | Samples and Artwork | 11 |
| 6.9 | Know-how | 12 |
| 6.10 | Design Direction | 12 |
| 6.11 | Meetings | 12 |
| 6.12 | Market Weeks | 12 |
| 6.13 | Design Rights | 12 |
| 6.14 | Confidentiality | 13 |
| 6.15 | Shops, Stores, Retail Outlets | 13 |
| 6.16 | Disposal of Seconds and Close-Outs | 14 |
| 6.16.1 | Seconds | 14 |
| 6.16.2 | Close-Outs | 14 |
| 6.17 | Standards of Conduct | 15 |
| 6.17.1 | Standards | 15 |
| 6.17.2 | Audit Requirement | 15 |
| 6.17.3 | Approval | 15 |
| 6.17.4 | Use of Facility | 15 |
| ARTICLE VII. THE TRADEMARK | | 16 |
| 7.1 | Rights to the Trademark | 16 |
| 7.1.1 | Ownership of the Trademark | 16 |
| 7.1.2 | No Adverse Actions | 16 |
| 7.1.3 | Additional Registrations | 16 |
| 7.1.4 | Survival | 16 |
| 7.2 | Protecting the Trademark | 17 |
| 7.3 | Use of the Trademark | 17 |
| 7.3.1 | Compliance with Legal Requirements | 17 |
| 7.3.2 | Registration | 17 |
| 7.4 | Ownership of Copyright | 17 |
| 7.5 | Notice of Infringement | 17 |
| 7.6 | Trademark Security | 18 |
| 7.6.1 | Counterfeit Protection | 18 |
| 7.6.2 | Trademark Security Plan | 18 |
| 7.7 | Use of Trademark on Invoices, etc | 18 |
| 7.8 | Monitoring | 18 |
| ARTICLE VIII. TERM AND TERMINATION | | 18 |
| 8.1 | Expiration | 18 |
| 8.2 | Other Rights Unaffected | 19 |
| 8.3 | Immediate Right of Termination of the License | 19 |
| 8.4 | Termination With Notice and Right to Cure | 19 |
| 8.5 | Effect of Termination | 20 |

8.6    Inventory Upon Termination ............................................................ 20
8.7    Freedom to License............................................................................ 21
8.8    Rights Personal .................................................................................. 21
8.9    Trustee in Bankruptcy....................................................................... 21
ARTICLE IX. INDEMNIFICATION AND INSURANCE ............................... 22
9.1    Indemnification by the Licensee...................................................... 22
9.2    Notice of Suit or Claim..................................................................... 22
9.3    Indemnification by PVH ................................................................... 22
9.4    Insurance............................................................................................ 23
       9.4.1    Requirement ....................................................................... 23
       9.4.2    Theft and Destruction Coverage ..................................... 23
       9.4.3    General Provision ............................................................. 23
       9.4.4    Approved Carrier/Policy Changes .................................. 24
       9.4.5    Evidence of Coverage ...................................................... 24
       9.4.6    Territory ............................................................................. 24
ARTICLE X. COMPLIANCE WITH LAWS ..................................................... 24
10.1   Compliance with Laws ..................................................................... 24
10.2   Equitable Relief ................................................................................ 24
ARTICLE XI. MISCELLANEOUS ..................................................................... 24
11.1   Warranties and Representations of the Parties................................ 24
11.2   Definitions ......................................................................................... 24
11.3   Notices ............................................................................................... 25
11.4   No Assignment Without Consent .................................................... 25
11.5   Assignment by PVH .......................................................................... 25
11.6   No Agency ......................................................................................... 26
11.7   Suspension of Obligations ............................................................... 26
11.8   Benefit................................................................................................ 26
11.9   Entire Agreement; Amendment ....................................................... 26
11.10  Non-Waiver........................................................................................ 26
11.11  Severability ........................................................................................ 26
11.12  Headings ............................................................................................ 26
11.13  Counterparts....................................................................................... 26
11.14  Governing Law .................................................................................. 26
11.15  Jurisdiction........................................................................................ 27
11.16  Non-Solicitation................................................................................ 27
11.17  Guaranties ......................................................................................... 27

EXHIBITS

EXHIBIT A        TRADEMARK REGISTRATIONS
EXHIBIT B        ROYALTY STATEMENT
EXHIBIT C        ADVERTISING STATEMENT
EXHIBIT D        SAMPLE SUBMISSION FORM
EXHIBIT E        THIRD-PARTY MANUFACTURING AGREEMENT
EXHIBIT F        PRODUCTION FACILITY EVALUATION FORM

LICENSE AGREEMENT

LICENSE AGREEMENT, dated as of December __, 2001, by and between PHILLIPS-VAN HEUSEN CORPORATION ("PVH"), a Delaware corporation, and INTERNATIONAL HOME TEXTILES, INC. (the "Licensee"), a Florida corporation.

WITNESSETH:

WHEREAS, PVH is the owner in the United States of America, its possessions and territories (the "Territory") of the IZOD trademark and the Licensee desires to obtain from PVH, and PVH is willing to grant to the Licensee, a license to use the Trademark in connection with the sale, distribution and promotion of sheets, pillow cases and towels (including, without limitation, wash cloths, hand towels, bath towels, bath sheets, bath mats and beach towels, but excluding dish towels) (collectively, the "Products"), in the Territory, subject to the terms contained in this Agreement. Products bearing the Trademark are hereinafter referred to as "Licensed Products." Capitalized terms listed in Section 11.2 are defined in the Sections set forth therein.

NOW, THEREFORE, the parties hereto agree as follows:

## ARTICLE I.  GRANT

1.1    License. PVH hereby grants to the Licensee an exclusive license (the "License") during the License Period, without the right to sublicense or assign, subject to the reservations contained in Section 1.2 and all of the terms contained in this Agreement, to use the Trademark in connection with the manufacture of Products, and the sale, distribution and promotion of the Licensed Products in the Territory, excluding the sale, distribution and promotion of Licensed Products via commerce conducted on, made available through or facilitated by interactive or electronic media, whether now known or hereafter developed, including, without limitation, the Internet and on-line service providers, regardless of the means through which it is conducted ("E-Commerce"), other than on a wholesale basis to customers within the Territory. The Licensee shall have the right to import into the Territory Licensed Products manufactured outside the Territory; provided, however, that the Licensee takes reasonable precautions to prevent all labels, tags, packaging material, business supplies and advertising and promotional materials and all other forms of identification bearing the Trademark (collectively, the "Labels") from being used otherwise than in connection with the distribution and sale of Licensed Products within the Territory. The Licensee shall neither export Licensed Products from the Territory nor sell Licensed Products to any entity which it knows or has any reason to believe intends to export Licensed Products from the Territory.

1.2    Reservation. To the extent of the following reserved rights, the License shall not be exclusive.

1.2.1    Company-Controlled Stores. PVH reserves the right to use the Trademark upon and/or in connection with the sale, distribution and promotion of the Licensed Products to consumers at retail in any or all of PVH's company-controlled stores in the Territory, and PVH reserves the right in connection with such sale, distribution and promotion to

manufacture or purchase Licensed Products from any supplier PVH chooses, including the Licensee; provided, however, that PVH shall purchase the Licensed Products from the Licensee for such stores to the extent that PVH reasonably determines that the Licensee is competitive in cost, quality, service and availability with other suppliers.

      1.2.2   E-Commerce. PVH reserves the exclusive right to use the Trademark upon and/or in connection with the sale, distribution and promotion of Products via E-Commerce, other than E-Commerce conducted on a wholesale basis.

      1.2.3   License Strictly Limited. Nothing contained in this Agreement shall be construed as an assignment or grant to the Licensee of any right, title or interest in or to the Trademark, it being understood and acknowledged by the Licensee that all rights relating thereto are reserved by PVH except for the rights specifically granted to the Licensee in this Agreement. The Licensee understands and agrees that PVH, and its other licensees and sublicensees, may manufacture or authorize third parties to manufacture Licensed Products in the Territory for sale outside of the Territory, or to manufacture and sell or authorize third parties to manufacture and sell products of any and all types and descriptions other than the Products in or outside the Territory. In addition, no license is granted hereunder for the manufacture, sale or distribution of the Licensed Products to be used for publicity purposes (other than publicity of the Licensed Products), in combination sales or as premiums or giveaways, or to be disposed of under or in connection with similar methods of merchandising, such rights being specifically reserved for PVH.

      1.3   Definitional Disputes. The Licensee acknowledges that due to the nature of the marketplace, the definition of Products may change or may not be amenable to precise delineation. The Licensee agrees that if there is a dispute over the definition of Licensed Products, PVH shall render a reasonable written determination which shall be conclusive and binding on the Licensee without legal recourse.

      1.4   Exploitation of the License.

      1.4.1   Commercially Reasonable Efforts. At all times during the License Period, the Licensee shall use commercially reasonable efforts to exploit the License throughout the Territory, including, but not limited to, selling a sufficiently representative quantity of all styles, fabrications, colors and sizes of the Licensed Products; offering for sale the Licensed Products so that they may be sold to consumers on a timely basis; maintaining a sales force sufficient to provide effective distribution throughout all areas of the Territory; and cooperating with PVH's and any of its licensees' marketing, merchandising, sales and anti-counterfeiting programs.

      1.4.2   Merchandising Calendar. The Licensee shall, as promptly as shall be practicable, provide PVH with a merchandising calendar for each product category and, after consultation with PVH, a detailed timeline for each product category launch.

      1.4.3   Distribution Channels. The Licensee agrees that its sales of Licensed Products will be appropriately distributed among the various channels of distribution.

1.4.4  Additional Licenses Prohibited.  The Licensee shall not enter into or obtain from any third party any license that would directly or indirectly compete with the Licensed Products in the Territory without the prior written consent of PVH; provided, however, this provision shall not apply to any existing licenses owned by the Licensee on or prior to the date hereof, or any renewals thereof, or any licensee hereafter entered into with Martha Stewart, Pillowtex, Cannon or Fieldcrest for any of their respective brands.

1.5    Showrooms; In-Store Shops; Trade Shows.

1.5.1  Showrooms.  The Licensee shall display the Licensed Products for sale in a separate showroom at its Miami headquarters.  Such showroom shall be designed in conformity with the prestige associated with the Trademark, and the plans therefor shall be subject to the prior written approval of PVH, which approval shall not be unreasonably withheld or delayed.  Subject to the prior written approval of PVH, which approval shall not be unreasonably withheld or delayed, the Licensee may (i) display the Trademark on showroom doors and office directories and (ii) display the Licensed Products for sale in other showroom spaces.

1.5.2  In-Store Shops.  The Licensee will, at PVH's request, participate in any in-store shop or main floor fixturing programs with any of the Licensee's customers.  All such programs shall be designed in conformity with the prestige associated with the Trademark, and the plans therefor shall be subject to the prior written approval of PVH.   To the extent that the same is not paid for by the Licensee's customers, the Licensee shall pay for the necessary fixturing for the display of the Licensed Products.

## ARTICLE II. LICENSE PERIOD

2.1    Initial License Period.  The initial license period shall commence on the date of this Agreement and shall end on December 31, 2005 (the "Initial License Period"), unless sooner terminated as herein provided.

2.2    Renewal License Period.  The Licensee shall have the right, provided that the Licensee is not then in default of any of the provisions of this Agreement, to request an ~~1/1/06~~ extension of the License for an additional license period commencing on ~~July 1, 2005~~ and ending ~~on June 30, 2008~~ (the "Renewal License Period"; the Initial License Period and any Renewal License Period together are referred to as the "License Period"), unless sooner terminated as herein provided.  Said right to request an extension shall be exercised by written notice by the Licensee to PVH, received by PVH not more than nine months nor less than six months prior to the expiration of the Initial License Period on terms (including appropriate revisions of Sections 3.2 and 4.1.3) mutually acceptable to PVH and the Licensee, in their sole and absolute discretion, agreed to not less than three months prior to the expiration of the Initial License Period.  The Licensee acknowledges that the three month and six to nine month periods are necessary in order to maintain the continuity of PVH's licensing and marketing programs and to protect the goodwill associated with the Trademark.  The Licensee agrees that "time is of the essence" and that the Licensee's failure to request timely an extension of the License or to reach agreement with PVH on terms, shall be construed as a decision by the Licensee that it has elected not to

extend the License and shall permit PVH immediately to replace the Licensee by executing a new license agreement with a third party, to commence after the License Period has ended, without any liability to the Licensee. Expiration or termination of the License shall not affect any obligation of the Licensee to make payments hereunder accruing prior to such expiration or termination.

## ARTICLE III. SALES

3.1    Sales/Marketing and Production Plans. Not later than 30 days after the date of this Agreement with respect to the period from the date of this Agreement to June 30, 2003, and not later than 60 days prior to the beginning of each subsequent 12-month period during the License Period (each, an "Annual Period"), the Licensee shall submit to PVH a written marketing plan, forecast and pro forma business plan (a "Licensing Forecast"), which shall contain a reasonable, good faith estimate of Net Sales levels for such Annual Period.

3.2    Minimum Sales Levels. During each Annual Period, the Licensee shall be required to meet the following minimum Net Sales levels (the "Minimum Sales Levels"):

| Annual Period | Minimum Sales Level |
|---|---|
| Initial License Period | |
| Date of this Agreement – 12/31/02 | $ 2,000,000 |
| 01/01/03 – 12/31/03 | $ 5,000,000 |
| 01/01/04 – 12/31/04 | $ 7,000,000 |
| 01/01/05 - 12/31/05 | $10,000,000 |
| Renewal License Period | |
| 01/01/06 - 12/31/06 | $12,000,000 |
| 01/01/07 - 12/31/07 | $15,000,000 |
| 01/01/08 - 12/31/08 | $18,000,000 |

The Minimum Sales Levels shall be exclusive of sales of Licensed Products to PVH, including but not limited to sales for its company-controlled stores.

3.3    Certification. Within 60 days after the end of each Annual Period, the Licensee shall send to PVH a certification by a duly authorized officer of the Licensee of the Net Sales of Licensed Products during such Annual Period by size and product category. Within 90 days of the end of each Annual Period, the Licensee shall send to PVH such certification further certified by the Licensee's independent auditors.

## ARTICLE IV. LICENSE FEES

4.1    Requirement of Royalties. All Licensed Products sold by the Licensee or its Affiliates require the payment of royalties by the Licensee to PVH as set forth in this

Article IV.  "Affiliates" of any party means all persons and business entities, whether corporations, partnerships, joint ventures or otherwise, which now or hereafter control, or are owned or controlled, directly or indirectly, by such party, or are under common control with such party.

4.1.1    Percentage Royalties.  In respect of each Annual Period or portion thereof during the License Period, the Licensee shall pay PVH percentage royalties ("Percentage Royalties") in the amount of 5% of all Net Sales, other than sales to PVH for its company-controlled stores, which shall be in the amount of 3% of Net Sales.  Percentage Royalties shall be payable in quarterly installments no later than July 31, October 31, January 31 and April 30 with respect to sales during the immediately preceding calendar quarter; provided, however, that the Percentage Royalties shall be payable only to the extent of the excess, if any, of (i) the aggregate Percentage Royalties for such calendar quarter and all prior calendar quarters in respect of such Annual Period or, if greater, the aggregate amount of the installments of the Guaranteed Minimum Royalties under Section 4.1.3 for such calendar quarter and all prior calendar quarters in respect of such Annual Period, over (ii) the aggregate actual payments under this Section 4.1.1 and Section 4.1.3 for all prior calendar quarters in respect of such Annual Period.  For the purpose of the foregoing limitation, Percentage Royalties on sales to PVH for its company-controlled stores shall be excluded.  All royalties shall accrue upon the sale of the Licensed Products regardless of the time of collection of the proceeds from such sale by the Licensee or the failure to collect such proceeds.  For purposes of this Agreement, a Licensed Product shall be considered "sold" upon the date of billing, invoicing, shipping or payment, whichever occurs first.

4.1.2    Gross and Net Sales.  "Gross Sales" means the invoiced amount of Licensed Products, including, but not limited to, Seconds and Close-Outs, sold by the Licensee before any deductions for returns, allowances, discounts, insurance or freight.  "Net Sales" means the Gross Sales of Licensed Products, less returns actually allowed and actually received by the Licensee, price allowances and customary and usual trade discounts granted.  The combined deductions from the Gross Sales for returns, allowances and trade discounts shall not exceed 8% of the Gross Sales of the Licensed Products in any Annual Period.  No other deductions shall be taken.  It is the intention of the parties that Percentage Royalties will be based on the bona fide wholesale prices at which the Licensee sells Licensed Products to independent retailers in arms' length transactions.  In the event the Licensee shall sell Licensed Products to its Affiliates, Gross Sales, Net Sales and Percentage Royalties shall be calculated on the basis of such a bona fide wholesale price irrespective of the Licensee's internal accounting treatment of such sales.

4.1.3    Guaranteed Minimum Royalties.  In respect of each Annual Period or portion thereof during the License Period, the Licensee shall pay to PVH the minimum royalties listed below (the "Guaranteed Minimum Royalties"), in four equal installments no later than July 31, October 31, January 31 and April 30 for the immediately preceding calendar quarter; provided, however, that (i) the installment of the Guaranteed Minimum Royalties for any such calendar quarter shall be payable only to the extent of the excess, if any, of such installment over the Percentage Royalties under Section 4.1.1 for such calendar quarter and (ii) if the actual payments under Section 4.1.1 of Percentage Royalties for such calendar quarter and the aggregate actual payments under Section 4.1.1. and this Section 4.1.3 for all prior calendar quarters in respect of such Annual Period, exceed the Guaranteed Minimum Royalties payable

for such Annual Period, no further Guaranteed Minimum Royalties shall be payable in respect of such Annual Period; and provided further, however, that the Guaranteed Minimum Royalties for the Annual Period ending December 31, 2002 shall be paid in four equal installments, the first such payment to be made upon the execution and delivery of this Agreement by the Licensee with respect to the period from the date of this Agreement to March 31, 2002, and the subsequent payments to be made no later than July 31, 2002, October 30, 2002 and January 31, 2003 with respect to the immediately preceding calendar quarter. For the purpose of the limitation in the foregoing first proviso, Percentage Royalties on sales to PVH, including, without limitation, for its company-controlled stores, shall be excluded.

| Annual Period | Guaranteed Minimum Royalties |
|---|---|
| **Initial License Period** | |
| Date of this Agreement – 12/31/02 | $100,000 |
| 01/01/03 – 12/31/03 | $250,000 |
| 01/01/04 – 12/31/04 | $350,000 |
| 01/01/05 – 12/31/05 | $500,000 |
| **Renewal License Period** | |
| 01/01/06 - 12/31/06 | $600,000 |
| 01/01/07 - 12/31/07 | $750,000 |
| 01/01/08 - 12/31/08 | $900,000 |

    4.2    Royalty Statements. At the time each payment of Guaranteed Minimum Royalties and Percentage Royalties is due, the Licensee shall deliver to PVH a royalty statement, substantially in the form of Exhibit B, signed by a duly authorized officer of the Licensee and certified by such officer as complete and accurate, stating that the Licensee is in compliance with the terms and conditions hereof and setting forth for each month during the immediately preceding calendar quarter, and for such quarter in the aggregate, and, in the case of the statement for the fourth calendar quarter, for each Annual Period in the aggregate, all of the following information: (i) Gross Sales; (ii) the amount of returns, allowance and discounts from Gross Sales which properly may be deducted therefrom in calculating Net Sales; (iii) Net Sales; (iv) a computation of the amount of Percentage Royalties by the number of units in each product category by size of the Licensed Products; (v) Net Sales by account, including separately Net Sales to PVH's company-controlled stores; and (vi) all of the Licensee's inventory of Licensed Products and of related work in process (collectively, the "Inventory"). The Licensee shall identify separately in such statements all sales to Affiliates. Within 90 days of the end of each Annual Period, the Licensee will also deliver to PVH a certification from its independent auditors that the royalty statement for the fourth calendar quarter is in accordance with the requirements of this Section 4.2. Receipt or acceptance by PVH of any statement furnished, or of any sums paid by the Licensee, shall not preclude PVH from questioning their correctness at any time; provided, however, that reports submitted by the Licensee shall be binding and conclusive on the Licensee.

6

4.3    Books and Records. The Licensee shall, at its sole cost and expense, maintain complete and accurate books and records (specifically including, without limitation, the originals or copies of documents supporting entries in the books of account) covering all transactions arising out of or relating to this Agreement. Such books and records shall be maintained in accordance with generally accepted accounting principles. PVH and its duly authorized representatives shall have the right once with respect to each Annual Period, during normal business hours, during the License Period and for three years thereafter, to examine and copy said books and records and all other documents and materials in the possession of and under the control of the Licensee with respect to all transactions arising out of or relating to this Agreement. The exercise by PVH of any right to audit at any time or times or the acceptance by PVH of any statement or payment shall be without prejudice to any of PVH's rights or remedies and shall not bar PVH from thereafter disputing the accuracy of any payment or statement, and the Licensee shall remain fully liable for any balance due under this Agreement. The Licensed Products shall be assigned style numbers unique from any other Products the Licensee may manufacture or sell. The style number assigned to each Licensed Product shall be identical to the style number utilized to identify that Licensed Product in all the Licensee's books and records. All documents evidencing the sale of Licensed Products shall state the style number of each of such Products. The Licensee shall not use terms such as "assorted" or "irregular" without a style specification with respect to the Licensed Products.

4.4    Underpayments. If, upon any examination of the Licensee's books and records pursuant to Section 4.3, PVH shall discover any royalty underpayment by the Licensee, the Licensee will make all payments required to be made to correct and eliminate such underpayment within 10 days of PVH's demand. In addition, if said examination reveals a royalty underpayment of 3% or more for any royalty period, the Licensee will reimburse PVH for the cost of said examination within 10 days of PVH's demand.

4.5    Manner of Payment. All payments required by the Licensee hereunder shall be made to PVH in U.S. Dollars at PVH's address for notices provided in Section 11.3, and all references to dollars shall mean U.S. Dollars. In the event that the Licensee is required to withhold certain amounts for payment to the appropriate governmental authorities, the Licensee will supply to PVH the official receipts evidencing payment therefor.

4.6    Interest on Late Payment. In addition to any other remedy available to PVH, if any payment due under this Agreement is delayed for any reason, including, without limitation, as a result of any royalty underpayment, interest shall accrue and be payable, to the extent legally enforceable, on such unpaid principal amounts from and after the date on which the same became due at the lower of 1½% per month and the highest rate permitted by law in New York.

4.7    No Set-Off. The obligation of the Licensee to pay royalties hereunder shall be absolute, notwithstanding any claim which the Licensee may assert against PVH. The Licensee shall not have the right to set-off, compensate or make any deduction from such royalty payments for any reason whatsoever.

4.8    Taxes. The Licensee will bear all taxes, duties and other governmental charges in the Territory relating to or arising under this Agreement, including, without limitation,

any state or federal income taxes (except withholding taxes on royalties), any stamp or documentary taxes or duties, turnover, sales or use taxes, value added taxes, excise taxes, customs or exchange control duties or any other charges relating to or on any royalty payable by the Licensee to PVH. The Licensee shall obtain, at its own cost and expense, all licenses, Federal Reserve Bank, commercial bank or other bank approvals, and any other documentation necessary for the importation of materials and Products and the transmission of royalties and all other payments relevant to the Licensee's performance under this Agreement. If any tax or withholding is imposed on royalties, the Licensee shall obtain certified proof of the tax payment or withholding and immediately transmit it to PVH.

        4.9    <u>Financial Statements</u>. Once during each Annual Period, upon 60 days' written notice to the Licensee, the Licensee shall deliver to PVH an interim financial statement certified to by the Licensee's chief financial officer. Within 120 days after the end of each fiscal year of the Licensee, the Licensee shall deliver to PVH an annual financial statement certified to by the Licensee's independent, certified public accountant.

## ARTICLE V. ADVERTISING

     5.1    <u>Advertising</u>.

        5.1.1    <u>Advertising Launch</u>. During the first Annual Period, the Licensee shall pay over to PVH an aggregate of $50,000 to be used by PVH, in its sole and absolute discretion, for advertising the Trademark. Such amount shall be paid in four equal payments, the first such payment to be made upon execution and delivery of this Agreement by the Licensee and subsequent payments to be made no later than each of March 31, 2002, June 30, 2002 and September 30, 2002. During the first Annual Period, the Licensee shall spend not less than $40,000 for the party to launch the Licensed Products and for public relations in connection with such launch.

        5.1.2    <u>Advertising Obligation</u>. In each Annual Period following the first Annual Period, the Licensee shall pay to PVH an amount equal to 2% of Net Sales for the immediately prior Annual Period (the "<u>Advertising Obligation</u>") to be used by PVH, in its sole and absolute discretion, for advertising the Trademark; <u>provided</u>, <u>however</u>, that in no event shall the Advertising Obligation with respect to the second Annual Period be less than $50,000; and <u>provided</u>, <u>further</u>, <u>however</u>, that in no event shall the Advertising Obligation with respect to any Annual Period after the second Annual Period be less than an amount equal to 2% of the Minimum Sales Level for the immediately prior Annual Period. The Advertising Obligation for each Annual Period shall be paid in four equal installments no later than January 31, April 30, June 30 and September 30 of such Annual Period.

     5.2    <u>Marketing Obligation</u>. In each Annual Period, the Licensee shall spend an amount equal to at least 3% of Net Sales for the immediately prior Annual Period (the "<u>Marketing Obligation</u>") for trade shows, cooperative advertising, catalogues, point of sale promotions, in-store fixturing, visual marketing programs, special events and signage; <u>provided</u>, <u>however</u>, that the Marketing Obligation for the first Annual Period shall be $60,000. If in any Annual Period the Marketing Obligation has not been satisfied, then the Licensee shall spend

such amount for the designated expenses within the first 90 days of the subsequent Annual Period. If the Marketing Obligation has not been satisfied by the end of such 90-day period, then the amount which should have been expended and which was not expended shall be paid over to PVH to be used by PVH for advertising the Trademark; provided, however, that if the Marketing Obligation has not been fulfilled within 90 days after the termination of the License Period, the unexpended Marketing Obligation shall be paid over to PVH absolutely. Proof of expenditure shall be submitted each quarter using the Marketing Expenditure Form, attached hereto as Exhibit C.

      5.3    Advertising Support. The Licensee shall pay over to PVH the incremental costs of any advertising support, including the cost of acquiring rights to use images of models in product shots, requested by the Licensee of, and supplied by, PVH.

      5.4    Approval of Packaging, Labeling and Advertising. All Labels, packaging and advertising shall mirror those of PVH and shall be in strict compliance with specifications to be provided by PVH and may not be used without the prior written consent of PVH. The use of any other packaging or labeling is expressly prohibited. All Labels shall use the Trademark, but no other trademark or trade name shall be used except as may be required by applicable law or permitted by PVH. The Licensee shall not be permitted to use its name on the Licensed Products, packaging and other materials displaying the Trademark, other than as specifically approved by PVH. PVH reserves the right to require the Licensee to purchase Labels to be used on the Licensed Products only from sources designated by PVH, provided that such sources provide the Labels to the Licensee in a reasonably competitive manner as to price and delivery schedules.

## ARTICLE VI. QUALITY AND STANDARDS

      6.1    Distinctiveness and Quality of the Trademark. The Licensee shall maintain the distinctiveness of the Trademark and the image and high quality of the goods and merchandise bearing the Trademark presently manufactured and sold by PVH and its other licensees, and the prestigious marketing of same as presently maintained by PVH and its other licensees. The Licensee agrees that all Licensed Products manufactured or sold by it will be of high quality as to workmanship, fit, design and materials, and shall be at least equal in quality, workmanship, fit, design and material to the samples of Licensed Products submitted by the Licensee and approved by PVH pursuant to Section 6.2. All manufacturing and production shall be of a quality in keeping with the prestige of the Trademark. In addition, the Licensee acknowledges that in order to preserve the goodwill attached to the Trademark, the Licensed Products should be sold at prices and terms reflecting the prestigious nature of the Trademark, and the reputation of the Trademark as appearing on goods of high quality and reasonable price, it being understood, however, that PVH is not empowered to fix or regulate the prices for which the Licensed Products are to be sold, either at the wholesale or retail level.

      6.2    Samples of Licensed Products. Before the Licensee shall sell or distribute any Licensed Products, the Licensee shall submit samples of each of such Licensed Products to PVH for its prior written approval. Any such request for approval shall be submitted to PVH on the form annexed hereto as Exhibit D. Such samples shall be submitted sufficiently far in

advance to permit the Licensee time to make such changes as PVH deems necessary. Any approval given hereunder shall be limited to the time period during the Annual Period set forth in such request, or as otherwise modified in PVH's discretion. Once samples have been approved, the Licensee will manufacture only in accordance with such approved samples and will not make any changes without PVH's prior written approval. Upon PVH's request, the Licensee shall submit to PVH additional samples of Licensed Products. No Licensed Products (including samples) shall be distributed and/or sold by the Licensee unless such Licensed Products are in substantial conformity with, and at least equal in quality to, the samples previously approved by PVH in accordance with this Section 6.2. Upon request by PVH, the Licensee shall supply PVH with a reasonable quantity of production samples in order for PVH to assess the conformity of production with the approval samples. All samples of Licensed Products submitted to PVH pursuant to this Section 6.2 shall be provided at the Licensee's sole cost and expense.

　　　　6.3　　Non-Conforming Products. In the event that any Licensed Products are, in the judgment of PVH, not being manufactured, distributed or sold with first quality workmanship or in strict adherence to all details and characteristics furnished by PVH, PVH shall notify the Licensee thereof in writing, and the Licensee shall promptly change such Licensed Product to conform thereto. If Licensed Products as changed do not strictly conform after PVH's request and such strict conformity cannot be obtained after one resubmission, such Licensed Products (the "Non-Conforming Products") shall be disposed of in a way which shall not reduce the value of the Trademark or detract from its reputation, and the Licensee shall obtain the express prior written consent of PVH with respect to the terms and method of their disposal. PVH may require, without limitation, that the Licensee remove the Trademark from the Non-Conforming Products, in which event the Non-Conforming Products may be sold by the Licensee, provided such Non-Conforming Products do not contain any Labels or other identification bearing the Trademark. PVH may purchase at the Licensee's expense any Licensed Products found in the marketplace which, in PVH's judgment, are inconsistent with approved quality standards and bill such costs to the Licensee. The Licensee must pay all royalties due on sales of Non-Conforming Products. PVH may require the Licensee to recall any Licensed Products not consistent with approved quality standards. The Licensee shall use its best efforts to comply with PVH's requirements.

　　　　6.4　　Approvals. All approvals of Labels, packaging, advertising, styles, samples, proposed customers or any other matters required or permitted by this Agreement must be in writing from PVH to the Licensee. All matters requiring approval of PVH or the exercise of its discretion shall be at the sole and absolute discretion of PVH. Notwithstanding the foregoing, a submission for approval of Labels, packaging, advertising, styles, samples or proposed customers shall be deemed approved unless PVH delivers a notice of disapproval within 30 days after receipt thereof by PVH. PVH shall provide an explanation for disapprovals of Labels, packaging, advertising, styles, samples or proposed customers, unless such disapproval reflects an issue of taste or subjective judgment. PVH has no obligation to approve, review or consider any item which does not strictly comply with the required submission procedures. Approval by PVH shall not be construed as a determination that the approved matter complies with all applicable regulations and laws. No disapproved item shall be manufactured, sold, used, distributed or advertised. The Licensee may revise any disapproved item and resubmit it. The Licensee must strictly comply with all of PVH's decisions. PVH may amend the approval forms as appropriate. In the event that it is reasonably necessary for PVH to do

10

on-site approvals, the Licensee will pay any and all expenses and air-fare incurred by PVH with respect to such on-site approvals.

      6.5    <u>Manufacture of Licensed Products by Third Parties</u>. The Licensee shall not enter into any agreement with any third party for the manufacture or assembly of Licensed Products without the prior written consent of PVH, which consent shall not be unreasonably withheld or delayed. In order to maintain PVH's high standard of quality control and to insure that appropriate measures are taken against counterfeiting, the Licensee's notice to PVH shall include all of the following information: (i) name and address of each proposed manufacturer; (ii) type of Licensed Products to be manufactured; (iii) quantity of Licensed Products to be manufactured; and (iv) any other relevant information. The Licensee shall obtain the signature of an authorized representative from each approved third-party manufacturer used by the Licensee on an agreement (a "<u>Third-Party Manufacturing Agreement</u>"), substantially in the form of <u>Exhibit E</u>. The Licensee shall not knowingly enter into a Third-Party Manufacturing Agreement with any third party that has breached a similar agreement with PVH or any of its licensees with respect to any of PVH's owned, licensed or sublicensed trademarks, as set forth in the Third-Party Manufacturing Agreement. The Licensee acknowledges that it shall remain primarily liable and completely obligated under all of the provisions of this Agreement in respect of such contracting or assembly arrangements.

      6.6    <u>Marking, Labeling and Packaging in Accordance with Applicable Laws</u>. All Licensed Products manufactured, distributed or sold by, or on behalf of, the Licensee shall be marked, labeled, packaged, advertised, distributed and sold in accordance with this Agreement, in accordance with all applicable laws, rules and regulations in the Territory, and in such a manner as will not tend to mislead or deceive the public. At the request of PVH, the Licensee shall cause to be placed on all Licensed Products an appropriate notice designating PVH as the trademark owner thereof. The manner of presentation of such notice shall be determined by PVH.

      6.7    <u>Inspection of Facilities</u>. PVH and its duly authorized representatives shall have the right, during normal business hours and upon reasonable notice, to inspect all facilities utilized by the Licensee (and its contractors and suppliers to the extent the Licensee may do so) in connection with the manufacture, sale, storage or distribution of Licensed Products, and to examine the Licensed Products in the process of manufacture and when offered for sale within the Licensee's and its contractor's operation.

      6.8    <u>Samples and Artwork</u>. PVH shall make available to the Licensee certain samples, designs, colors, fabric samples, tags, labels, packaging, catalogues and artwork available to PVH, and the cost of providing such materials shall be borne by the Licensee at PVH's cost. All right, title and interest in and to samples, sketches, designs, and other materials furnished by or to the Licensee or submitted by or to PVH whether created by PVH or the Licensee in connection with such Licensed Product, including any modifications or improvements thereof which may be created by PVH or the Licensee, except for Excluded Designs, are hereby assigned to and shall be the sole property of PVH as between the Licensee and PVH, and are licensed hereunder solely and exclusively for use in connection with the manufacture, sale, distribution and promotion of Licensed Products in the Territory. "<u>Excluded Design</u>" means a design (i) submitted by the Licensee and not approved by PVH; (ii) not

11

distinguishable from similar generic products generally available in the marketplace; or (iii) not distinguishable from a product which has previously appeared in the Licensee's product line and the Licensee advised PVH of such condition at the time of submission. In the event of clause (i) or (iii) above, the Licensee shall retain title to such designs but shall permit PVH to use such designs in perpetuity. PVH may use and permit others to use said designs and other materials in any manner it desires, provided that such use does not conflict with any rights granted the Licensee hereunder. The Licensee specifically acknowledges that such designs and other materials may be used by PVH and other licensees on Licensed Products in jurisdictions outside the Territory and on products other than Licensed Products anywhere in the world. In addition to the foregoing, for marketing purposes, PVH shall, upon reasonable request, update the Licensee on PVH's advertising and media activities for the Trademark and make available to the Licensee such of the following which are available to PVH: (i) reports on marketing policy of PVH; (ii) reports on color, style and fabric trends; (iii) samples of advertising materials; (iv) display ideas; and (v) Labels.

      6.9    <u>Know-how</u>. The Licensee shall have the right to cause its personnel to visit PVH's offices, factories, showrooms and other places of business, and also to attend PVH's sales meetings, in order to obtain additional know-how and assistance, all as PVH deems appropriate. The scheduling of such visits shall be at times mutually convenient to the parties hereto. In connection with such visits, the Licensee shall bear all air-fare and subsistence expenses of the Licensee's representatives.

      6.10    <u>Design Direction</u>. The designs of the Licensed Products shall mirror the designs of PVH's products bearing the Trademark taking into consideration the market for the Products. PVH may submit samples to the Licensee of Products it deems to be core to the IZOD product line, and the Licensee shall develop Licensed Products substantially similar thereto and shall use its reasonable efforts to market same. PVH will regularly provide information to the Licensee on design direction for each season, and will make available to the Licensee, for its review at PVH's New York showrooms, such season's lines.

      6.11    <u>Meetings</u>. PVH may from time to time hold meetings of PVH's licensees. The Licensee shall, upon receipt of reasonable notice, attend such meetings at its own expense but shall not be required to attend more than two such meetings per year.

      6.12    <u>Market Weeks</u>. In the event PVH desires to market the Licensed Products in conjunction with its products bearing the Trademark, the Licensee shall, upon receipt of reasonable notice from PVH, have sales personnel present at PVH's showroom in New York during each major market week, and the Licensee shall be permitted to utilize such showrooms to market and sell the Licensed Products during such market week.

      6.13    <u>Design Rights</u>. The Licensee acknowledges and agrees that PVH owns or shall own all design rights, other than Excluded Designs, regardless of whether such designs were created by PVH or by or on behalf of the Licensee. The Licensee agrees to make, procure and execute all assignments necessary to vest ownership of design rights in PVH. The Licensee shall place appropriate notices, reflecting ownership of design rights by PVH, on all the Licensed Products, Labels and promotional materials. The Licensee shall not do or allow to be done anything which may adversely affect any of PVH's design rights. All designs used by the

Licensee for the Licensed Products shall be used exclusively for the Licensed Products and may not be used under any other trademark or private label, whether during the License Period or any time thereafter, without the prior written consent of PVH. The Licensee shall disclose and freely make available to PVH any and all developments or improvements it may make relating to the Licensed Products and to their manufacture, promotion and sales, including, without limitation, developments and improvements in any machine, process or product design, that may be disclosed or suggested by PVH or regarding any patent or trademark which the Licensee is entitled to utilize.

   6.14 Confidentiality. The Licensee acknowledges that it may receive from PVH prints, designs, ideas, sketches, and other materials or information, including a formula, pattern, compilation, program, device, method, technique, or process, that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use (collectively, the "Trade Secrets") which PVH intends to use on or in connection with lines of merchandise other than the Licensed Products and which have not as yet found their way into the channels of distribution. The parties recognize that these materials are valuable property of PVH. The Licensee acknowledges the need to preserve the confidentiality and secrecy of these materials and agrees to take all necessary steps to ensure that use by it, or by its contractors, will in all respects preserve such confidentiality and secrecy. The Licensee shall take all reasonable precautions to protect the secrecy of the materials, samples, and designs described in this Article VI prior to their commercial distribution or the showing of samples for sale, and shall not sell any merchandise employing or adapted from any of said designs except under the Trademark. PVH shall take all reasonable precautions to keep confidential the original designs created by the Licensee for Licensed Products prior to their advertisement, commercial distribution or the showing of samples for sale. The Licensee shall not, at any time during the License Period or any time thereafter, disclose or use for any purpose, other than as contemplated by this Agreement, any confidential information and data relating to the business of PVH.

   6.15 Shops, Stores, Retail Outlets. Subject to Section 6.16, the Licensed Products sold by the Licensee may be sold only to those specialty shops, department store and retail outlets which carry high quality and prestige merchandise and whose operations are consistent with PVH's reputation and its sales policies and with the prestige of the Trademark and only to those customers expressly approved by PVH, including, without limitation, the customers listed on Schedule 6.15. Whenever the Licensee shall wish to sell Licensed Products to customers not previously approved by PVH, the Licensee shall submit a written list of the proposed customers to PVH for PVH's prior written approval. The proposed customers approved from such list together with the customers listed on Schedule 6.15, are referred to as the "Approved Accounts." PVH may subject sales to any customer, including, without limitation, any customer listed on Schedule 6.15, to any conditions or limitations PVH considers appropriate; provided, however, that in order to be effective, any such conditions or limitations must be set forth in a writing provided to the Licensee. PVH shall have the right to withdraw its approval of any Approved Account, including, without limitation, any customer listed on Schedule 6.15, on written notice to the Licensee; provided, however, that the Licensee may fulfill any firm orders entered into prior to the Licensee's receipt of PVH's withdrawal of approval. The Licensee shall not (i) market or promote or seek customers for the Licensed Products outside of the Territory; (ii) maintain any Inventory outside of the Territory, except in

connection with the manufacture of Licensed Products outside of the Territory in accordance with the terms hereof pending shipment to the Licensee or its approved customers; (iii) sell or distribute any Licensed Products to wholesalers, jobbers, diverters, or any other entity which does not operate retail stores exclusively; (iv) sell the Licensed Products directly to the public in retail stores or via E-Commerce, except as approved by PVH; (v) use the Licensed Products as giveaways, prizes or premiums, except for promotional programs which have received the prior written approval of PVH; (vi) sell the Licensed Products to any third party or Affiliate of the Licensee or any of its directors, officers, employees or any person having an equity participation in or any other affiliation to the Licensee, without the prior written approval of PVH, or (vii) sell Licensed Products to any third party that intends to resell the Licensed Products (a) outside of the Territory or (b) via E-Commerce.

6.16    Disposal of Seconds and Close-Outs.  Seconds and Close-Outs sold by the Licensee may be sold only to Approved Accounts and Approved Seconds and Close-Outs Accounts.  Whenever the Licensee shall wish to sell Seconds and Close-Outs to customers not previously approved by PVH, the Licensee shall submit to PVH a written list of the proposed customers for Seconds and Close-Outs for PVH's prior written approval.  The proposed customers approved from such list are referred to as the "Approved Seconds and Close-Outs Accounts."  PVH may subject sales to any customer, including, without limitation, any customer listed on Schedule 6.16, to any conditions or limitations PVH considers appropriate; provided, however, that in order to be effective, any such conditions or limitations must be set forth in a writing provided to the Licensee.  PVH shall have the right to withdraw its approval of any Approved Seconds and Close-Outs Accounts, including, without limitation, any customer listed on Schedule 6.16, on written notice to the Licensee; provided, however, that the Licensee may fulfill any firm orders entered into prior to the Licensee's receipt of PVH's withdrawal of approval.

6.16.1    Seconds.  The Licensee shall only sell Licensed Products which are damaged, imperfect, non-first quality or defective goods ("Seconds") in a way which shall not reduce the value of the Trademark or detract from its reputation and shall obtain the express prior written consent of PVH with respect to the terms and method of their disposal.  All Seconds approved for sale by PVH shall be clearly marked "Seconds" or "Irregular."  The percentage of Seconds of any of the Licensed Products which may be disposed of pursuant to this Section 6.16.1 shall not, in any event in any Annual Period, exceed 10% of the total number of units of Licensed Products distributed or sold by the Licensee in such Annual Period.

6.16.2    Close-Outs.  All first quality Licensed Products which cannot reasonably be sold to regular customers at substantially full line price ("Close-Outs") shall be sold only with PVH's prior written approval, which PVH may withhold in its sole discretion, upon such terms and conditions as the Licensee, in its reasonable discretion, determines appropriate and shall not be sold to any person which the Licensee knows, or has reason to know, will export such Close-Outs from the Territory.  The percentage of Close-Outs of any of the Licensed Products which may be disposed of pursuant to this Section 6.16.2 shall not, in any event in any Annual Period, exceed 15% of the total number of units of Licensed Products distributed or sold by the Licensee in such Annual Period.

6.17    <u>Standards of Conduct</u>.

6.17.1 <u>Standards</u>. The Licensee acknowledges that it has received copies of, read and understands PVH's publication "A Shared Commitment - Requirements for Suppliers, Contractors, Business Partners" and PVH's "Statement of Corporate Responsibility." The Licensee shall conduct its business in compliance with the moral, ethical and legal standards set forth in such publications, as the same may from time to time be revised by PVH upon reasonable prior notice to the Licensee (the "<u>Standards</u>"), and shall cause all manufacturers, contractors and suppliers which manufacture Licensed Products or from whom the Licensee obtains Licensed Products or materials for the manufacture of Licensed Products to abide by the Standards.

6.17.2 <u>Audit Requirement</u>. Prior to producing Licensed Products in a facility (whether directly produced or produced by or through a contractor, subcontractor or supplier) the Licensee will arrange to have the facility audited for compliance with the Standards unless PVH notifies the Licensee in writing that it already has a current audit with respect to such facility that evidences compliance with the Standards. Audits on each facility used must thereafter be conducted no less often than annually. Each audit shall be conducted by a suitable third party inspection service designated by the Licensee and approved by PVH and shall be conducted using the evaluation form attached hereto as <u>Exhibit F</u> or a substantively similar form reasonably acceptable to PVH. The Licensee shall identify to PVH in writing each facility in which it is proposed that any Licensed Product (or part thereof) be produced or which is to be re-audited and PVH shall notify the Licensee within 30 days of PVH's receipt of the notice if PVH has currently approved the facility for production and when re-audit is required. If a facility is currently approved for production, the Licensee shall have no obligation to arrange for a current audit of the facility. The facilities listed on <u>Schedule 6.17</u> have effective audits through the dates set forth thereon. All audits shall be conducted at the Licensee's sole expense.

6.17.3 <u>Approval</u>. The Licensee shall review all audit reports for completeness and accuracy. If the Licensee is reasonably satisfied with the completeness and accuracy of an audit report, it shall provide a copy or a reasonably detailed written summary thereof to PVH. PVH shall have 30 days from its receipt of an audit report or written summary thereof to notify the Licensee of its disapproval of any facility that the Licensee represents to PVH as satisfying the Standards. If PVH does not give notice to the Licensee within such 30-day period, the facility shall be deemed approved by PVH. PVH shall set forth in its notice of disapproval its reason(s) for disapproval in reasonable detail.

6.17.4 <u>Use of Facility</u>. Unless and until the Licensee delivers to PVH an audit report for a facility or written summary thereof that evidences compliance with the Standards and PVH approves thereof, the facility shall not be used for the production of Licensed Products. If the Licensee uses a facility that has not been approved in accordance herewith, fails timely to submit to PVH the audit report or a written summary thereof when a re-audit of a facility is required in accordance with the terms hereof or if the Licensee or any of its manufacturers, contractors or suppliers with respect to Licensed Products shall, in PVH's sole determination, fail to abide by the Standards, PVH's sole remedy with respect to such breach of this Section 6.17, to the extent that PVH is not otherwise damaged as a result of such breach,

15

shall be to terminate the License and all of the other rights granted to the Licensee under this Agreement. Nothing in this Section 6.17 shall be deemed to confer third-party beneficiary rights upon any person, corporation, partnership or other entity.

## ARTICLE VII. THE TRADEMARK

### 7.1    Rights to the Trademark.

7.1.1    Ownership of the Trademark.  PVH represents that it is the sole and exclusive owner in the Territory of the trademark applications and registrations set forth on Exhibit A and all combinations, forms and derivatives thereof which may hereafter be approved by PVH for use by the Licensee hereunder (the "Trademark").  The Licensee acknowledges that (i) the Licensee's rights to use the Trademark shall be governed exclusively by this Agreement and (ii) all use of the Trademark by the Licensee shall inure solely to the benefit of PVH.  The Licensee further acknowledges the great value of the goodwill associated with the Trademark and that the Trademark and all the rights therein, and goodwill attached thereto, belong exclusively to PVH.

7.1.2    No Adverse Actions.  The Licensee shall not, at any time, do, or otherwise suffer to be done, any act or thing which may at any time, in any way, adversely affect any rights of PVH in and to the Trademark or any registrations thereof or which, directly or indirectly, may reduce the value of the Trademark or detract from its reputation.  The Licensee shall not file or prosecute a trademark or service mark application or applications to register the Trademark or any trademark, name or other mark confusingly similar thereto in respect of the Products or any other goods or services in the Territory or elsewhere.  The Licensee shall not, during the License Period or thereafter, (i) attack PVH's title or right in and to the Trademark in any jurisdiction or attack the validity of the License or the Trademark or (ii) contest the fact that the Licensee's rights under this Agreement (a) are solely those of a manufacturer and distributor and (b) subject to the provisions of Section 8.5, cease upon termination of the License Period.

7.1.3    Additional Registrations.  The Licensee acknowledges and agrees that PVH, as the sole and exclusive owner of the Trademark, has the exclusive right to apply for registrations and to extend existing registrations of the Trademark for all categories of goods, including, without limitation, the Products.  The Licensee agrees that it shall promptly notify PVH of the Licensee's first use of the Trademark on Products in any jurisdiction in the Territory.  The Licensee agrees to cooperate with PVH in the preparation, filing and prosecution of applications for registration, or extensions of existing registrations, or other documentation relative to the Trademark.  During the License Period, the Licensee may also request (but not require) that PVH register the Trademark for Products in additional jurisdictions in the Territory or extend existing registrations.  All costs and fees (including attorneys' fees) incurred in connection with any such registration or extension shall be paid as PVH and the Licensee shall agree at that time.

7.1.4    Survival.  The provisions of this Section 7.1 shall survive the termination of the License Period and this Agreement.

16

7.2    Protecting the Trademark. The Licensee shall cooperate fully and in good faith with PVH for the purpose of securing, preserving and protecting PVH's rights in and to the Trademark and any secondary trademark that the Licensee may develop and use with the approval of PVH. At the request of PVH, and at PVH's expense, the Licensee shall execute and deliver to PVH any and all documents and do all other acts and things which PVH deems necessary or appropriate to make fully effective or to implement the provisions of this Agreement relating to the ownership or registration of the Trademark.

7.3    Use of the Trademark.

7.3.1    Compliance with Legal Requirements. The Licensee will use the Trademark in the Territory strictly in compliance with the legal requirements therein. The Licensee shall duly display all other notices with respect to the Trademark, on the Licensed Products and otherwise, as are or may be required by the trademark laws and regulations applicable within the Territory. Upon expiration or termination of the License for any reason whatsoever, the Licensee will execute and deliver to PVH any and all documents required by PVH terminating any and all trademark registrations and other documents regarding the Trademark.

7.3.2    Registration. Notwithstanding anything herein to the contrary, the Licensee acknowledges that PVH does not have, and does not represent, that it has active registrations of the Trademark in the Territory for all of the Products. PVH shall bear the cost and expense of filing and prosecuting such applications and the Licensee agrees to cooperate with PVH, to the extent reasonably requested, in the application process. PVH shall use all commercially reasonable efforts to obtain such registrations but makes no representations regarding the same and retains the right to withdraw or abandon any such application, in its reasonable discretion. If the Trademark cannot be registered in the Territory for a Product for whatever reason, PVH shall give notice thereof to the Licensee and the Licensee shall thereupon cease further use of the Trademark in the Territory with respect to such Product. Except as otherwise provided in Section 9.3, PVH shall have no liability to the Licensee for the Licensee's use or inability to use the Trademark in the Territory for all Products. The inability of the Licensee to use the Trademark in the Territory on all Products shall not otherwise affect the Licensee's rights, obligations or liabilities hereunder.

7.4    Ownership of Copyright. Any copyright which may be created in any sketch, design, print, Label or the like designed or approved or used with the Trademark by the Licensee will be the property of PVH, other than Excluded Designs. The Licensee will not, at any time, do, or otherwise suffer to be done, any act or thing which may adversely affect any rights of PVH in such sketches, designs, prints, Labels and the like and will, at PVH's request, do all things reasonably required by PVH to preserve and protect said rights.

7.5    Notice of Infringement. The Licensee shall promptly notify PVH in writing of any infringement or imitation of the Trademark or the use by any person of any trademarks or tradenames confusingly similar to the Trademark which come to the attention of the Licensee. PVH will thereupon take such action as it deems advisable for the protection of the Trademark and its rights therein, and the Licensee shall assist PVH in the prosecution of any such suit, as PVH may reasonably request, at PVH's expense. In no event, however, will PVH

17

be required to take any action if it deems it inadvisable to do so, and the Licensee will have no right to take any action with respect to the Trademark without the prior written consent of PVH. In the event a third party infringes the use of the Trademark in the Territory on items similar to the Licensed Products, PVH shall take all advisable and necessary measures to protect the Trademark and the Licensee agrees that, at PVH's request, it will pay the costs incurred therefor, including judicial expenses and legal fees.

      7.6    Trademark Security.

      7.6.1  Counterfeit Protection. The Licensee shall use its best efforts to prevent counterfeiting. All Licensed Products shall bear and use any reasonable counterfeit preventive system, devices or labels designated by PVH.

      7.6.2  Trademark Security Plan. The Licensee shall prepare and implement a trademark security plan (a "Trademark Security Plan") if requested by PVH at any time during the License Period. The implementation of any such plan shall be subject to the prior written approval thereof by PVH. Not later than 90 days after PVH makes such request and, thereafter, at the same time the Licensee submits the Licensing Forecast to PVH, the Licensee shall submit a Trademark Security Plan to PVH. Each Trademark Security Plan (if any) shall describe the methods of controlling the purchase, storage, requisition from storage, use and shipment of Labels to safeguard against the escape or unauthorized use of the Trademark or Licensed Products. Each Trademark Security Plan (if any) shall include, but not be limited to, (i) maintaining necessary records to account for and reconcile all flows of Labels and (ii) providing for an annual audit by the Licensee of such flows and use, for each manufacturing facility in which Labels are affixed to Licensed Products. Within 30 days after completion of such audit, the Licensee shall provide PVH with a detailed copy of the audit report. In the event that a manufacturing facility cannot regularly account for and reconcile substantially all of the Labels or Licensed Products, the Licensee shall discontinue placing orders with such facility.

      7.7    Use of Trademark on Invoices, etc. The use of the Trademark by the Licensee on invoices, order forms, stationery and related materials in advertising in telephone or other directory listings is permitted only upon PVH's prior written approval of the format in which the Trademark is to be so used, the juxtaposition of the Trademark with other words and phrases, and the content of the copy.

      7.8    Monitoring. The Licensee shall use reasonable efforts to monitor the use of the Trademark by the Licensee's customers and to require its customers to advertise, display and promote the Trademark in a manner consistent with the terms and conditions of this Agreement.

## ARTICLE VIII.  TERM AND TERMINATION

      8.1    Expiration. The License and, subject to Section 8.5, the other rights granted to the Licensee hereunder shall terminate at the end of the License Period.

8.2     Other Rights Unaffected. It is understood and agreed that termination of the License or other rights granted to the Licensee hereunder by PVH on any ground shall be without prejudice to any other rights or remedies which PVH may have.

8.3     Immediate Right of Termination of the License. If any of the following grounds for termination shall occur, PVH may elect, by written notice to the Licensee, to terminate immediately the License and other rights granted to the Licensee hereunder:

(a)     Failure by the Licensee to perform or observe the agreement contained in Section 3.2;

(b)     Failure by the Licensee to perform or observe in any material respect any term or covenant or agreement contained in Sections 5.4, 6.1, 6.2, 6.14 or 11.4;

(c)     Underpayment of royalties of 5% or more by the Licensee with respect to any calendar quarter or Annual Period as determined pursuant to Section 4.3;

(d)     The Licensee institutes for its protection, or is made a defendant, in any proceeding under bankruptcy, insolvency, reorganization or receivership law, or the Licensee is placed in receivership or makes an assignment for benefit of creditors or is, or states that it is, unable to meet its debts in the regular course of business;

(e)     The Licensee shall use the Trademark in an unauthorized or improper manner;

(f)     Cessation by the Licensee of, or the taking of steps by the Licensee to cease, its business;

(g)     The Licensee shall sell, transfer, lease, pledge, encumber, sublease or assign, by operation of law or otherwise (collectively, a "Transfer"), (i) all or substantially all the assets of the Licensee, or (ii) 50% or more, in the aggregate, of the ownership interests in the Licensee directly or indirectly to a direct competitor of PVH;

(h)     Entry of a final judgment against the Licensee, or the occurrence of any other event, which individually or in the aggregate, is reasonably likely to have a materially adverse effect on the business condition (financial or otherwise), operations, performance, properties or prospects of the Licensee or its ability to perform its obligations under this Agreement; or

(i)     The guaranties referred to in Section 11.17 shall for any reason be revoked, rescinded or determined to be unenforceable.

8.4     Termination With Notice and Right to Cure. In the event of the failure by the Licensee to perform or observe any term or covenant or agreement contained in this Agreement, other than those specified in Section 8.3, PVH may terminate the License and the other rights granted to the Licensee under this Agreement by giving notice of termination to the Licensee (a "Notice of Termination"), which termination shall become effective automatically

19

unless the Licensee completely cures the breach within 15 days of the giving of the Notice of Termination, unless such cure cannot be completed within 15 days, in which case termination will not become effective so long as the Licensee is in good faith diligently and expeditiously attempting to cure such breach. If the Notice of Termination relates to royalties or to product quality, pending cure, the Licensee shall ship no Licensed Products; if the Licensee does ship, it shall automatically forfeit its right to cure and the License shall be terminated. Upon the giving of a Notice of Termination for the second time, for any reason, the Licensee shall no longer have the right to cure any violation, and termination shall be effective upon the giving of the Notice.

      8.5    Effect of Termination. On the expiration or termination of the License and the License Period for any reason whatsoever, all of the rights of the Licensee under this Agreement shall forthwith terminate and immediately revert to PVH; all royalties on sales theretofore made shall become immediately due and payable; the Licensee shall forthwith discontinue all use of the Trademark, except that the Licensee may during the period (i) commencing on the date of the expiration of the License Period pursuant to Section 2.1 or 2.2 or termination of the License because of the breach of Section 3.2 and ending six-months thereafter or (ii) commencing on the date of the termination of the License pursuant to clause (b), (c) or (d) of Section 8.3 and ending 90 days thereafter (each, the "Disposal Period"), consummate all sales of Licensed Products which were firm on the date of such expiration or termination and sell the balance of the Inventory not purchased by PVH as provided in Section 8.6; provided, however, that any advertising used during the Disposal Period shall be subject to PVH's prior written approval and such disposition of the Licensed Products shall continue to be subject to the Licensee's obligations hereunder, including, but not limited to, payments to be made to PVH, and royalties with respect thereto shall be due on the last day of the Disposal Period. Subsequent to the Disposal Period, or if none, subsequent to such termination, the Licensee shall no longer use the Trademark, any variation, imitation or simulation thereof, or any trademark similar thereto; the Licensee will promptly transfer to PVH, free of charge, all registrations, filings and rights with regard to the Trademark which it may have possessed at any time; and the Licensee shall thereupon deliver to PVH, free of charge, all sketches, designs, colors and the like in its possession or control, designed or approved by PVH, and all Labels supplied by PVH in the Licensee's possession or control. PVH shall have the option, exercisable upon notice to the Licensee within 30 days of such expiration or termination, to negotiate the purchase of Labels which have not been supplied by PVH. If such negotiations do not result in the purchase of such Labels, the Licensee shall destroy the unused Labels at the end of the Disposal Period, or if none, upon such termination, under the supervision of PVH, and the Licensee shall supply to PVH a certificate of destruction thereof signed by a duly authorized officer of the Licensee.

      8.6    Inventory Upon Termination. Upon the expiration or termination of the License and the License Period for any reason whatsoever, the Licensee shall immediately deliver to PVH a complete and accurate schedule of Inventory of Licensed Products as of the close of business on the date of such expiration or termination (the "Inventory Schedule"). PVH thereupon shall have the option, exercisable by written notice to the Licensee within 15 days after its receipt of the Inventory Schedule, to purchase any or all of the Inventory (other than Inventory required to consummate sales of Licensed Products which were firm on the date of such expiration or termination) for an amount equal to the wholesale price of the Inventory less 40%. Percentage Royalties shall not be payable with respect to the purchase of the Inventory by PVH. In the event such notice is sent by PVH, PVH may collect the Inventory referred to therein

within 90 days after PVH's notice. PVH will pay for the Inventory upon collection. In the event such notice is not sent, the Licensee may dispose of the Licensed Products during any Disposal Period pursuant to Section 8.5; provided, however, that such disposition shall continue to be subject to the Licensee's obligations hereunder, including, without limitation, with respect to the payment of royalties and the approval of customers and advertising. At the end of the Disposal Period, or if none, upon such termination, any Licensed Products remaining in the Licensee's possession or control, including, without limitation, in any stores of the Licensee, shall, at the request of PVH, be destroyed. To the extent the Licensee completely removes the Trademark from the Licensed Products, and all Labels attached to such Licensed Products, and such Licensed Products are not distinguished from similar generic products generally available in the marketplace, such Products shall no longer be Licensed Products. PVH shall have the right at any time to conduct a physical inventory of the Licensed Products then in the Licensee's possession or control.

      8.7    <u>Freedom to License</u>. In the event of termination of the License or the receipt by PVH of a notice from the Licensee requesting the termination of the License, PVH shall be free to license to others the use of the Trademark in connection with the manufacture, sale, distribution and promotion of Licensed Products in the Territory.

      8.8    <u>Rights Personal</u>. The License and rights granted hereunder are personal to the Licensee. No assignee for the benefit of creditors, receiver, trustee in bankruptcy, sheriff or any other officer or court charged with taking over custody of the Licensee's assets or business, shall have any right to continue performance of this Agreement or to exploit or in any way use the Trademark if this Agreement is terminated pursuant to Sections 8.3, 8.4 or 11.7, except as may be required by law.

      8.9    <u>Trustee in Bankruptcy</u>. Notwithstanding the provisions of Section 8.8, in the event that, pursuant to the applicable bankruptcy law (the "<u>Code</u>"), a trustee in bankruptcy, receiver or other comparable person, of the Licensee, or the Licensee, as debtor, is permitted to assume this Agreement and does so and, thereafter, desires to assign this Agreement to a third party, which assignment satisfies the requirements of the Code, the trustee or the Licensee, as the case may be, shall notify PVH of same in writing. Said notice shall set forth the name and address of the proposed assignee, the proposed consideration for the assignment and all other relevant details thereof. The giving of such notice shall be deemed to constitute an offer to PVH to have this Agreement assigned to it or its designee for such consideration, or its equivalent in money, and upon such terms as are specified in the notice. The aforesaid offer may be accepted by PVH only by written notice given to the trustee or the Licensee, as the case may be, within 15 days after PVH's receipt of the notice to such party. If PVH fails to deliver such notice within said 15 days, such party may complete the assignment referred to in its notice, but only if such assignment is to the entity named in said notice and for the consideration and upon the terms specified therein. Nothing contained herein shall be deemed to preclude or impair any rights which PVH may have as a creditor in any bankruptcy proceeding.

## ARTICLE IX.  INDEMNIFICATION AND INSURANCE

9.1    <u>Indemnification by the Licensee</u>.  The Licensee does hereby indemnify and hold harmless PVH and its subsidiaries and affiliates and its and their respective directors, officers, employees, agents and representatives (each, an "<u>Indemnified Party</u>") from and against any and all losses, liabilities, damages and expenses (including reasonable attorneys' fees and expenses (including allocable costs of in-house counsel)), whether incurred in any action or proceeding between the parties hereto, or otherwise, which an Indemnified Party may incur or be obligated to pay in any action, claim or proceeding, for or by reason of any acts, whether of omission or commission, that may be committed or suffered by the Licensee or any of their servants, agents or employees in connection with the Licensee's performance of this Agreement, including but not limited to:

(a)    any alleged defect in any Licensed Product, regardless of whether the action is based upon negligence or strict liability, and regardless of whether the alleged negligence is characterized as "passive" or "active";

(b)    the manufacture, labelling, sale, distribution or advertisement of any Licensed Product by the Licensee;

(c)    any violation of any warranty, representation or agreement made by the Licensee pertaining to a Licensed Product; or

(d)    the claim of any broker, finder or agent in connection with the making of this Agreement or any transactions contemplated by this Agreement.

The provisions of this Section and the Licensee's obligations hereunder shall survive any termination of the License or recision of this Agreement.

9.2    <u>Notice of Suit or Claim</u>.  The Licensee shall promptly inform PVH by written notice of any suit or claim against the Licensee relating to the Licensee's performance under this Agreement, whether such suit or claim is for personal injury, involves alleged defects in the Licensed Products manufactured, sold or distributed hereunder, or otherwise.

9.3    <u>Indemnification by PVH</u>.  PVH does hereby indemnify and hold harmless the Licensee and its subsidiaries and affiliates and its and their respective directors, officers, employees, agents and representatives from and against any and all losses, liabilities, damages and expenses (including reasonable attorneys' fees, costs and expenses) which the Licensee may incur or be obligated to pay in any action or claim against the Licensee for infringement of any other person's claimed right to use a trademark in the Territory, but only where such action or claim results from the Licensee's use of the Trademark in the Territory in accordance with the terms of this Agreement.  The Licensee shall give PVH prompt written notice of any such claim or action and thereupon PVH shall undertake and conduct the defense of any suit so brought.  If, however, there is a dispute between PVH and the Licensee as to whether the suit was brought as a result of the Licensee's failure to use the Trademark in accordance with the terms of this Agreement, the Licensee may be required to conduct such defense unless and until it is determined that no such misuse of the Trademark occurred.  If it is determined that no such

22

misuse of the Trademark occurred, PVH shall reimburse the Licensee all reasonable fees, costs and expenses incurred by the Licensee in defending the suit. In the event an appropriate action is not taken by PVH within 30 days of its receipt of notice from the Licensee, the Licensee shall have the right to defend such claim or action in its own name, but no settlement or compromise of any such claim or action may be made without the prior written approval of PVH. In either case, PVH and the Licensee shall keep each other fully advised of all developments and shall cooperate fully with each other and in all respects in connection with any such defense. Such indemnification shall be deemed to apply solely to the amount of the judgment, if any, against the Licensee, and sums paid by the Licensee in connection with its defense, and shall not apply to any consequential damages suffered by the Licensee which are not included in the aforementioned judgment. Such indemnification shall not apply to any damages sustained by the Licensee by reason of such claimed infringement other than those specified above.

       9.4    Insurance.

       9.4.1   Requirement. Without limiting the Licensee's liability pursuant to the indemnity provisions of this Agreement, the Licensee shall maintain comprehensive general liability insurance in the amount of at least $1,000,000 (combined single limit per occurrence) with a broad form property damage liability endorsement, and a $5,000,000 umbrella insurance policy. This insurance shall include broad form blanket contractual liability, personal injury liability, advertising liability, products and completed operations liability. Each coverage shall be written on an "occurrence" form.

       9.4.2   Theft and Destruction Coverage. The Licensee shall purchase insurance against theft and destruction of the Licensed Products which shall (i) be written on an "all risk" basis, including, without limitation, employee dishonesty, flood and earthquake coverage; (ii) provide that the Licensee shall be reimbursed for loss in an amount equal to the manufacturer's selling price for the Products (either by a selling price endorsement or business interruption insurance); (iii) provide that PVH is added as a loss payee to the extent of any royalties and other fees due to PVH hereunder with respect to any loss to Licensed Products; (iv) be in effect while goods are on premises owned, rented or controlled by the Licensee and while in transit or storage; and (v) include a brand and label clause stating that the insurer will pay the cost of removing PVH's name from damaged merchandise and relabeling goods. PVH shall be the sole judge as to whether any Licensed Products or Labels are damaged such as to require the removal of any Labels or the re-Labeling of any Licensed Products, in its reasonable discretion.

       9.4.3   General Provision. The insurance described in Section 9.4.1 shall include: (i) a cross-liability endorsement; (ii) an endorsement stating that PVH shall receive at least 30 days' written notice prior to cancellation or non-renewal of coverage; (iii) an endorsement naming PVH as an additional insured; (iv) an endorsement stating that the insurance required by this Agreement is primary and that any insurance purchased by PVH shall only apply in excess of the insurance purchased by the Licensee; (v) a waiver of subrogation in favor of PVH; and (vi) an endorsement stating that PVH may recover for any loss caused PVH, its agents or employees, whether caused by the negligence (including active, passive and gross negligence) of the Licensee, or otherwise.

9.4.4    Approved Carrier/Policy Changes.  All insurance shall be obtained from an insurance company approved by PVH.  The Licensee shall give at least 30 days' prior written notice to PVH of the cancellation or any modification of such insurance policy that would affect PVH's status or benefits thereunder.  This insurance may be obtained for PVH by the Licensee in conjunction with a policy which covers products other than the Licensed Products.

9.4.5    Evidence of Coverage.  No later than 20 days from the date hereof, the Licensee shall furnish to PVH evidence, in form and substance satisfactory to PVH, of the maintenance and renewal of the required insurance, including, but not limited to, copies of policies with applicable riders and endorsements, and certificates of insurance.

9.4.6    Territory.  The insurance set forth in this Section must cover the entire Territory.

## ARTICLE X.  COMPLIANCE WITH LAWS

10.1    Compliance with Laws.  The Licensee shall comply with all laws, rules, regulations and requirements of any governmental body which may be applicable to the operations of the Licensee contemplated hereby, including, without limitation, as they relate to the manufacture, distribution, sale or promotion of Licensed Products, notwithstanding the fact that PVH may have approved such item or conduct.

10.2    Equitable Relief.  PVH shall be entitled to equitable relief by way of temporary and permanent injunction and such other and further relief as any court with jurisdiction may deem just and proper.

## ARTICLE XI.  MISCELLANEOUS

11.1    Warranties and Representations of the Parties.  Each of the parties hereby represents and warrants to the other party that:  it is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation; it has the full right, power and authority to enter into, and perform its obligations under, this Agreement; and all necessary corporate acts have been effected by it to render this Agreement valid and binding upon it.

11.2    Definitions.  Each of the following terms has the meaning ascribed thereto in the Section indicated below next to such term:

| Defined Term | Section Defined In | Defined Term | Section Defined In |
|---|---|---|---|
| Advertising Obligation | 5.1.2 | Account List | |
| Affiliates | 4.1 | Close-Outs | 6.16.2 |
| Annual Period | 3.1 | Code | 8.9 |
| Approved Account List | 6.15 | Disposal Period | 8.5 |
| Approved Seconds and Close-Outs | 6.16 | Excluded Design | 6.8 |

24

| | | | |
|---|---|---|---|
| Gross Sales | 4.1.2 | Notice of Termination | 8.4 |
| Guaranteed Minimum Royalties | 4.1.3 | Percentage Royalties | 4.1.1 |
| Indemnified Party | 9.1 | Products | Recital |
| Initial License Period | 2.1 | PVH | Preamble |
| Inventory | 4.2 | Renewal License Period | 2.2 |
| Inventory Schedule | 8.6 | Seconds | 6.16.1 |
| Labels | 1.1 | Standards | 6.17.1 |
| License | 1.1 | Territory | Recital |
| License Period | 2.2 | Third-Party Manufacturing Agreement | 6.5 |
| Licensed Products | Recital | Trademark | 7.1.1 |
| Licensee | Preamble | Trademark Security Plan | 7.6.2 |
| Licensing Forecast | 3.1 | Trade Secrets | 6.14 |
| Marketing Obligation | 5.2 | Transfer | 8.3(g) |
| Minimum Sales Levels | 3.2 | | |
| Net Sales | 4.1.2 | | |
| Non-Conforming Products | 6.3 | | |

11.3    Notices.  All reports, approvals and notices required or permitted to be given under this Agreement shall be in writing and shall, unless specifically provided otherwise in this Agreement, be deemed to have been given if personally delivered or if mailed (by certified or registered mail, return receipt requested and postage prepaid) or faxed as follows:

If to PVH, to:

Phillips-Van Heusen Corporation
200 Madison Avenue
New York, New York  10016
Attention:  Senior Vice President – Licensing
Telephone:  (212) 381-3628
Facsimile:  (212) 381-3959

If to the Licensee, to:

International Home Textiles, Inc.
19401 West Dixie Highway
Miami, Florida  33180
Attention:  Salo Grosfeld, President
Telephone:  (305) 933-7100
Facsimile:  (305) 932-4232

A party may change its address for receipt of notices at any time upon notice to the other party.

11.4    No Assignment Without Consent.  The License and all rights granted to the Licensee hereunder are personal in nature, and the Licensee shall not Transfer the License, this Agreement or its rights and interest hereunder, or any part hereof, without the prior written consent of PVH, which consent may be withheld by PVH in its sole and absolute discretion; provided, however, that if such Transfer is to an Affiliate of the Licensee, such consent shall not be unreasonably withheld.  Notwithstanding the foregoing, the Transfer by the Licensee to an Affiliate of the License, this Agreement or any of the Licensee's rights or interests hereunder, or any part thereof, shall not relieve the Licensee of any obligation hereunder.

11.5    Assignment by PVH.  PVH shall have a complete and unrestricted right to Transfer its rights and interests in this Agreement to any domestic or foreign corporation or other business entity, providing that such transferee agrees to be bound by all of the terms hereof and

25

is the holder of the Trademark in the Territory. PVH shall given written notice to the Licensee within 30 days of any such Transfer.

11.6    No Agency. The Licensee shall not represent itself as the agent or legal representative of PVH or its Affiliates for any purpose whatsoever and shall have no right to create or assume any obligation of any kind, express or implied, for or on behalf of them in any way whatsoever. PVH shall similarly not represent itself as the agent or legal representative of the Licensee or its Affiliates.

11.7    Suspension of Obligations. If the Licensee shall be prevented from performing any of its obligations because of governmental regulation or order, or by strike or war, declared or undeclared, or other calamities such as fire, earthquake, or similar acts of God, or because of other similar or dissimilar cause beyond the control of the Licensee, the Licensee's obligations shall be suspended during the period of such conditions. If such condition continues for a period of more than 60 days, PVH shall have the right to terminate this Agreement.

11.8    Benefit. This Agreement shall inure to the benefit of and be binding upon the parties hereto, and, subject to Sections 11.4 and 11.5, their successors and assigns.

11.9    Entire Agreement; Amendment. This Agreement, including the exhibits and schedule hereto, constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and all prior agreements, contracts, promises, representations and statements between them, if any, whether written or oral, with respect thereto are merged into this Agreement. This Agreement may not be amended or modified, except in a writing signed by both parties hereto.

11.10    Non-Waiver. The failure of either party to enforce at any time any term, provision or condition of this Agreement, or to exercise any right or option herein, shall in no way operate as a waiver thereof, nor shall any single or partial exercise preclude any other right or option herein; and no waiver whatsoever shall be valid unless in writing, signed by the waiving party, and only to the extent herein set forth.

11.11    Severability. In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect in any jurisdiction, the validity, legality and enforceability of such provisions shall not be affected or impaired in any other jurisdiction, nor shall the remaining provisions contained herein in any way be affected or impaired thereby, unless PVH determines such provision was material, in which case PVH may terminate this Agreement.

11.12    Headings. The headings of the Articles and Sections of this Agreement are for convenience only and in no way limit or affect the terms or conditions of this Agreement.

11.13    Counterparts. This Agreement may be executed in two counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument.

11.14    Governing Law. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN

26

ACCORDANCE WITH AND SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE.

      11.15 <u>Jurisdiction</u>. Any legal action or proceeding with respect to this Agreement shall be brought in the courts of the State of New York or of the United States of America located in the City of New York, and, by execution and delivery of this Agreement, each party hereby accepts for itself and in respect to its property, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts. The Licensee hereby irrevocably and unconditionally waives any claim for special, consequential or punitive damages and any objection, including, without limitation, any objection to the laying of venue or based on the grounds of *forum non conveniens*, which it may now or hereafter have to the bringing or maintaining of any such action or proceeding in such respective jurisdictions. Each party irrevocably and unconditionally consents to the service of process of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the other party at its address for notices provided in Section 11.3, such service to become effective 30 days after such mailing.

      11.16 <u>Non-Solicitation</u>. The Licensee agrees that during the License Period and for a period of two years following the termination or expiration thereof for any reason, the Licensee shall not hire or solicit to hire, whether on its own behalf or on behalf of any other person (other than PVH), any employee of PVH or any of its Affiliates or any person who had left the employ of PVH or any of its Affiliates within 12 months of the termination or expiration of the License Period. In addition, during the License Period and such two-year period thereafter, the Licensee shall not, directly or indirectly, encourage or induce any employee of PVH or any of its Affiliates to leave PVH's or such Affiliate's employ.

      11.17 <u>Guaranties</u>. The obligations of the Licensee hereunder, including, without limitation, the obligation to pay Percentage Royalties and Guaranteed Minimum Royalties shall be guaranteed jointly and severally by the shareholders of the Licensee pursuant to a personal guaranty in form and substance acceptable to PVH.

27

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

PHILLIPS-VAN HEUSEN CORPORATION

By: _____
Name: Mark D. Fischer
Title: Vice President

INTERNATIONAL HOME TEXTILES, INC.

By: _____
Name: Saul Grosfeld
Title: President

28

**SCHEDULE 6.15**

## APPROVED ACCOUNTS

**BED, BATH & BEYOND**

**BELK**

**DILLARDS**

**FEDERATED**
The Bon Marche
Burdine's
Macy's East
Macy's West
Rich's/Lazarus

**INDEPENDENTS**
Bealls
Bon Ton
Boscovs
Dayton-Hudson
Elder Beerman
Gottschalks
Marshall Fields
Stage Stores

**JCPENNEY**

**LINENS & THINGS**

**MAY CORPORATION**
Famous Barr
Filenes
Foleys
Hechts
Kaufmann's
Lord & Taylor
Meier & Frank
Robinsons/May

**SAKS, INC.**
Carons/Herberger's
Parisian
Proffitt's/McRae's
Younkers

**SCHEDULE 6.16**

**APPROVED SECONDS AND CLOSE-OUTS ACCOUNTS**

**TJX CORP.**
TJMaxx

**ROSS STORES**

**EXHIBIT A**

**LICENSED TRADEMARK**
**TRADEMARK REGISTRATIONS**
**IN U.S. PATENT AND TRADEMARK OFFICE**

| Trademark | Registration Number | Registration Date |
|-----------|---------------------|-------------------|
| IZOD | 2191113 | 09/22/98 |

## ROYALTY STATEMENT

FORM MUST BE SUBMITTED COMPLETED

## PHILLIPS-VAN HEUSEN CORPORATION

Page _____ of _____

Date _____

NAME OF LICENSEE:    INTERNATIONAL HOME TEXTILES, INC.

LICENSEE'S ADDRESS:    19401 West Dixie Highway
Miami, Florida  33180

LICENSED PRODUCT:    Bed and Bath

**(i)**    For each month during the period of _____ to _____ (the "Period").

For the month of _____.

| Category | Style No. | Size | Units | Gross Sales | Discounts | Net Sales | Percentage Royalties |
|----------|-----------|------|-------|-------------|-----------|-----------|----------------------|
|          |           |      |       |             |           |           |                      |

For the month of _____:

| Category | Style No. | Size | Units | Gross Sales | Discounts | Net Sales | Percentage Royalties |
|----------|-----------|------|-------|-------------|-----------|-----------|----------------------|
|          |           |      |       |             |           |           |                      |

For the month of _____:

| Category | Style No. | Size | Units | Gross Sales | Discounts | Net Sales | Percentage Royalties |
|----------|-----------|------|-------|-------------|-----------|-----------|----------------------|
|          |           |      |       |             |           |           |                      |

**TOTAL**

(ii)    NET SALES BY ACCOUNT


(iii)    INVENTORY AS OF THE END OF THE PERIOD:


**Style Number**          **Units**               **Wholesale Price**



    The undersigned, _____ the _____ of the Licensee, does hereby certify that the foregoing information provided to PVH pursuant to Section 4.2 of the License Agreement between PVH and the Licensee dated as of December __, 2001 is complete and accurate.

    IN WITNESS WHEREOF, the undersigned has executed this Royalty Statement on this ____ day of _____, _____.


INTERNATIONAL HOME TEXTILES, INC.


By: _____
         Name:
         Title:

2

**EXHIBIT C**

<u>**MARKETING STATEMENT**</u>

FORM MUST BE SUBMITTED COMPLETED

# PHILLIPS-VAN HEUSEN CORPORATION

Page ____ of _____

Date _____

NAME OF LICENSEE:   INTERNATIONAL HOME TEXTILES, INC.

LICENSEE'S ADDRESS:   19401 West Dixie Highway
Miami, Florida 33180

LICENSED PRODUCT:   Bed and Bath

EXPENDITURES REFLECT THE PERIOD ___/___/___ TO ___/___/___, ALL

TEARSHEETS AND ADVERTISING BILLS MUST ACCOMPANY THIS FORM

PUBLICATION OR TYPE OF ADVERTISING     DOLLAR AMOUNT LICENSEE SPENT

Submit to the attention of:

Phillips-Van Heusen Corporation
200 Madison Avenue
New York, NY  10016
Attention:  Senior Vice President - Licensing

**EXHIBIT D**

## STYLE APPROVAL FORM

<u>(ALL SAMPLES SUBMITTED FOR APPROVAL MUST BE IN CORRECT FABRIC)</u>

FORM MUST BE SUBMITTED COMPLETED

# PHILLIPS-VAN HEUSEN CORPORATION

Page _____ of _____

Date _____

NAME OF LICENSEE:    INTERNATIONAL HOME TEXTILES, INC.

LICENSEE'S ADDRESS:    19401 West Dixie Highway
Miami, Florida 33180

LICENSED PRODUCT:    Bed and Bath

SEASON(S)_____STYLE NUMBER _____FABRICATION

WHOLESALE PRICE_____COLORS _____

SIZES _____FACTORY _____

START TAKING ORDERS _____END TAKING ORDERS _____

START SHIP _____END SHIP _____

INTERNATIONAL HOME TEXTILES, INC.

By: _____
Name:
Title:

APPROVED _____ DISAPPROVED _____

COMMENTS _____

_____

PHILLIPS-VAN HEUSEN CORPORATION

By: _____    By: _____
Name:                           Name:
Title:                          Title: <u>Division Manager</u>

DATE RETURNED TO LICENSEE_____

Submit to the attention of:

Phillips-Van Heusen Corporation
200 Madison Avenue
New York, NY 10016
Attention: Senior Vice President - Licensing

**EXHIBIT E**

# THIRD-PARTY
# MANUFACTURING
# AGREEMENT

AGREEMENT, dated _____ __, ____, by and between International Home Textiles, Inc. (the "Licensee"), having an address at 19401 West Dixie Highway, Miami, Florida 33180, and _____ (the "Manufacturer"), having an address at _____.

## WITNESSETH:

WHEREAS, the Licensee pursuant to a License Agreement with Phillips-Van Heusen Corporation ("PVH") has been granted a license ("License") to use the IZOD trademark (the "Trademark") in connection with the distribution, sale and marketing of certain goods ("Licensed Products");

WHEREAS, PVH is the owner, licensee or sublicensee of the following trademarks: Van Heusen, Bass, IZOD, IZOD CLUB, Geoffrey Beene, Aigner, Arrow, Regis, Eagle, Milano Uomo, DKNY, FUBU and John Henry, which PVH licenses (or sublicenses) to its licensees (or sublicensees), and PVH's policy is not to place, and to cause its licensees (or sublicensees) not to place, orders with any manufacturer or subcontractor that breaches the provisions contained in this Agreement and similar provisions contained in other third-party manufacturing agreements;

WHEREAS, the License entitles the Licensee to subcontract the manufacture and/or assembly of the Licensed Products to third parties, subject to certain express limitations and conditions; and

WHEREAS, the Licensee has selected the Manufacturer as a manufacturer to produce the Licensed Products for the Licensee subject and pursuant to the terms and conditions set forth below;

NOW, THEREFORE, the parties hereby agree as follows:

1.     The Manufacturer shall have no rights in or to the Trademark or in any mark similar thereto by reason of its manufacture of the Licensed Products and shall only use the Trademark in strict accordance with the Licensee's instructions.

2.     The Manufacturer recognizes the validity of the Trademark and will take no action in derogation of PVH's entire right and interest in and to the Trademark. The Manufacturer will not oppose, petition to cancel or otherwise interfere with any registration PVH has now or may obtain in the future for the Trademark.

3.     The Manufacturer will manufacture and sell the Licensed Products and/or assemble the Licensed Products and will deliver them only to the Licensee or to the Licensee's authorized representatives or agents. Any and all Licensed Products produced by the Manufacturer which do not meet the Licensee's quality standards or result from overruns or

cancellations of the Licensee's orders (collectively, "Rejected Products") will be strictly accounted for and physically maintained, at the Manufacturer's sole expense, in the Manufacturer's warehouse or such other place as may be under the Manufacturer's exclusive access and control. [Rejected Products not bearing the Trademark or any identifying logo may be sold to any third party; provided; however, that all labels, hang tags, and other identifying marks must be removed from such Rejected Products before sale to such a third party. Rejected Products bearing the Trademark or any identifying logo may be sold to any third party; provided, however, that (A) such Rejected Products must be held for a minimum period of three months after the original ship date of the Licensee's purchase order, and (B) all labels must be cut and the Product clearly and significantly stamped "irregular" before sale to such a third party.]*

4.    The Manufacturer will follow the specifications and standards from time to time stipulated by the Licensee and will permit the Licensee and PVH to inspect the manufacturing processes and provide samples of the Licensed Products in order for the Licensee or PVH, as the case may be, to satisfy itself that the specifications and standards are being met.

5.    The Manufacturer acknowledges that the Licensee may provide it with certain prints, designs, ideas, sketches and other materials or trade secrets which may or will be used in connection with the Licensed Products and/or lines of merchandise other than the Licensed Products which have not been announced to the public or entered the stream of commerce. The Manufacturer recognizes that such materials are exclusive and valuable property of PVH and acknowledges the need to preserve the confidentiality and secrecy of such materials. The Manufacturer agrees to take all reasonable precautions to protect the secrecy of the materials, samples and designs prior to their commercial distribution or the showing of samples of same for sale. The Manufacturer will also take all reasonable precautions to protect the secrecy of the original designs created either by PVH or the Licensee for Licensed Products prior to their advertisement, commercial distribution or the showing of samples for sale. During the term of this Agreement, the Manufacturer will not disclose or use for any purpose not contemplated by this Agreement any confidential information or data that is proprietary to either PVH or the Licensee.

6.    The Manufacturer shall institute procedures to control the storage, requisition from storage and use all labels, packages and other materials bearing the Trademark to safeguard against the escape or unauthorized use of the Trademark or Licensed Products.

7.    The Manufacturer will adhere to the standards and guidelines set forth in PVH's publication "A Shared Commitment - Requirements for Suppliers, Contractors, Business Partners" and PVH's "Statement of Corporate Responsibility," copies of which the Manufacturer acknowledges it has received. The Manufacturer further acknowledges that it has read understands such publications. The Manufacturer will communicate immediately to the Licensee any departure from such standards and guidelines. The Manufacturer acknowledges that

---

*      Bracketed language should be deleted where agreement is with subcontractor.

2

compliance with such standards and guidelines is a prerequisite to a continuing relationship with the Licensee.

In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect in any jurisdiction, the validity, legality and enforceability of such provisions shall not be affected or impaired in any other jurisdiction, nor shall the remaining provisions contained herein in any way be affected or impaired thereby.

THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

INTERNATIONAL HOME TEXTILES, INC.

By: _____
    Name:
    Title:

MANUFACTURER:

By: _____
    Name:
    Title:

3

**EXHIBIT F**

## PRODUCTION FACILITY EVALUATION FORM

FORM MUST BE SUBMITTED COMPLETED

# PHILLIPS-VAN HEUSEN CORPORATION

Page _____ of _____

Date _____

NAME OF LICENSEE:          INTERNATIONAL HOME TEXTILES, INC.

LICENSEE'S ADDRESS:       19401 West Dixie Highway
                                          Miami, Florida  33180

LICENSED PRODUCT:        Bed and Bath

PRODUCTION FACILITY:

Name:_____

Name of President of Production Facility:_____

Address:_____

_____

Product:_____

Date Factory Evaluation Completed:_____

Signed:          _____
                      (Note: Must be corporate officer)


                      _____
                      (Print Name)

                                    Submit to the attention of:

                                    Phillips-Van Heusen Corporation.
                                    200 Madison Avenue
                                    New York, NY   10016
                                    Attention:  Senior Vice President - Licensing